**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JEFFERY LEE,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 10-0587-WS-M** |
| | ) |
| **KIM THOMAS, Commissioner,** | ) |
| **Alabama Department of Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

## ORDER

This matter comes before the Court on petitioner Jeffery Lee's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by Person in State Custody under Death Sentence (doc. 1). Both parties have submitted extensive filings setting forth their respective positions as to the 12 grounds and dozens of subgrounds for habeas relief identified in the Petition. That Petition is now ripe for consideration.

**I.     Background.**

**A.     *The Offense Conduct.***

On the morning of December 12, 1998, after an all-night binge of drinking alcohol, smoking marijuana and ingesting cocaine, Jeffery Lee went with his brother and cousin to Jimmy's Pawn Shop, just outside of Orrville, Alabama. The ostensible purpose of this outing was for Lee to purchase a ring for his girlfriend. Upon entering the shop, Lee perused the jewelry on display. He asked one of the employees, Helen King, about wedding rings, and told her that he did not have any money, but that he would come back when he got money from his grandmother. Lee then purchased a pint of liquor and left the premises. The three men drove up the street and parked the car, at which time Lee consumed the liquor and smoked a marijuana cigarette laced with cocaine.

Minutes later, they returned to Jimmy's Pawn Shop. This time, things were different. Lee walked into the shop and exclaimed, "What's up motherfucker?" Without warning, and before anyone in the store could react, he immediately raised a sawed-off shotgun and fired

repeatedly and without hesitation at the store's owner, Jimmy Ellis, and its two employees, King and Elaine Thompson.[1]  Lee then milled about the shop.  He approached the cash register and attempted to dislodge it, but was unsuccessful.  When Lee finally walked out of Jimmy's Pawn Shop, he left the murder weapon sitting on the store's counter.  He also left a trail of bloody carnage in his wake.  Ellis lay dead of multiple shotgun blasts, including a fatal shot to the chest. Thompson lay dead of a shotgun blast to the face at close range.  The third victim, King, was wounded, but still alive.  She lay on the floor and pretended to be dead until Lee left the store, at which time King got up, locked the front door, and called 911.  Lee returned and attempted to enter the store again (presumably to retrieve the shotgun); however, he could not do so because the door was locked.[2]  Lee was long gone from the crime scene by the time authorities arrived.

Lee and his two associates (who had been waiting outside during the killings) visited briefly with family members, then fled to Newnan, Georgia, where they rented a motel room. Later that day, Lee parted company with his brother and cousin.  Those individuals returned home to Alabama, while Lee remained holed up in the hotel.  Lee was apprehended by law enforcement officers at 4:30 a.m. on the morning of December 13, 1998, in Coweta County, Georgia, and signed a written confession shortly thereafter.[3]

**B.      Procedural History.**

Lee was charged in the Circuit Court of Dallas County, Alabama, with the murders of Jimmy Ellis and Elaine Thompson, as well as the attempted murder of Helen King.  The murder charges were capital in nature pursuant to Alabama Code §§ 13A-5-40(a)(2) and (10), inasmuch as Lee was charged to have committed those offenses during a robbery or attempted robbery, and

---

[1]      The trial judge later characterized Lee's conduct in the pawnshop as follows: "As shown vividly by the surveillance video he opened fire upon entering the door.  He emptied his weapon, firing as quickly as he could, shot after shot."  (Vol. 22, R-74 at 6.)

[2]      The events inside the store were preserved for trial not only by King's eyewitness testimony, but also by a surveillance video system, which recorded the images (though no audio) of what transpired.  Additionally, Lee confessed to the shootings, although he maintained that he had fired the first shot accidentally.

[3]      Although it does not appear relevant to the analysis of any issue raised in this § 2254 Petition, for the sake of completeness the Court notes that Lee is African-American, and that all three of his victims were white.

to have murdered two or more persons by one act or pursuant to a single scheme or course of conduct. Local attorneys Michael Jackson and Joseph Hagood were appointed to represent him.

### 1.    Trial, Verdict and Death Sentence.

Multiple Alabama courts, including the trial judge and the Alabama Court of Criminal Appeals, characterized the evidence against Lee in the guilt phase of the trial to be "overwhelming." (Vol. 22, R-79, at 2 ("Having presided at Lee's trial, this Court finds the evidence of Lee's guilt was overwhelming."); R-80, at 17 ("the evidence presented against Lee in the guilt phase was overwhelming").) On April 12, 2000, a jury in the Circuit Court of Dallas County, Alabama returned a unanimous verdict of guilty against Lee on all four counts, including the three counts of capital murder in connection with the killings of Ellis and Thompson. (Vol. 1, R-1 at 5; Vol. 4, R-16 at 412-13.)[4] During the penalty phase, defense counsel called Lee's father, his uncle, his aunt, and his mother, and invoked expert testimony from the guilt phase concerning Lee's limited mental capacity. After deliberating for just over an hour, the jury returned a recommendation by a vote of 7 to 5 that Lee be sentenced to a term of life imprisonment without parole. (Vol. 4, R-26 at 460.) The trial judge conducted a separate sentencing hearing without a jury on September 22, 2000, at which time he heard testimony from the victims' family members, from the surviving victim (King), and from Lee's family members. (Vol. 1, R-1 at 6; Vol. 4, R-27 at 461-88.)

On October 11, 2000, Circuit Judge Jack Meigs announced on the record his judgment that Lee be sentenced to death for these crimes.[5] In an accompanying written order, the trial judge explained that the only statutory aggravating factor proven beyond a reasonable doubt was that set forth in Alabama Code § 13A-5-49(4), inasmuch as Lee had committed the capital

---

[4]    Two counts of capital murder charged the murder of Ellis and Thompson during a robbery, while the third count charged the murder of both persons pursuant to a single course of conduct.

[5]    Judge Meigs prefaced his announcement by stating the following: "I have considered this case and this is the hardest one I've ever had to do. I've had many. I think it has been foremost in my mind since we were here two weeks ago [for the sentencing hearing]." (Vol. 4, R-28 at 491.)

offenses while engaged in an attempt to commit robbery.  (Vol. 22, R-74 at 2-3.)[6]  The trial judge also considered each of seven statutory mitigating factors (including lack of criminal history and defendant's relatively young age), as well as defendant's evidence of non-statutory mitigating circumstances (limited mental capacity, status as a father of two small children, post-capture cooperation and remorse, status as a good employee, and his family's love and support).  (*Id.* at 5-6.)  After consideration of the aggravating circumstance and the statutory and non-statutory mitigating circumstances, and after due consideration of the jury's recommendation of life without parole by a 7-5 vote, Judge Meigs concluded "that the aggravating circumstance outweighs the mitigating circumstances.  It is therefore the judgment of the Court that the defendant be punished by death for the capital offenses for which he was convicted."  (*Id.* at 6.)

## 2. *Direct Appeal.*

Antecedent to Lee's direct appeal, Jackson and Hagood withdrew as counsel of record, and Bryan A. Stevenson of the Equal Justice Initiative of Alabama was appointed to represent Lee on appeal.  (Vol. 1, R-2 at 128-32.)  On October 11, 2000, Stevenson filed a notice of appeal on Lee's behalf.  (*Id.* at 133.)  The ensuing direct appeal challenged Lee's convictions and death sentence.

Initially, the Alabama Court of Criminal Appeals remanded the matter to the Circuit Court with instructions that the trial judge enter an amended sentencing order stating specific reasons for giving the jury's recommendation the consideration he gave it.[7]  Pursuant to this remand, on October 31, 2001, Judge Meigs entered an Amended Sentencing Order, stating that (i) he was "extremely mindful of the jury's recommendation," but (ii) "[i]t appeared clear to the Court that the aggravating circumstance outweighed the mitigating circumstances beyond a

---

[6]     The statutory aggravating factor of intentionally causing the death of two or more persons by one act or pursuant to one scheme or course of conduct was not available, inasmuch as Alabama Code § 13A-5-49(9) did not take effect until September 1, 2009, nearly nine months after Lee committed his offenses.

[7]     The remand was to comply with the Alabama Supreme Court's 2001 pronouncement that, when a jury makes a recommendation of life imprisonment without parole, "the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it."  *Ex parte Taylor*, 808 So.2d 1215, 1219 (Ala. 2001).  The *Taylor* decision had not yet been handed down at the time when the trial judge entered his original sentencing order in the Lee matter on October 11, 2000.

reasonable doubt." (Vol. 22, R-75 at 1.)[8] He further opined that, in his view, "[t]his case deserves the death penalty," and noted that he had compared Lee's actions and the surrounding facts to similar cases, and that the sentence was proportionate to sentences in other capital convictions in Alabama for commission of murder during a robbery. (*Id.* at 2.)

On June 27, 2003, the Alabama Court of Criminal Appeals issued an extensive opinion (the Westlaw printout of that ruling spans 93 pages) adjudicating the more than 30 grounds for direct appeal raised by Lee. (Vol. 22, R-76.) The state appellate court concluded by affirming Lee's convictions and sentences in their entirety. Subsequent petitions for rehearing in the Alabama Court of Criminal Appeals, for writ of certiorari in the Alabama Supreme Court, and for writ of certiorari in the United States Supreme Court were all denied. (Vol. 22, R-76 through R-78.)

### 3.    *Rule 32 Proceedings.*

His direct appeal having failed, Lee turned his attention to state post-conviction proceedings. In particular, he filed a Rule 32 petition in the Dallas County Circuit Court in February 2005, and filed an amended Rule 32 petition in April 2005. (Vol. 13, R-62 and R-63.)[9] In its final configuration, Lee's Rule 32 petition raised more than three dozen assignments of error, including, *inter alia*, 25 separate grounds for an ineffective assistance of counsel claim and 10 constitutional attacks on Alabama's death penalty scheme, both on its face and as applied. On August 28, 2007, Judge Meigs issued a 138-page opinion denying Lee's amended Rule 32 petition in its entirety. (Vol. 22, R-79.) In so doing, he concluded that "the allegations in Lee's amended Rule 32 petition are either deficiently pleaded, fail to state a claim, are directly refuted by the record or are otherwise without merit, or are precluded from postconviction review." (*Id.* at 137-38.) Lee once again appealed to the Alabama Court of Criminal Appeals; however, on October 9, 2009, that appellate court entered a 32-page order affirming the Circuit Court's

---

[8]    The trial judge elaborated as follows: "He planned his crime. He went to the store earlier in the day and pretended to shop for a ring. Instead, he was looking it over with an eye to return to commit his crime. When he returned, he fired immediately upon entering, with no warning and no questions asked. His intent was obvious; to take out the victims and steal what he could." (*Id.* at 2.)

[9]    Lee was represented in this endeavor by local counsel Richard K. Keith, as well as a constellation of attorneys from the law firm Perkins Coie, LLP, in Seattle, Washington.

summary denial of the postconviction petition, without granting an evidentiary hearing.  (Vol. 22, R-80.)  Lee's petitions for rehearing and for writ of certiorari were subsequently denied.  (*Id.*)

### 4.    *Habeas Corpus Petition.*

On October 21, 2010, Lee timely filed in this District Court his § 2254 Petition for Writ of Habeas Corpus by Person in State Custody under Death Sentence.[10]  The lengthy § 2254 Petition asserts 12 grounds for federal habeas corpus relief (along with countless embedded sub-grounds and sub-issues), including the following: (i) violation of *Batson v. Kentucky* during jury selection; (ii) prosecutorial misconduct; (iii) violation of Confrontation Clause in State's reliance on out-of-court testimonial statements; (iv) illegal procurement of psychiatric evidence; (v) improper interpretation and statements of law by the trial court; (vi) ineffective assistance of counsel in myriad ways; (vii) violation of due process in trial court's failure to grant funding for investigator and mitigation expert; (viii) violation of due process and equal protection in trial court's denial of motion for change of venue; (ix) violation of *Atkins v. Virginia* in sentencing mentally retarded defendant to death; (x) unconstitutional Alabama system allowing trial judges to override jury recommendation of life imprisonment; (xi) Alabama's method of execution constitutes cruel and unusual punishment; and (xii) the cumulative effect of errors requires reversal.

In evaluating Lee's § 2254 Petition, the Court has the benefit of Lee's 134-page petition and incorporated memorandum of law (doc. 1); the State's 120-page answer and incorporated memorandum of law (doc. 22); and petitioner's 133-page reply (doc. 25).  The Court has carefully pored over all of these materials, as well as the extensive 22-volume record of the underlying proceedings.  The Petition is now ripe for review and consideration.

## II.    Standard of Review.

Lee's federal habeas petition was filed long after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under the highly deferential AEDPA standard, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's determination "(1) resulted

---

[10]    In this proceeding, Lee is once again represented by various attorneys from the Perkins Coie firm, but also by Leslie Smith of the Federal Defenders Office in the Middle District of Alabama.

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, --- U.S. ----, 131 S.Ct. 770, 785 (2011) ("Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to federal law then clearly established in the holding of this Court, … or that it involved an unreasonable application of such law … or that it was based on an unreasonable determination of the facts in light of the record before the state court") (citations and internal quotation marks omitted).

What this means is that a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011) (citation omitted). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S.Ct. at 786-87. In other words, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. … [T]he deference due is heavy and purposely presents a daunting standard for a habeas petitioner to clear." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011); *see also Greene v. Fisher*, --- U.S. ----, 132 S.Ct. 38 (2011) (AEDPA standard is purposely onerous because "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction") (citations and internal quotation marks omitted); *Cullen v. Pinholster*, --- U.S. ----, 131 S.Ct. 1388, 1398, 180 L.Ed.2d 557 (2011) (AEDPA standard "is a difficult to meet … and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citations and internal quotation marks omitted). In evaluating Lee's § 2254 Petition, then, the Court takes great care to abide by the stricture that "[a] federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own." *Hill v. Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011); *see also Reese*

*v. Secretary, Florida Dep't of Corrections*, 675 F.3d 1277, 1286 (11th Cir. 2012) ("This inquiry is different from determining whether we would decide *de novo* that the petitioner's claim had merit.").

Also of critical importance to the § 2254 analysis are notions of procedural default and exhaustion. "A state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011) (citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that that is independent of the federal question and adequate to support the judgment"). "[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice." *Borden*, 646 F.3d at 808 n.26; *see also Conner*, 645 at 1287 (to overcome procedural default, petitioner must "show cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice").

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights. … Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009) (citations omitted). For exhaustion purposes, it is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Secretary, Dep't of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). What is necessary is that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted).[11] That said, it is well-settled that "habeas petitioners

---

[11]     Lee accuses the State of "conflat[ing] the separate doctrines of exhaustion and fair presentation." (Doc. 25, at 15 n.4.) This is not a correct statement, as it disregards the interrelationship between these principles. Far from being separate doctrines, fair presentation of one's claims is the very touchstone of exhaustion. *See, e.g., Picard v. Connor*, 404 U.S. 270, (Continued)

are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley v. Secretary for Dep't of Corrections*, 377 F.3d 1317, 1344 (11th Cir. 2004).  Such clarification does not extend to a right to alter the nature or legal theory of the claim.  *See, e.g., Pietri v. Florida Dep't of Corrections*, 641 F.3d 1276, 1289 (11th Cir. 2011) (affirming dismissal of unexhausted claim of ineffectiveness of appellate counsel, which was separate and distinct from substantive claim that petitioner had raised in state court).

## III.   Analysis of Petitioner's Claims.

As noted *supra*, Lee has interposed a dozen distinct grounds in support of his Petition, along with a much larger quantum of embedded sub-grounds.  The Court will consider these claims for relief sequentially, in the same order in which they were presented in the Petition.

### A.   Violation of **Batson** *by Removal of African-Americans from Jury.*

Lee's first claim for relief is that the State exercised its peremptory challenges in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).  In particular, Lee argues that the State contravened *Batson* by utilizing all 21 of its peremptory strikes to remove African-Americans from the venire.

#### 1.   The **Batson** *Test.*

"*Batson* requires a court to undertake a three-step analysis to evaluate equal protection challenges to a prosecutor's use of peremptory challenges."  *McGahee v. Alabama Dep't of Corrections*, 560 F.3d 1252, 1256 (11th Cir. 2009).  "First, the trial court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. … Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. … Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination."  *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (citations omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154

_____

275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) ("once [a] federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied").  Petitioner's comment on this point is curious, given his admission elsewhere that "[e]xhaustion requires that a habeas petitioner's constitutional claims be 'fairly presented' to state courts."  (Doc. 25, at 3.)

-9-

L.Ed.2d 931 (2003) (similar).  The crucial third step requires evaluation of the "persuasiveness of the justification proffered by the prosecutor," with the ultimate burden of persuasion regarding racial motivation resting at all times with the opponent of the strike (in this case, the petitioner). *Rice*, 546 U.S. at 338 (citation omitted); *see also Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ("If a race neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.").  "The credibility of the prosecution's explanation is to be evaluated considering the totality of the relevant facts, including whether members of a race were disproportionately excluded."  *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (citation omitted).[12]

   The Eleventh Circuit has remarked that "a *Batson* claim at habeas is often analyzed under AEDPA § 2254(d)(2), and is only granted if it was unreasonable to credit the prosecutor's race-neutral explanations."  *McGahee*, 560 F.3d at 1256 (citations and internal quotation marks omitted).  Moreover, in performing its habeas review function of Lee's *Batson* claim, this Court bears in mind that "[s]tate-court factual findings … are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence."  *Rice*, 546 U.S. at 338-39 (internal quotation marks omitted).

### 2.   State Court Analysis.

   On direct appeal, Lee squarely presented as a ground for relief that the trial court had improperly denied his *Batson* motion after the State used all of its peremptory challenges to remove black veniremembers.  The Alabama Court of Criminal Appeals found no error.  In so doing, the state court examined the reasons given by the prosecutor on the record for each of his peremptory strikes in response to the contemporaneous *Batson* motion lodged by defense counsel.  In particular, the court observed that the prosecution identified 13 veniremembers as having been struck for their opposition to the death penalty, which is a race-neutral reason.  *Lee*

---

   [12]      "Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned."  *Parker*, 565 F.3d at 1271 (citations omitted).

*v. State*, 898 So.2d 790, 813-14 (Ala. Crim. App. 2003).  The court also approved as race-neutral the State's articulated reasons for exercising peremptory strikes on six other prospective jurors because of their arrest record, because they were uncooperative and did not wish to answer questions, because they did not want to serve, and/or because members of their family had been involved in criminal activity.  *Id.* at 814.  Finally, the appellate court found that the prosecution offered race-neutral reasons for one strike based on the veniremember's relationship with Lee and Lee's family and the appearance that this individual was uncomfortable with serving on the jury.  *Id.*[13]

Moving on to the pretext portion of the *Batson* inquiry, the Alabama Court of Criminal Appeals considered for plain error and rejected each of five arguments posited by Lee on direct appeal.[14]  First, the court examined Lee's claim that black venirepersons J.M. and D.G. (as to both of whom the State exercised peremptory challenges) were similarly situated to white veniremember M.P. (as to whom the State raised only a failed challenge for cause, with no peremptory challenge).[15]  In finding no evidence of disparate treatment, the state court noted that M.P. had professed her ability to consider both death penalty and life imprisonment, while J.M. had opined that the death penalty "wouldn't do any good" because of the risk of putting innocent people to death.  Although D.G. had not stated opposition to the death penalty, he was not deemed similarly situated to M.P. because he had been struck for the additional stated race-neutral reason that a family member had been convicted of a property crime.  *Lee*, 898 So.2d at

---

[13]      The above discussion totals only 20 peremptory strikes.  With regard to the prosecution's twenty-first peremptory strike, the Alabama Court of Criminal Appeals deemed Lee's arguments moot because that veniremember "was an alternate juror in this case, and he ultimately served on the jury because one of the other jurors was not present when the trial started."  *Id.* at 815.

[14]      In so doing, the state court correctly observed that Lee's trial counsel had only lodged a pretext objection to the prosecution's reasons for striking one black venireperson, and that was veniremember 213, who ultimately ended up serving on the jury anyway.  (Vol. 3, R-5 at 190.)  Thus, the pretext arguments presented by Lee on direct appeal were being raised for the very first time, as he never gave the trial court an opportunity to address or explore them.  *See Lee*, 898 So.2d at 815.  For that reason, the state court applied a "plain error" standard of review.

[15]      Although petitioner's filings routinely identify jurors and veniremembers by name, this Court adheres to the convention of identifying them only by their initials, so as to safeguard these individuals' privacy interests.

815-16.  Second, Lee objected on direct appeal to the State's strikes based on arrest records where the veniremembers' criminal history information was not found in the record.  The appellate court deemed that objection meritless because the record showed that the prosecution furnished Lee's counsel with written criminal history records for the venire before the parties began exercising strikes.  *Id.* at 816.[16]

The third pretext argument presented by Lee on direct appeal was that it was improper for the State to exercise peremptory challenges against three African-American veniremembers because of their demeanor.  The Alabama Court of Criminal Appeals summarily rejected this contention, reasoning that (i) striking a juror because of his or her demeanor is race-neutral; (ii) Lee did not dispute the prosecution's characterization of those persons' demeanor; and (iii) the State in any event had articulated other race-neutral reasons for striking each of them.  *Id.* Appellant's fourth ground for claiming pretext was his contention that a black venireperson named J.M. was similarly situated to a white venireperson named M.S. in terms of death penalty feelings, yet the State exercised a peremptory challenge only on J.M., not on M.S.  Reviewing the record, the state court opined that "[c]learly, veniremembers M.S. and J.M. were not similarly situated" in their views on the death penalty.  *Id.*[17]  The state court likewise found no merit to Lee's fifth pretext contention on the *Batson* issue, wherein he maintained that the State struck a black veniremember named D.G. for being accused or charged of a property crime, but did not strike a similarly situated white prospective juror named E.E.  In rejecting this claim, the state court noted that "the defense had long since struck veniremember E.E. when the State struck veniremember D.G."  *Id.* at 817.  Thus, E.E. was not available for the prosecution to strike at the time a peremptory challenge was used on D.G.

---

[16]     The trial record confirms that the prosecution provided such information to the defense before a single strike was exercised by either side during the jury selection process.  (Vol. 3, R-6 at 181.)  There is no indication in the record that Lee's counsel was denied a sufficient opportunity to review such information before making his strikes, objecting to the State's strikes, or interposing his *Batson* motion.  Likewise, there is no indication in the record that the veniremembers whom the State struck based on their criminal histories did not actually have criminal histories that supported such challenges.

[17]     In particular, the Alabama Court of Criminal Appeals noted that M.S. "ultimately stated that she would also consider the death penalty and would vote based on the evidence," whereas J.M. indicated that she "would say not the death penalty … because if he was innocent … and you found him guilty, it wouldn't do any good to kill him."  *Id.* at 817.

For all of these reasons, the Alabama Court of Criminal Appeals overruled Lee's argument on direct appeal that he was entitled to a new trial because the trial court had improperly denied his *Batson* motion. Although the state court examined the juror-specific reasons and made juror-by-juror comparisons, it did not address the important factual backdrop of the State's use of 100% of its peremptory challenges on African-Americans.

### 3. Petitioner's Habeas Argument.

#### a. Unexhausted Aspects of Petitioner's Batson Ground for Relief.

Lee's § 2254 Petition relies on a trio of *Batson* arguments that he never presented to the state appellate courts. First, he maintains that the prosecutor expressly admitted, conceded or "revealed a racial motive for his strikes" before the trial court. (Doc. 1, Ground I, ¶ 8.) Second, he contends that the trial court "erroneously concluded that the prosecutor's desire to balance the defense strikes was acceptable under *Batson*" and "impermissibly considered the racial make-up of the jury seated." (*Id.*) Third, he argues that Edgar Greene, the prosecutor who exercised the peremptory strikes in this case, had a history of racial discrimination in jury selection. (*Id.*, ¶ 19.)

The State correctly objects that these arguments are not properly raised in Lee's § 2254 Petition because they were not exhausted in state court. In that regard, the Supreme Court requires "a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). To satisfy the exhaustion and fair presentation requirements, the Eleventh Circuit has written, "we do require that a petitioner presented his claims to the state court such that *a reasonable reader would understand each claim's* particular legal basis *and specific factual foundation*." *Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (citation omitted and emphasis added). It is not sufficient to satisfy the exhaustion requirement "that all the facts necessary to support the claim were before the state courts." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (citation omitted). "[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *Id.* at 1303 (citations omitted). After careful review of Lee's brief on direct appeal (*see* Vol. 7, R-41 at 19-33), the Court finds that a reasonable judicial officer would not have understood Lee to be predicating his *Batson* claim on an alleged admission by the prosecutor of racial motivation, alleged acquiescence of the trial court in same, or the specific prosecutor's history (as opposed to that of

the District Attorney's Office collectively) of racially discrimination jury selection.  Lee's re-imagining of his *Batson* claim on federal habeas review goes well beyond the mere linguistic or organizational reformulation, or the bolstering of a claim with further legal citations, as authorized in the authorities he cites.  As such, those aspects of Lee's *Batson* claim were not fairly presented to the state appellate courts, are not exhausted here, and are not cognizable in his § 2254 Petition.[18]

Even if the new grounds for the *Batson* claim presented in Lee's § 2254 Petition were properly exhausted and had been fairly presented on direct appeal, the result would be unchanged.  First, Lee's contention that the prosecutor "conced[ed] that he was striking African-American jurors in response to the defense's strikes of whites" (doc. 25, at 16) takes unreasonable liberties with the record.  What actually happened was that, after defense counsel accused the State of exercising peremptory challenges in a racially discriminatory manner, the prosecutor retorted that "the defense, most of its strikes, were striking White jurors.  In fact, I

_____

[18]       Petitioner's position that these arguments are properly exhausted is not persuasive.  Specifically, Lee suggests that he did not have to reveal the factual predicate of his *Batson* claim because it was incumbent on the state appellate court to examine all relevant circumstances.  (Doc. 25, at 15-16.)  But this contention cannot be reconciled with the above-cited authorities.  It was Lee's obligation to "connect the dots" on the facts underlying his *Batson* claim, not the state courts' duty to do it for him.  Nor is it proper for Lee to attempt to shift to the state courts the burden of developing and articulating his legal arguments for him based on information in the record that he did not see fit to bring to their attention even in the span of a sprawling 161-page brief on direct appeal.  Federal habeas corpus practice is not an exercise in playing "gotcha" when the state court fails to identify needles in the haystack that the petitioner later perceives as the centerpiece of his claim, even though he never flagged them for the state's review.  This is particularly true given that Lee is advocating a highly strained reading of these passages from the trial transcript, going well beyond the plain meaning of the words spoken to impute nefarious motives to the State and passive acquiescence by the trial court.  The state appellate court could not reasonably have perceived that such was petitioner's argument or that he was reading uncited record passages in this contorted manner to make his claim.  Also, Lee does not advance his cause by citing *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 61 (1986) for the proposition that presenting additional facts in federal court does not violate the exhaustion requirement.  (Doc. 25, at 4.)  The actual quote from that decision reads as follows:  "We have never held that presentation of additional facts to the district court, ***pursuant to that court's directions***, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts."  *Vasquez*, 474 U.S. at 257-58 (emphasis added).  Petitioner inexplicably omitted the bold text from his quotation of that passage, thereby materially altering its meaning.  This Court never directed Lee to submit additional facts in support of his *Batson* claim, so *Vasquez* is inapposite.

think all but three or four were exercised to remove White jurors from the panel." (Vol. 3, R-5 at 188.) Petitioner suggests that this statement is an admission that the State was striking black venirepersons to balance out the defense's striking of white venirepersons. It is nothing of the sort. The prosecutor's words cannot fairly be read as a concession that the State followed a pattern of racially motivated strikes to counteract the defendant's racially motivated strikes. To the contrary, the most logical construction of the prosecutor's statement was to point out the irony of the defense's *Batson* objection when the defense's strikes themselves were highly correlated to race. This Court will not indulge speculation or wishful thinking to transform a prosecutor's innocuous statement into a nefarious admission of racially biased use of peremptory strikes. *See generally Presley v. Allen*, 2008 WL 1776570, *4 (11th Cir. Apr. 21, 2008) (rejecting peititioner's argument that State's comment that "the State is being forced into striking females because the defendant was excusing all the white males" proved a *Batson* violation, inasmuch the comment "was not a means of offering race- and gender-neutral reasons for his challenges" and the State then provided explanations for its choices). Nor will it, on habeas review, fault the state appellate court for not *sua sponte* devising and endorsing such a farfetched interpretation of the record.[19]

Similarly, the record cannot support Lee's position that the trial court found that the State's racially motivated strikes were permissible under *Batson* as long as they merely offset the defense's racially motivated strikes. The trial judge made no such pronouncements, but simply stated "[i]t appears you have given factually race valid reasons for striking" (Vol. 3, R-5 at 190) after hearing the prosecutor's recitation of race-neutral reasons for each and every peremptory strike. Habeas motions are reviewed by reference to the record that actually exists, not one that

---

[19]     Even less plausible is petitioner's assertion that the prosecutor's statement during the sentencing hearing (months after the trial concluded) that "[t]he jury was made up of people of different ages, different races and different backgrounds" (Vol. 4, R-27 at 481) somehow proves "that the race of jurors was significant to the State." (Doc. 1, Ground I, ¶ 10.) Petitioner relies on this statement elsewhere in his § 2254 Petition to accuse the State of prosecutorial misconduct and his lawyers of ineffective assistance for not objecting. But these arguments are equally meritless because they flow from the same unreasonable interpretation of the words actually spoken at sentencing.

the petitioner might wish to exist; therefore, this Court will not impute unconstitutional rationales to the trial judge that are unsupported by the record.[20]

As for petitioner's assertion that *Batson* error exists in this case because of prosecutor Edgar Greene's pattern of racially discriminatory jury strikes, there is no substantial record evidence of same.  The jury was struck in Lee's trial in April 2000.  Petitioner's only showing that Greene has a history of *Batson* violations is as follows: (i) Greene was "involved" in unspecified ways in the 1986 trial of Earl Jerome McGahee, where a *Batson* violation was found on habeas review in 2009; (ii) Greene proffered the State's reasons for exercising peremptory strikes in the 1987 trial of Victor Stephens, where a *Batson* violation was found on habeas review in 2011; and (iii) Greene explained the reasons for the State's strikes in the 1988 trial of Jesse Ellis Clark, where no *Batson* violation was apparently ever found.  (Doc. 1, Ground I, at ¶ 19.)  Lee's suggestion that these decisions show that the Alabama Court of Criminal Appeals' interpretation of *Batson* on Lee's direct appeal in 2003 is contrary to law or unreasonable because it failed to weigh Greene's history of *Batson* violations is unfounded.  That the prosecutor may have struck two criminal juries improperly more than a decade before Lee went

---

[20]     To be sure, the trial court did observe that jury as impaneled consisted of 9 blacks and 3 whites, plus 1 black alternate and 1 white alternate.  (Vol. 3, R-5 at 190.)  But he did not state that the final jury composition was the reason for his overruling of the defense's *Batson* objection.  The trial judge did not elaborate on his reasons for pointing out the racial composition of the jury.  Courts routinely discuss the final composition of a jury in *Batson* challenges, at least in part because comparing the composition of the jury to the composition of the venire is a circumstance that is properly considered in a *Batson* analysis.  *See, e.g., United States v. Gamory*, 635 F.3d 480, 498 (11th Cir. 2011) (pointing out that "there were three African-Americans seated on the jury" in rejecting *Batson* challenge); *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007) (in finding that petitioner's *Batson* claim fails, noting that "at least three black jurors served unchallenged on the sworn panel"); *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim.").  Lee would conjecture that the trial judge denied the *Batson* motion solely because blacks were well-represented in the final impaneled jury, but there is no record basis for such a leap.  Equally unfounded in the record is Lee's assertion that the prosecutor's remark that the defense had used most of its strikes on white venirepersons "greatly – and improperly – influenced the state court's decision to reject Mr. Lee's *Batson* claim."  (Doc. 25, at 18.)  In truth, there is no reason to think that the State's observation about the defense's peremptory strikes affected to the trial court's adjudication of the *Batson* motion in any way, shape or form.

to trial is hardly a substantial indicator of racial bias in Lee's jury selection, particularly where the state appellate court had no information that *Batson* violations had actually occurred in those cases because the errors were not uncovered by federal habeas courts until many years after Lee's direct appeal concluded.

        b.     *Petitioner's Remaining* Batson *Arguments.*

Elsewhere, Lee attempts to advance his *Batson* claim via a contention that the State did not treat similarly-situated black and white venirepersons similarly (*i.e.*, that black jurors were struck for having viewpoints similarly expressed by white jurors who were not struck). Conceptually, that is a viable basis for interposing a pretext argument. *See, e.g., Parker*, 565 F.3d at 1271 ("Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual … when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken …."). But it does not fit here, as the Alabama Court of Criminal Appeals recognized on direct appeal. Lee protests that the State did not use a peremptory challenge on white juror M.P. for opposition to the death penalty. But M.P. specifically answered, "Yes, I could," when asked if she could vote for death in a case involving an intentional killing. (Vol. 2, R-5 at 101-02.)[21] M.P. was therefore not similarly situated to black venirepersons on whom the State exercised peremptory challenges for opposition to the death penalty. The same goes for Lee's assertion that white venireperson M.S. expressed similar views on the death penalty to black venireperson J.M., yet the State struck only J.M. In fact, their statements were not similar. M.S. stated that she could impose the death penalty, although she "would rather do life without parole." (Vol. 2, R-5 at 102.) Later, M.S. answered affirmatively when asked if she would be able to listen to the evidence and either vote for or against the death penalty, based on the evidence. (*Id.* at 116.) By contrast, J.M. stated that she was not "in favor of the death penalty because people were innocent" and that "if he was innocent … and you found him guilty, it wouldn't do any good to kill him." (*Id.* at 116-17.)

---

[21]     To hammer home the point, the trial judge corrected the prosecutor when the latter mistakenly indicated that M.P.'s testimony was that "she could only do life without." (Vol. 3, R-5 at 183.) So the State well knew before it exercised peremptory challenges that M.P. had said she could vote for a death sentence.

Given J.M.'s plainly stronger anti-death penalty sentiments than M.S.'s, petitioner's attempt to derive pretext from the State's strike of the former but not the latter is unavailing.[22]

Next, petitioner imputes pretext to the State for identifying reasons for their peremptory strikes that, according to petitioner, are unsupported by the record. Of course, the trial judge made a finding that the prosecutor's stated reasons were "factually race valid reasons for striking." (Vol. 3, R-5 at 190.) More importantly, the record does support the stated reasons. Lee points to venireperson D.G., and notes that D.G. never stated opposition to the death penalty. But the State's listed reasons for striking D.G. were "Family member involved and convicted of a property crime. Opposed to the death penalty. Very uncooperative about answers." (*Id.*) Even assuming petitioner is correct that D.G. did not state opposition to the death penalty, the record plainly shows that he did state that he had a family member accused of a property crime. (Vol. 2, R-5 at 51.) There is no factual basis for attributing pretext to that justification for exercising a peremptory strike on D.G., and this stated reason was in itself sufficient to justify striking him. Thus, there was no *Batson* error as to this juror.[23]

---

[22]     The undersigned finds no error in the Court of Criminal Appeals' careful analysis of this identical argument on direct appeal. *See Lee*, 898 So.2d at 816-17 ("Clearly, veniremembers M.S. and J.M. were not similarly situated."). Petitioner's habeas contention to the contrary focuses on a sliver of J.M.'s statement, while ignoring her follow-up comments, including statements that she made after defense counsel tried to cut her off, as she exclaimed, "Can I finish?" (Vol. 2, R-5 at 117.) So J.M. felt strongly enough about her anti-death penalty views to elaborate on them even as defense counsel was attempting to lock her into a neutral stance without allowing her a full opportunity to articulate the nature, vehemence and ideological basis for her opposition.

[23]     *See generally King v. Moore*, 196 F.3d 1327, 1335 (11th Cir. 1999) ("when the motives for striking a prospective juror are both racial and legitimate, *Batson* error arises only if the legitimate reasons were not in themselves sufficient reason for striking the juror."). In so concluding, the Court has considered Lee's additional argument that striking D.G. for having a family member involved in a property crime was pretextual because the State did not strike a white venireman, E.E., who answered affirmatively to the same question. As the Alabama Court of Criminal Appeals correctly explained, this circumstance does not give rise to a *Batson* violation because "the defense had long since struck veniremember E.E. when the State struck veniremember D.G." *Lee*, 898 So.2d at 817. The State could not have struck E.E. in lieu of D.G. because E.E. was already off the panel before it struck D.G. The system of peremptory strikes does not allow for "double strikes" of the same venireperson by both sides. Simply put, petitioner cannot be heard to complain of disparate treatment as between E.E. and D.G. when defense counsel struck E.E. long before the State struck D.G., such that the State did not single (Continued)

-18-

Similarly unfounded is petitioner's suggestion that the State's statement that it struck six black venirepersons (J.H., M.B., S.B., G.P., L.J. and E.H.) based on their positive response to a question about whether they opposed the death penalty was pretextual because they all said they might be able to give it.  Petitioner ignores the fact that the very next question asked by the prosecutor was, "How many of you feel [the death penalty] is a proper punishment and you would vote for it under the circumstances and evidence if it was justified?"  (Vol. 2, R-5 at 128.) Not a single one of J.H., M.B., S.B., G.P., L.J. or E.H. responded affirmatively to that question. This sequence of questions and answers shows a reasonable evidentiary basis for the prosecutor's statement that these individuals were struck from the jury for their opposition to the death penalty.  Besides, petitioner has not identified a single white venireperson who answered the same or similar sets of questions in the same or similar manner that these six individuals did, as to whom the State did <u>not</u> exercise a peremptory challenge, so there appears to be no comparator.

Three other arguments by petitioner in a similar vein concerning particular strikes can be dispatched quickly.  First, Lee suggests that the prosecutor's statement that several venirepersons were struck because they were "uncooperative" or "did not want to answer questions" is unsupported.  But such reticence is often illustrated not by a juror's words, but by his or her demeanor, tone of voice, pattern of speech or body language, traits which do not appear in a cold record.  Strikes based on visual or auditory cues that do not appear in a record are entirely proper and permissible under *Batson*.  *See, e.g., United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1198 (11th Cir. 2000) (finding no *Batson* error where proffered race-neutral reason centered on juror's "body language" and "mannerisms"); *United States v. Diaz*, 26 F.3d 1533, 1542 (11th Cir. 1994) ("a venireperson's inability to pay attention is a proper race-neutral reason for using a peremptory strike").  That the record does not capture those behaviors does not render them any less valid, particularly where defense counsel and trial judge (who likewise would have witnessed such juror conduct) did not question the validity of the prosecutor's characterization of these venirepersons' demeanor and cooperativeness, and petitioner has never submitted evidence

out D.G. for a strike based on a circumstance that was equally applicable to a then-sitting, available white venireperson.

or articulated facts suggesting that they did not actually happen.[24]  Second, petitioner maligns the State for striking several veniremembers based on their criminal histories, when "there is no evidence of these criminal histories in the record."  (Doc. 1, Ground I, ¶ 14.)  This is a red herring.  As petitioner well knows, and as the state appellate court found, "the prosecutor had documentation regarding the veniremembers' criminal history," furnished that documentation to defense counsel before the jury striking process began, and the trial court "assured defense counsel that it would allow him time to review the documentation before striking the jury."  *Lee*, 898 So.2d at 816.[25]  Where both sides had the criminal history records on which the State based a number of its peremptory strikes, and where there was no objection or suggestion that those individuals did not actually have criminal histories, the Court will not impute *Batson* error to the proceedings merely because no one apparently thought to append to the criminal history printout (which was in both sides' possession at the time) to the state-court record.[26]  And third,

---

[24]     Indeed, this sort of situation is precisely why *Batson* jurisprudence requires reviewing courts to give "great deference" to a trial judge's determination of no racial motivation in a peremptory strike.  *See, e.g., United States v. Bernal-Benitez*, 594 F.3d 1303, 1312 n.5 (11th Cir. 2010) (recognizing importance of deference because "[t]he judge presiding over jury selection is in a better position than we are to consider the relevant evidence – including the interactions between counsel and the venire during voir dire, counsels' questions and comments, and the venire persons' demeanors"); *Cordoba-Mosquera*, 212 F.3d at 1198 ("Deference is particularly warranted here, where the proffered race-neutral explanation centered on … behaviors that are especially given to on-the-spot interpretation.").

[25]     Given the clarity of the record on this point, petitioner's strident assertion that the prosecutor refused to disclose this information to the defense "until it was impossible for the defense to use the information" (doc. 1, Ground I, ¶ 14) is simply false.

[26]     In his Reply, petitioner refashions this argument as being that the purported arrest records were inconsistent with the venirepersons' silence when asked if they had been arrested. (Doc. 25, at 31.)  Petitioner cites no portion of the record for the proposition that black venirepersons whom the State struck for having arrest histories denied or were silent when asked in voir dire whether they had such histories.  Moreover, the Court's review of the record shows that these individuals were <u>not</u> asked if they had ever been arrested; instead, they were asked only if they had ever been "the accused party in a property crime" or "the accused party … in a crime of violence."  (Vol. 2, R-5 at 51, 56.)  Obviously, arrests may be completely unrelated to property or violent crime; thus, there is no discrepancy.  Besides, given that the prosecutor had arrest records for each venireperson already, there was little reason for him to waste time on voir dire drilling them for information he already had (especially when jurors may be skittish about revealing their arrest history in open court among their peers).  And finally, neither defense counsel nor the trial judge professed any disagreement or reluctance to accept the prosecutor's (Continued)

petitioner's arguments regarding the alleged race-based strike of black venireperson K.S. (juror #212) are of no consequence because, as the state court observed, that individual "was an alternate juror in the case, and he ultimately served on the jury because one of the other jurors was not present when the trial started."  *Id.* at 815.[27]

                c.      *State Court's Unreasonable Application of Federal Law.*

Ultimately, it appears that the animating force behind Lee's *Batson* claim in his § 2254 Petition is that the state court should have granted him relief because the State exercised 100% of its peremptory challenges on African-American venirepersons.  However, he points to no Supreme Court authority holding that unanimity of peremptory strikes on jurors of a single race is a *per se* violation of *Batson*.  Federal appellate jurisprudence is to the contrary.[28]  That said,

---

characterization that these venirepersons had criminal histories for which they were being struck. This is significant, particularly where defense counsel had that information and surely would have objected had the State's "arrest history" explanation not been supported by those records. At any rate, without any showing by petitioner that there were no arrest histories for the black jurors who were struck on that basis, the Court will not credit Lee's mere speculation and innuendo on the subject.

27     Petitioner has never explained why he believes his *Batson* arguments concerning veniremember K.S. are of any force or effect.  K.S. actually served as a juror in this case.  The marginalization of Lee's *Batson* claim concerning K.S. is especially clear given that *Batson* rights attach to each prospective juror to serve.  *See United States v. Allen-Brown*, 243 F.3d 1293, 1297 (11th Cir. 2001) ("*Batson* holds that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror.") (citation and internal quotation marks omitted).  K.S. was not excluded from jury service here, because he actually did serve; thus, there was no unconstitutional discrimination against him.  He suffered no deprivation, and Lee enjoyed the full benefit of K.S.'s service on his trial jury. Therefore, the State's attempted (but ultimately unsuccessful) strike of K.S. is much ado about nothing for *Batson* purposes.

28     *See United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005) ("the number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck") (citation omitted); *United States v. Walker*, 490 F.3d 1282, 1292 (11th Cir. 2007) ("striking members of only one race does not always create an inference of purposeful discrimination"); *Presley v. Allen*, 2008 WL 1776570, *4 (11th Cir. Apr. 21, 2008) ("Although the statistics presented are suggestive of discrimination, in that the state struck all but one of the black members of the venire and used 78% of its strikes against females, the Alabama Supreme Court's determination that the statistics were not enough given the facts of this case was not objectively unreasonable.").

the Court recognizes, of course, that "total or seriously disproportionate exclusion of African-Americans is itself such an unequal application of the law … as to show intentional discrimination." *McGahee v. Alabama Dep't of Corrections*, 560 F.3d 1252, 1267 (11th Cir. 2009). Context matters. Courts evaluating *Batson* challenges do not look at singular factors in a vacuum, but rather must consider the totality of the circumstances. *See, e.g., Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) ( "The credibility of the prosecution's explanation is to be evaluated considering the totality of the relevant facts.") (citation omitted); *McGahee*, 560 F.3d at 1261 ("The *Batson* decision is quite clear that in deciding whether the defendant has made the requisite showing, the trial court should consider ***all relevant circumstances***.") (citation and internal marks omitted) (emphasis in original).

This brings us to the defect in the Alabama Court of Criminal Appeals' opinion. Nowhere did that court profess to be examining all relevant facts in reviewing the trial court's handling of the *Batson* objection. More significantly, the appellate court made no mention of the number of strikes that the State exercised against African-American jurors, or the purported history of *Batson* problems in the Dallas County District Attorney's Office, even though Lee unequivocally raised such issues in his principal brief on direct appeal. (*See* Vol. 7, R-41 at 19-33.) "Where a legal standard requires a state court to review all of the relevant evidence to a claim, the state court's failure to do so is an unreasonable application of law under AEDPA." *McGahee*, 560 F.3d at 1262 (finding that Court of Criminal Appeals' failure to consider "all relevant circumstances" during the third step of the *Batson* analysis amounted to an unreasonable application of clearly established federal law).[29] The State's cursory arguments to the contrary are unpersuasive.

Merely stating that the Alabama appellate court's analysis of Lee's *Batson* claim constituted an unreasonable application of clearly established federal law neither disposes of the

---

[29]     *McGahee* is particularly instructive because the Eleventh Circuit in that case found that the Alabama Court of Criminal Appeals had unreasonably applied federal law on a *Batson* claim by failing, *inter alia*, "to consider the fact that 100% of the African-American potential jurors were removed from the jury by the State." 560 F.3d at 1265. Under this reasoning, it appears to be a virtual certainty that the Eleventh Circuit would deem the Alabama Court of Criminal Appeals' handling of the *Batson* issue in Lee's case to be an unreasonable application of federal law because it did not consider the fact that 100% of the State's peremptory challenges were exercised to remove African-American jurors.

matter nor automatically entitles Lee to habeas relief.  Rather, "[w]here we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *McGahee*, 560 F.3d at 1266.

> d.  De Novo *Analysis of* Batson *Claim*.

Considering the *Batson* issue *de novo*, the Court finds that petitioner made a *prima facie* showing of race discrimination in the State's exercise of peremptory strikes, but that the State proffered race-neutral reasons for each of those strikes.  At least one proffered reason for each juror on which the State exercised a peremptory challenge was supported by the record or (in the case of demeanor-based reasons or reasons relating to arrest history information that the State shared with defense counsel) not challenged or disputed by defense counsel or the trial court.  As such, for each venireperson struck, the State provided at least one race-neutral reason that was well grounded in fact and/or record.[30]  Petitioner certainly has not shown otherwise.  The Court further finds (based on the extensive discussion, *supra*) that petitioner has made no showing that any black juror as to whom the State exercised a peremptory strike was similarly situated to a white juror as to whom the State did not exercise a peremptory strike (and who was still in the venire at the time the State struck the black juror).  In other words, petitioner has made no showing that the State treated comparable white and black venirepersons differently, or that the prosecutor's proffered justification for any strike was equally applicable to jurors of a different race who remained on the panel.  These findings are all consistent with the Alabama Court of Criminal Appeals' determinations on direct appeal as to the circumstances that it did consider in Lee's case.

Nor do the facts and circumstances that the state appeals court failed to consider (*i.e.*, statements by prosecutor and trial judge concerning defense strikes, evidence of a history of race discrimination by the D.A.'s Office, the fact that the State used all of its peremptory challenges

---

[30]     In this regard, the trial court made a finding of fact after the State listed its reasons for each peremptory strike, to-wit: "It appears you have given factually race valid reasons for striking." (Vol. 3, R-5 at 190.)  Petitioner has made no showing by clear and convincing evidence (or even by a preponderance) that this factual determination was unreasonable.  *See* 28 U.S.C. § 2254(e)(1) (in habeas cases, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

on blacks) materially alter the analysis.  For instance, the Court finds that the prosecutor did not admit to race-based motivation in exercising strikes, and that the trial judge never ruled that race-based strikes by the State were acceptable as long as they merely served to balance race-based strikes by the defense.  Petitioner's strained interpretation of the record on these points is not persuasive for the reasons already discussed, *supra*.

Likewise, the history of the District Attorney's Office (or the particular prosecutor, Mr. Greene, in this case) does not substantially strengthen petitioner's pretext argument.  Of course, such evidence – if it exists – can be relevant to the *Batson* inquiry.[31]  But the only such evidence before the state trial court was defense counsel's bare reference to "*Robert Thomas v. State*" in response to the judge's question, "How long have they had that problem?  I don't ever remember Mr. Greene having one."  (Vol. 3, R-5 at 187.)  The *Thomas* case was one in which the Alabama Supreme Court in 1992 remanded because the District Attorney's Office in Selma, Alabama had exercised peremptory challenges based on veniremembers' criminal histories, without sharing the criminal history information with the other side.  *Ex parte Thomas*, 601 So.2d 56, 58-59 (Ala. 1992).  The *Thomas* Court did not find a *Batson* violation, but found that more information was necessary.  Nothing about *Thomas* would suggest a culture in the District Attorney's Office that was suffused with bias against African-Americans in jury selection.  Thus, the trial judge had no facts or circumstances before him that might have supported granting Lee's *Batson* motion on that basis.[32]  Even if the other cases that petitioner now cites in his § 2254 Petition as evidence of

---

[31]     *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029 (2003) (evidence that "the culture of the District Attorney's Office in the past was suffused with bias against African-Americans in jury selection … is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case").

[32]     In his § 2254 Petition, Lee cites various other cases in support of the existence of such a culture of race discrimination.  It appears highly doubtful that such decisions can be properly viewed as evidence bearing on the *Batson* ruling in this case when they were never presented to the trial judge.  How could the trial judge find a culture or history of race discrimination by the prosecutors in this case when no such evidence was before him, or was submitted at all (at least as to the individual prosecutor, Mr. Greene) until listed in Petitioner's § 2254 Petition more than a decade later?  *See generally Cullen v. Pinholster*, --- U.S. ----, 131 S.Ct. 1388, 1401 (2011) ("Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so.").

a history of bias by the District Attorney's Office are properly before this Court on federal habeas review, they show, at most, that the office committed a number of *Batson* violations well over a decade before the jury was struck in Lee's case, without anything suggesting an ongoing, pervasive, persistent culture of such violations in that office (or among those prosecutors) at the time of Lee's trial.  Such evidence does not meaningfully cast doubt on the legitimacy of the motives underlying the State's actions in Lee's case.

Finally, the State's use of 100% of its peremptory strikes against African-American veniremembers is probative, but certainly not dispositive in this case.  As noted *supra*, that fact is certainly relevant and may support an inference of race discrimination, but it does not equate to a *per se Batson* violation.  Again, context matters.  In this case, the context included the following: (i) the State had articulated valid, race-neutral reasons for each of those strikes; (ii) Lee did not show that a single white veniremember left on the jury was similarly situated to a black counterpart whom the State struck; and (iii) the venire panel itself was predominantly African-American when the parties commenced their peremptory strikes, such that at any given time when the prosecution exercised a peremptory strike approximately 2/3 of the venire was African-American.[33]  Placed in that context, the facially daunting statistics of the manner in which the State exercised its peremptory challenges do not appear to demonstrate improper racial motivation.[34]

---

[33]     This circumstance is explained, in part, by the defense's use of peremptory strikes in a manner that disproportionately removed white venirepersons from the jury.  When peremptory challenges began, 32 of the 53 remaining veniremembers were black, for a ratio of 60.3%.  When they ended, 10 of the 14 members of the jury (inclusive of alternates) were black, for a ratio of 71.4%.  Because the defense left only 4 whites on the venire, the State had relatively few options for peremptory strikes of white jurors at each step of the peremptory challenge process.  Examination of the racial composition of the panel before, during and after these strikes casts the State's use of its peremptory strikes in a far less incriminating or suspicious light than the cold 21-out-of-21 statistic taken in isolation.

[34]     In his reply, petitioner blusters that "[o]n a random basis, there is a 0.01283% chance that each of the State's peremptory strikes would have been of an African-American member of the venire panel."  (Doc. 25, at 24.)  This argument misses the point.  The State never professed to have exercised its peremptory strikes in a "random" manner, such as by drawing names out of a hat or tossing darts at a set of veniremembers' photographs.  The "random odds" are irrelevant.  Rather, what the State said it did was exclude various jurors based on specific considerations (opposition to death penalty, uncooperative demeanor, arrest history, etc.) that were not present in the same manner or degree in any remaining white venirepersons.  If (Continued)

The critical point to bear in mind is this:  In any *Batson* challenge, the objecting party always bears the "burden of proving purposeful discrimination."  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1312 (11th Cir. 2010) (citation omitted).  A petitioner can satisfy this burden by various types of evidence calling into question the credibility of the prosecutor's race-neutral explanation.  *See, e.g., Parker*, 565 F.3d at 1271 ("Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned.").  Petitioner has not met that burden here.  He has not shown that any of the State's peremptory challenges were exercised in a racially discriminatory manner.  Even after considering the totality of the facts and circumstances, including all of the facts and arguments presented in the § 2254 Petition,[35] and in cumulative manner, the Court is of the opinion that there was no *Batson*

---

petitioner had shown that white venirepersons actually did have these same characteristics, yet were not struck, or that black venirepersons actually did not have such characteristics, his *Batson* motion might have had far more traction.  But he did not.

[35]        This is so even for the arguments that petitioner never presented to the trial court. The procedural posture of such arguments is questionable at best.  Recall that petitioner's counsel, when confronted with the State's recitation of race-neutral reasons and the trial court's finding that they were factually valid, raised an argument only about a single venireperson, who ended up serving on the jury anyway.  Petitioner is thus asking this Court in its habeas role to second-guess the trial judge's *Batson* determination based on dozens of pages of briefing (and intricate dissection of the transcript of the jury selection process) that the trial judge never saw, based on arguments he never heard because they were never articulated by defense counsel at trial.  Such a manner of review seems, at a minimum, grossly unfair to the trial judge whose decision is being Monday-morning quarterbacked based on a host of arguments never made to him.  This concern loomed large in the Alabama Court of Appeals' determination on direct appeal that it would review Lee's *Batson* objection only for plain error.  That "plain error" review in turn likely led to the appellate court's failure to consider all facts and circumstances, as required by *Batson*.  The point here is simple:  The undersigned has qualms with the procedural posture of petitioner's *Batson* arguments.  In reviewing his *Batson* claim in its federal habeas role, the Court has set aside those concerns and considered those arguments straight-up, without weighing in on the parties' ill-researched debate of whether the state appellate court's "plain error" designation should somehow affect the analysis on habeas review.  *See, e.g., Smelcher v. Attorney General of Alabama*, 947 F.2d 1472, 1477 (11th Cir. 1991) ("Even if Alabama allowed (Continued)

violation here by the State.  Accordingly, notwithstanding the state court's unreasonable application of federal law, Lee is not entitled to habeas relief on Ground 1 of his § 2254 Petition.

**B.      *Prosecutorial Misconduct.***

As Ground 2 of his habeas petition, Lee attacks his state conviction and sentence on the theory that no fewer than nine instances of prosecutorial misconduct during the trial violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

"To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant."  *Spencer v. Secretary, Dep't of Corrections*, 609 F.3d 1170, 1182 (11th Cir. 2010) (citation omitted).  "[A] death sentence is unconstitutional only if the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). More generally, "[p]rosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused."  *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1198 (11th Cir. 2000) (citation omitted).[36]  In making that inquiry, reviewing courts give "considerable weight" to the trial court's "assessment of the prejudicial effect of the prosecutor's remarks and conduct."  *Id.* (citation omitted).

---

review on the grounds of plain error, the law is unclear whether a federal court on a writ of habeas corpus can apply this standard.").  Nonetheless, the fact remains that it appears incongruous, at best, to second-guess a trial court's *Batson* ruling based on a clutch of arguments that defendant never presented to him at the time, but that were devised by appellate or habeas counsel years after the fact.

[36]      *See also United States v. Young*, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.  Instead, … the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."); *Whisenhant v. Allen*, 556 F.3d 1198, 1207 (11th Cir. 2009) (explaining that "a defendant's due process right to a fair trial is not infringed by a prosecutor's remarks that are undesirable or even universally condemned," but that "the comment must have infected the trial with such unfairness that the conviction constitutes a denial of due process") (citation and internal quotation marks omitted).

###### 1.     *Personal Opinions about Evidence, Guilt, and Death Penalty.*

Initially, Lee ascribes misconduct to remarks in closing arguments about what the prosecutor thought or believed.  During closing argument in the guilt phase of the trial, the prosecutor made comments such as the following:  "I think that is not borne out by the evidence," "I don't think … that it is at all relevant," "I believe that's the only choice you can reach on these facts," and "I think that's got a lot to do with that."  (Vol. 4, R-12 at 349, 354; R-13 at 355; R-14 at 376.)  Petitioner also points to the prosecutor's statement during arguments in the penalty phase that, "This is the kind of case that the death penalty requires.  I think it does." (Vol. 4, R-25 at 438.)

The prosecutor's unfortunate tendency during closing argument of prefacing his points with qualifiers like "I think" and "I believe" may have been ill-advised and improper,[37] but it does not come close to satisfying the legal standard for prosecutorial misconduct.  The jury heard overwhelming evidence of Lee's guilt, such that any error in these statements at the guilt phase was harmless and could not have affected his substantial rights.  *See United States v. Frank*, 599 F.3d 1221, 1238 (11th Cir. 2010) ("even when error occurs, the defendant's substantial rights are not affected if the evidence sufficiently established his guilt"); *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) ("When the record contains sufficient independent evidence of guilt, any error is harmless.") (citation omitted).  The trial court also properly issued an adequate curative instruction, to-wit: "You're not to consider as evidence the arguments or statements of the attorneys."  (Vol. 4, R-15 at 401.)

As to the penalty phase statement of the prosecutor's belief, the law is clear that "[a] petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death."  *Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009).[38]  Such was the case

---

[37]     In that regard, appellate courts have cautioned prosecutors using phrases such as "I think," "I feel" and "I believe" to "painstakingly avoid such phraseology."  *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. 1981); *see also Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009) ("During a trial, counsel have a duty to refrain from commenting on their personal views on a defendant's guilt or innocence.").  The prosecutor in Lee's trial repeatedly ran afoul of this stricture.

[38]     *See also Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1998) ("Mills cannot demonstrate that the alleged failure to present mitigating evidence prejudiced him at the penalty phase because the jury recommended a life sentence."); *Routly v. Singletary*, 33 F.3d 1279, 1297 (Continued)

here.  Lee cannot demonstrate that, but for the prosecutor's throwaway four-word remark to the jury that he believed this to be an appropriate case for the death penalty, the outcome of the sentencing phase would have been different.  Besides, the trial court cured any error in the prosecutor's argument by instructing the jury at the close of the penalty phase that "[t]he evidence does not include statements made by attorneys in the course of trial.  What the lawyers say for both the State and the defense is not evidence in the case.  What the lawyers have argued to you is not evidence."  (Vol. 4, R-25 at 452-53.)  *See, e.g., United States v. Grapp*, 653 F.2d 189, 195 (5ᵗʰ Cir. 1981) (no prejudice to defendants where prosecutor used "I think" and "I believe" phrases in closing argument, where the trial judge "instructed the jury that counsel's statements were not evidence and could not be considered in reaching a verdict").

The Alabama Court of Criminal Appeals did not err on direct appeal in rejecting this aspect of Lee's claim of prosecutorial misconduct.

## 2.    *Comment on Defendant's Decision Not to Testify.*

Petitioner also attributes prosecutorial misconduct to statements that he characterizes as an improper comment on his decision not to testify.  It is true, of course, that prosecutors are prohibited from commenting on a defendant's exercise of his Fifth Amendment privilege.  *See, e.g., Bernal-Benitez*, 594 F.3d 1303, 1315 (11ᵗʰ Cir. 2010) ("Nor may the prosecution comment on the defendant's failure to testify."); *United States v. Knowles*, 66 F.3d 1145, 1162 (11ᵗʰ Cir. 1995) ("The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.") (citation omitted).  "A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a

_____

(11ᵗʰ Cir. 1994) ("Routly cannot show that any failure to present mitigating evidence to the jury prejudiced him to any degree whatsoever in the jury's consideration of the penalty because the jury recommended a sentence of life imprisonment anyway."); *Porter v. Dugger*, 805 F. Supp. 941, 946 (M.D. Fla. 1992) ("The fact that the jury recommended life imprisonment precludes a finding that Counsels' assumed deficiency prejudiced Petitioner's sentencing.").  Petitioner offers no authority supporting his position that the Eleventh Circuit's plain statements on this point run counter to clearly established federal law, as demonstrated by U.S. Supreme Court holdings as of the time of the state-court decisions.  *See Reese*, 675 F.3d at 1286 (phrase "clearly established federal law" in § 2254(d) refers to holdings, not dicta, of U.S. Supreme Court decisions as of the time of the relevant state-court ruling).

jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002) (citation omitted). "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so." *Id.*

The § 2254 Petition identifies two statements that Lee maintains were violative of this requirement. First, the prosecutor stated during closing argument in the guilt phase, "Why a man thinks he's got to do that, why he feels he has to kill these people on this occasion, I can't get inside that kind of mind." (Vol. 4, R-12 at 348-49.) As the Alabama Court of Criminal Appeals found, however, this comment cannot reasonably be viewed as a comment on defendant's failure to testify at all. Rather, it was "an obvious comment on the appellant's motive for committing the murders." *Lee*, 898 So.2d at 823. This statement was neither manifestly intended as a comment on Lee's failure to testify, nor was it of such a character that a jury would naturally and necessarily perceive it that way. Thus, petitioner's objection in his § 2254 Petition to the state courts' resolution of this issue is meritless.

The same goes for the second statement. During the closing argument in the penalty phase, the prosecutor made a frankly inscrutable remark, to-wit: "He comes running to you and says, help me, save me. ***Don't want to talk about what I did.*** Don't want the talk about people in the grave yard. People who moan and cry for me, never see me again." (Vol. 4, R-23 at 434 (emphasis added).) The highlighted sentence could mean all sorts of different things. The most reasonable reading is that it appears to be a comment on the defense's strategy of deflecting attention away from events on the day of the murders and instead to Lee's personal characteristics and limitations. To be sure, this rather strange bit of stream-of-consciousness rambling by the prosecutor might possibly (and even reasonably) have been construed as a comment on Lee's failure to testify at trial. But this record does not support a conclusion that either it was manifestly intended as such, or that the jury <u>necessarily</u> would have interpreted the remark in that fashion. As such, this statement does not violate Lee's right to remain silent. Even if it did, the trial court's curative instructions[39] are sufficient to eliminate any concerns

---

[39]   The trial judge specifically instructed the jury that "[n]o inference or conclusion should be drawn by the jury from the fact that the defendant was not sworn and put on the witness stand as a witness in his own behalf, nor should this fact have any weight with the jury in reaching a verdict." (Vol. 4, R-15 at 403.) During the penalty phase, the trial judge likewise (Continued)

about unfair comment on petitioner's silence.  After all, "[w]e presume that jurors follow the instructions given to them."  *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011); *see also Lopez*, 590 F.3d at 1256 ("If the district court takes a curative measure, we will reverse only if the evidence is so prejudicial as to be incurable by that measure.").  And of course, the jury recommended life, so there can be no prejudice at the penalty phase, in any event.

For all of these reasons, petitioner is not entitled to relief on his prosecutorial misconduct claim insofar as it is grounded on allegations that the prosecutor impermissibly commented on his right to remain silent.[40]

### 3.    Arguments Calculated to Inflame Jury's Passions.

Next, Lee accuses the State of improperly appealing to the jury's passion and prejudice in a pair of comments made during the penalty-phase closing argument.  In particular, the prosecutor remarked at one point that "[t]he very fires of hell and damnation lick around his feet."  (Vol. 4, R-23 at 434.)  Shortly thereafter, he told the jury that the victims' families "need to know, that when someone brutally and horribly robs and murders people, they don't have to gather up their friends and their neighbors and their family and go out and hunt them down and carry out the law.  That we have a system of law that we will live by because it will and can work."  (Vol. 4, R-24 at 437.)

Such colorful comments were poorly phrased and perhaps ill-advised; however, that is not enough to entitle Lee to habeas relief.  There is no doubt that "assertions calculated to mislead or inflame the jury's passions are forbidden in the presentation of closing arguments." *Lopez*, 590 F.3d at 1256.  But neither must the prosecutor's remarks be confined to clinical,

---

gave specific instruction that "[t]he law imposes no burden upon Jeffrey Lee to prove or demonstrate the existence of mitigating circumstances" and that "[t]he Defendant does not have to disapprove anything about an aggravating circumstance, the burden is solely on the State to prove such circumstance."  (Vol. 4, R-25 at 445, 447.)

[40]    Oddly, petitioner also frames the "don't want to talk about what I did" comment as misconduct on the grounds that it was misleading.  (Doc. 25, at 40 n.14.)  Petitioner's sole support for the "misleading" contention is that on October 11, 2000, six months <u>after</u> the prosecutor spoke these words, Lee apologized to the victims' families and acknowledged that what he had done was "bad."  Of course, the prosecutor could not have known in April 2000 that Lee would make such a statement in the future.  Accordingly, there was nothing misleading about the prosecutor's argument on this point.

detached statements that are sanitized of moral commentary.  *See Reese*, 675 F.3d at 1291 ("we must recall that capital sentencing is inevitably an emotional exercise that demands the consideration of morality").  The particular comments made here are not the stuff of a federal constitutional violation.  Petitioner's interpretation of the first comment as a statement that Lee's "religious fate had been sealed" (doc. 1, Ground II, ¶ 11) is unreasonable.  At most, the comment suggests that Lee was confronting the prospect of an adverse fate, but that he could still be saved if the jury took his side.[41]  And petitioner's construction of the second comment as a thinly veiled invitation to lynch mob justice (*id.*, ¶ 13) is an unreasonable stretch.  Reviewing those words in context, the prosecutor was simply making a poorly-worded appeal to the virtues of law and order.[42]  But even if petitioner's interpretations were accurate, the state appellate court's overruling of these objections was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.[43]  After all,

---

[41]      As for petitioner's indignation that the prosecution purportedly injected religion into the case, a look through the closing arguments shows that the defense did so earlier and much more blatantly than the State.  During the guilt phase, defense counsel began by saying, "You know in the Bible in the gospel of John they often describe Jesus as being The Word.  You listen throughout the Bible, you can describe other ways, love, truth, we all know what happened here."  (Vol. 4, R-13 at 356.)  And in the sentencing phase, defense counsel argued to the jury, "I think Mrs. Thomas put it, thou shalt not kill, about the Bible.  God didn't say only murderers shouldn't kill, he said, 'Thou shalt not kill.'  He didn't make a distinction."  (Vol. 4, R-23 at 435.)  And defense counsel even asked a defense witness during the penalty phase, concerning the death penalty, "You think that's against the Bible?"  (Vol. 4, R-21 at 427.)  If anyone was invoking religion in this case, it was the defense, not the State.

[42]      Contrary to petitioner's argument, nothing in the prosecutor's comment can be rationally construed as meaning that if these jurors did not recommend a death sentence, then an angry, racist, white-hood-wearing mob would go out and do it for them.  In so contending, petitioner engages in unhelpful hyperbole by straining  the actual words spoken well beyond their plain meaning.

[43]      On this point, it bears noting that "[t]he references to the community indicate the obvious: the jury at the sentencing phase is asked to decide what justice demands that society perform in response to the crime. … A jury's consideration of the appropriateness of retribution is proper."  *Spivey v. Head*, 207 F.3d 1263, 1276 (11th Cir. 2000) (citations and internal quotation marks omitted).

curative instructions were given,[44] and the fact remains that the jury recommended life in any event, such that petitioner cannot show prejudice. This portion of petitioner's prosecutorial misconduct claim is therefore without merit. *See generally Reese*, 675 F.3d at 1293 (no misconduct where prosecutor referred to defendant as a "vicious dog").

### 4.    *Presentation of Facts Concerning Community Sentiment.*

Next, Lee ascribes misconduct to the prosecutor's statement during closing argument on the guilt phase that, "I can only wish that I could communicate to you the feelings that so many people have about the senselessness of this shooting." (Vol. 4, R-13 at 355.) The § 2254 Petition alleges that this remark improperly argued facts not in evidence because it "introduced the notion … that there was a popular consensus that Mr. Lee should have been convicted and was deserving of a death sentence." (Doc. 1, Ground II, at ¶ 14.)

When Lee raised this same argument on direct appeal, the Alabama Court of Criminal Appeals rejected it, reasoning that "the prosecutor did not imply that there were hundreds of people who felt that he should be found guilty. Rather, when viewed in context, his statement was a comment upon the nature of the crimes and a general appeal for law enforcement." *Lee*, 898 So.2d at 826. The Court agrees with the state court that the comment in question did not argue facts not in evidence. Certainly, the remark to which petitioner takes umbrage said nothing about Lee's guilt or innocence, did not imply that the entire community wanted Lee to be convicted, and was utterly silent about community sentiment concerning imposition of the death penalty in this case. Simply put, this aspect of petitioner's prosecutorial misconduct argument is predicated on an unreasonable inference that he has attempted to draw from a stray remark during closing argument that merely commented on the nature of the crimes and appealed for law enforcement. Besides, even if Lee were correct in arguing that the statement was improper, he has not shown prejudice, given the overwhelming evidence of his guilt and the curative instruction given by the trial court that the attorneys' statements were not evidence.

---

[44] During the penalty phase, the trial court instructed the jury that "[t]here's no room for the influence of passion, prejudice, or any other contrary factors." (Vol. 4, R-25 at 454.) There is no evidence and no reason to believe that this instruction was inadequate to cure the prosecutor's overwrought argument about the "fires of hell and damnation" and neighbors going "out and hunt them down and carry out the law."

Thus, this aspect of petitioner's prosecutorial misconduct claim flunks both the "misconduct" and the "prejudice" prongs of the inquiry.

### 5.   *Denigration of Constitutional Rights.*

As the fifth instance of purported misconduct, petitioner complains that the State improperly denigrated Lee's constitutional right to have the jury consider his mitigating evidence.  This contention is founded on the following passage from the prosecutor's closing argument during the penalty phase:  "What's fair?  What's justice?  Oh, but he comes here today and says, oh, help me.  Help me.  How much help did he give Elaine Thompson when he pulled a shotgun and shot her in the face two feet away from her?"  (Vol. 4, R-23 at 434.)  Petitioner construes that comment as implying that he "was not entitled to the procedural protections afforded him."  (Doc. 1, Ground II, at ¶ 15.)  It did no such thing.  By advancing such an argument here, Lee seeks to fit a square peg into a round hole.[45]  Nothing about this quoted passage suggests that the prosecutor was arguing that Lee is not entitled to procedural protections.  As such, the remark is not improper.  Even if it were, petitioner has not shown prejudice, in light of the curative instructions given by the trial judge and the fact that the jury, even after hearing this argument, recommended a life sentence anyway.  In short, this comment cannot support a viable § 2254 claim for prosecutorial misconduct.

### 6.   *Presentation of Non-Statutory Aggravating Circumstances.*

As the sixth instance of alleged prosecutorial misconduct about which he complains, Lee asserts that the prosecutor wrongfully encouraged both the jury and the judge to consider improper aggravating circumstances.  The record basis for this argument is the prosecutor's statement to the jury as follows:  "What are the aggravating circumstances in this case?   You've got to decide what is appropriate?"  (Vol. 4, R-22 at 433.)  Petitioner also relies on the

---

[45]      Petitioner relies on *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), in support of his position.  In *Brooks*, however, the prosecutor "noted that the victim did not have lawyers or a judge or any other procedural safeguards."  *Id.* at 1411.  That comment was a far more direct comparison of the relative procedural rights extended to defendant and victim than Lee complains of here.  Yet even in *Brooks*, the Eleventh Circuit found no impropriety in the prosecutor's words, based on a "more obvious interpretation of the argument" than the contorted, forced reading proffered by defendant.  *Id.*  The same is true here.  The obvious interpretation of the prosecutor's statements in the case at bar was not as a relative weighing of the procedural protections given to Lee and Elaine Thompson, but as a comment on the facts and circumstances of the offense.

prosecutor's statement to the trial judge that "the <u>primary</u> aggravating circumstance here is that this defendant set out to commit an armed robbery," and that Lee's deliberate murder of three people is an "aggravating circumstance, <u>coupled with all the others</u> … [that] outweighs any and all of the mitigating circumstances." (Vol. 4, R-27 at 462 (emphasis added).)

Upon review of the record, the Court finds it pellucidly clear that no prejudice accrued to Lee as a result of these statements. First, the notion that the jury might have been confused and construed the prosecutor's vague statement as meaning that it that it was permissible to consider any aggravating circumstances they desired borders on absurdity. The trial judge unequivocally told the jury that "it's not the function of the lawyers to instruct you on the law, it's my duty to instruct you on the law." (Vol. 4, R-25 at 438.) The judge went on to instruct the jury that "[t]he aggravating circumstance which may be considered by you in this case is that the capital offense was committed while the Defendant was engaged in the commission of [or] an attempt to commit flight after committing or attempting to commit robbery." (*Id.* at 443.) The judge then provided an explanation of the legal elements intentional murder committed during robbery, after which he stated, "The aggravating circumstance I just instructed you on, is the only aggravating circumstance you may consider in this case. ***You may not consider any other circumstance supporting or calling for a sentence of death***." (*Id.* at 444 (emphasis added).) Petitioner's suggestion that the jurors could have somehow been misled by the State into thinking that they were free to consider any aggravating circumstance they wished is unambiguously rebutted by the trial judge's very clear instructions on this point. *See generally Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (there is an "almost invariable assumption of the law that jurors follow their instructions").

And the notion that the prosecutor wrongfully "convinc[ed] the judge … to weigh [other aggravating circumstances] against the mitigating circumstances" is counterfactual. (Doc. 1, Ground II, at ¶ 18.) After all, the trial judge stated before the sentencing phase that "there's only one [aggravating circumstance] and that's murder during robbery." (Vol. 4, R-17 at 414.) As noted *supra*, the trial judge specifically instructed the jury during the penalty phase that this was the only aggravating circumstance they could consider. While the prosecution attempted at the sentencing to invoke another aggravating circumstance (that of intentional murder of multiple persons in a single act or course of conduct), the trial judge expressly rejected this argument because the effective date of that statutory aggravator postdated Lee's conduct. (Vol. 4, R-28 at

491.)  In his written sentencing order, the judge reinforced the point by writing as follows: "No other aggravating circumstances other than the one listed, Murder during Robbery, was proven by the State so therefore ***the Court finds that no other aggravating circumstances exist***."  (Vol. 22, R-74 at 3 (emphasis added).)  The record thus unequivocally refutes petitioner's patently infirm suggestion that the prosecutor convinced the judge to take additional aggravating factors into account in imposing a sentence of death.  A § 2254 Petition must be evaluated based on the record that actually exists, not one that the petitioner might wish to exist.  The Court will not ignore the substantial record facts that conclusively rebut Lee's arguments on this point.[46]

### 7.    *Misstatement of Facts in Evidence.*

Petitioner also imputes constitutional error to the prosecutor's purported misstatements of facts in evidence.  In this regard, Lee cites portions of the State's closing argument in the guilt phase of the trial in which (i) he misquoted Lee's confession as stating, "Then I tried to shoot the women.  Then I shot the woman."  (Vol. 4, R-12 at 347); (ii) he said that "the defense pretty well agrees" that Lee "intentionally and deliberately killed two people" (Vol. 4, R-14 at 375); and (iii) he misstated the testimony of Helen King (the lone survivor of the pawnshop shootings) by stating that she "said when he came back in, he had a different shirt on" (*id.* at 377).

Petitioner has not shown that he is entitled to habeas relief as to any of these comments.  As to the "[t]hen I tried to shoot the women" quotation, the prosecutor indeed garbled the exact text of Lee's confession, although he appeared to correct his error immediately.[47]  However, the State correctly observes that this issue is unexhausted and procedurally defaulted because Lee never argued to the state courts that the State committed prosecutorial misconduct by making

---

[46]    Even if Lee's arguments could be reconciled with the facts as to this issue (which they cannot), habeas relief would remain unavailable given that (i) the jury recommended life, such that no prejudice could have arisen from the State's penalty-phase arguments to them; (ii) petitioner has identified no legal basis for the notion that a prosecutor commits federal constitutional error by making a good-faith (but unsuccessful) argument to the judge about the possibility of considering additional aggravating circumstances; and (iii) as the State points out in its brief, there were glaring exhaustion problems with certain aspects of this issue, which Lee never presented to the state courts for review in the manner that he does here.

[47]    The pertinent excerpt from that written confession was as follows: "The first shot I fired accidentally went off.  The shotgun was pointed at the man when it fired.  I then shot both ladies."  (Vol. 2, R-2 at 167.)  The confession does not include a statement that Lee <u>tried</u> to shoot the women.  That linguistic difference was potentially relevant as to Lee's intent.

that statement.  Review of Lee's brief on direct appeal confirms that fact.  (Vol. 7, R-41 at 53-54.)  Moreover, when confronted with this exhaustion problem, petitioner offered no explanation as to why this aspect of his § 2254 Petition should not be deemed procedurally defaulted on that basis.  Nor has petitioner made any showing of cause and prejudice to excuse the default, much less established a fundamental miscarriage of justice.  Accordingly, this portion of his claim is procedurally defaulted, and will not be considered on the merits.  *See, e.g., Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief").

    With respect to the prosecutor's comment that the defense "pretty well agrees" that Lee intentionally, deliberately killed two people, even assuming that it was improper, there was plainly nothing prejudicial about that statement.[48]  As soon as these words escaped the prosecutor's lips, defense counsel interjected, "We don't agree with that."  (Vol. 4, R-14 at 375.)  So the jury instantly knew that the defense did not concur with the State's characterization of the defense's position.  More importantly, the Court agrees with the Alabama Court of Criminal Appeals' assessment that this statement was "not of such a nature" as to "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Lee*, 898 So.2d at 829.  There was no prejudice, particularly because of the defense's immediate denial, the curative

---

[48]     It bears noting, as an initial matter, that the prosecutor's assertion was not nearly as extreme or inflammatory as petitioner now suggests.  After all, in defense counsel's closing argument minutes before the prosecutor made the "pretty well agrees" comment, defense counsel made statements like, "Jeffery Lee here, he murdered two people.  There's no question about that."  (Vol. 4, R-13 at 356.)  Later in his closing argument, defense counsel reiterated the point, stating, "Remember again we all know what the truth is, Jeffery Lee murdered Mr. Ellis and Mrs. Thompson.  No question about that."  (*Id.* at 362.)  A third time in his closing, defense counsel went back to that concession, stating, "we are not trying to hide anything, we all know what happened.  He murdered Jimmy Ellis and Elaine Thompson.  No question about that.  That's what happened."  (*Id.* at 368.)  And even a fourth time, defense counsel said, "We're not even going to argue the point about it's anything less than murder. … This is murder.  This is murder."  (*Id.* at 369.)  In light of these defense arguments, it was hardly outrageous for the prosecutor to state that the defense "pretty well agrees" that Lee "intentionally and deliberately killed two people."  So it appears this statement was not an improper construction of the defense's heavily emphasized concessions in its closing argument, and therefore was not misconduct at all.

instructions given by the Court that the attorney's arguments were not evidence, and the overwhelming evidence of guilt.  The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

Finally, the State's comment that Helen King had testified that Lee had changed his shirt the second time he went into the store may or may not have been inaccurate.  It certainly was not misconduct.  The actual transcript of King's trial testimony on this point was as follows:

"A:      No, he just came in and started firing.
"Q:      This was the same man you had seen moments earlier seated here at the table?
"A:      He was wearing a different shirt then."

(Vol. 3, R-9 at 219.)  The "then" is ambiguous.  Was she comparing defendant's attire on the two occasions she saw him on the day of the shootings?  Or was she comparing his attire on the day of the shooting with his attire at trial?  The statement is ambiguous.  It was entirely proper and permissible for the prosecutor to argue his interpretation of that evidence during closing argument.[49]

### 8.      *Misstatement of Law to Jury.*

Yet another claim of prosecutorial misconduct advanced by Lee on habeas review concerns an alleged misstatement of law.  Petitioner takes exception to the State's comment during closing argument in the guilt phase regarding intent, wherein he said:

"What is an intent to murder?  Point a gun at somebody.  Intends to do it.  Pull the trigger.  What is going to happen?  You're led to the natural and reasonable question of what you do.  You point a .12 gauge shotgun and shoot it off at somebody, you're going to kill them unless they get awful lucky."

(Vol. 4, R-12 & 13, at 354-55.)  Petitioner maintains that this argument "improperly relieved the State of its burden to prove intent" by informing the jury that pointing a gun at a person is sufficient to prove intent to murder.  (Doc. 1, Ground II, at ¶ 24.)

In finding no error on direct appeal, the Alabama Court of Criminal Appeals correctly explained that the prosecutor's statement did not convey to jurors that the State had no burden of proof on intent, but merely argued permissible inferences to be drawn from the evidence.  *See*

---

[49]      Even if the prosecutor's remark about changing shirts was a misstatement of facts in evidence, it was not and could not have been prejudicial to the defense for the reasons stated by the Alabama Court of Criminal Appeals on direct appeal; therefore, habeas relief would remain unwarranted on this claim, in any event.

*Lee*, 898 So.2d at 829.  The state appellate court further observed that the above-quoted comments were made in the context of discussing Lee's shooting of King, not the victims who actually died; and that "the trial court thoroughly instructed the jury on intent with regard to capital murder," such that the prosecutor's comment did not infect the trial with unfairness as to render Lee's conviction a violation of his due process rights.  *Id.*  The Court finds no error in the state court's analysis of this issue, much less the sort of extreme malfunction of the state criminal justice system that is necessary to afford relief to a state prisoner in a § 2254 motion.[50]

> **9.      De-Emphasis of Jurors' Role in Sentencing Determination.**

Petitioner also ascribes constitutional error to a course of conduct by the prosecutor that he claims improperly de-emphasized jurors' role in the sentencing process and instructed jurors that they had a duty to convict Lee and recommend a death sentence.

The first part of this assignment of error is petitioner's allegation that it was misconduct for the prosecutor to notify the jury that its role at sentencing was advisory.[51]  Petitioner

---

[50]      In arguing otherwise, petitioner relies on *Sandstrom v. Montana*, 442 U.S. 510 (1970) for the proposition that "[b]ecause David Sandstrom's jury may have interpreted the judge's instructions as constituting a burden-shifting presumption … we hold the instruction in this case unconstitutional."  *Id.* at 525.  But petitioner is comparing apples to oranges.  *Sandstrom* involved a judge's instructions on the law to a jury, whereas here Lee is complaining about a prosecutor's comment about the law.  That distinction is enormously important given that the trial judge in this case gave the jury clear instructions concerning intent in the capital murder context, and told them that it was the judge's role (and not that of the lawyers) to instruct them on the law.  Thus, any error in the prosecutor's somewhat muddled statement that pointing a gun at someone and pulling the trigger suffices to show intent to murder is overridden by the trial judge's specific detailed instructions on intent.  There is no *Sandstrom* error here, and certainly no decision contrary to *Sandstrom*'s holding was made by the state appellate court on direct appeal of Lee's conviction and sentence.

[51]      Although petitioner characterizes the prosecutor's statements as "emphasiz[ing]" the advisory nature of the jury's role, in fact the prosecutor simply mentioned it twice.  In his opening statement in the penalty phase, the prosecutor said that the jury's job at that juncture was to "make your recommendation to the Court as to whether you recommend life without parole or death for the defendant."  (Vol. 4, R-18 at 416.)  Then, in closing argument, the prosecutor stated, "You have to make a recommendation to the judge.  Very serious recommendation as to whether you as a group recommend life without parole as a punishment or death."  (Vol. 4, R-22 at 432.)  This is far from excessive emphasis of the advisory nature of the jury's responsibility at sentencing.  This case is thus distinguishable on its face from the line of case authorities finding misconduct where a prosecutor makes comments that "the jury should not be made to feel that the entire burden of the defendant's life was on them."  *Darden v. Wainwright*, 477 U.S. 168, (Continued)

identifies no authority of any kind – much less U.S. Supreme Court holdings – for the proposition that a prosecutor is barred from telling a jury in the penalty phase that it is making a recommendation to the judge.  This Court is aware of none.  By mentioning that the jury was charged with making a recommendation on punishment, the prosecutor was only repeating that which the judge had already told the jury.[52]  Nor is there any factual basis for petitioner's apparent suggestion that the State tried to convince the jury that it was no big deal whether they selected life or death, since they were just making a recommendation.   To the contrary, in the same breath as he noted that the jury's task was to make a recommendation, the prosecutor characterized it as a "difficult problem" and a "[v]ery serious recommendation."  (Vol. 4, R-22, at 432.)  The record thus conclusively rebuts petitioner's assertion that the prosecution made light of the jury's role at sentencing by emphasizing that it would be making an insignificant, low-stakes, unimportant recommendation.  There was no improper conduct.  "A permissible argument … can never be unconstitutional."  *Reese*, 675 F.3d at 1291 (citations omitted).

Nor does Lee improve his position by characterizing the prosecutor's argument as being "that it was actually the jury's <u>duty</u> to convict Mr. Lee of capital murder and sentence him to death."  (Doc. 1, Ground II, at ¶ 27.)  That is not a fair interpretation of the State's comments.  Rather, the Alabama Court of Criminal Appeals correctly observed as follows:

> "Contrary to the appellant's assertion, the prosecutor did not inform the jurors that it was their duty to find him guilty.  Rather, the prosecutor simply asked the jurors to do their duty, even though it was difficult; asked the jurors to use their common

---

183 n.15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).  "In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced rule on the sentencing process."  *Id.*  To the contrary, the State expressly told the jurors that their role was "very serious."  The challenged comments were not improper, as a matter of law.

[52]     For example, at the outset of the penalty phase, the judge stated that "evidence will be presented to you by aggravating and mitigating circumstances for you to make a recommendation as to punishment."  (Vol. 4, R-16 at 413.)  He later informed the jury, "Again, you'll make a recommendation either for life imprisonment without possibility of parole, or death.  In general, you'll base your recommendation on the aggravating circumstance and mitigating circumstances."  (Vol. 4, R-17 at 415.)  Thus, the record clearly establishes that the jury was fully aware of its advisory role in recommending a punishment before the prosecutor mentioned it to them.  It is simply not the case that the State improperly "let the cat out of the bag" on that subject.

> sense in performing their duty; and asked the jurors to return a verdict of guilty of capital murder and attempted murder."

*Lee*, 898 So.2d at 826.  The Court perceives no error in the Alabama appellate court's analysis of these comments made during the guilt phase.[53]

During the penalty phase, the prosecutor also made references to the jury's duty which Lee now claims were unconstitutional.  Those statements included the following:  "Same question before you this afternoon.  Not an easy one.  Lord knows I think if you had your choice right now, you would rather be someplace else.  It's your duty."  (Vol. 4, R-24 at 438.)  On its face, this comment is not telling the jurors that they have a duty to recommend a death sentence; to the contrary, it acknowledges that the jury's decision is "[n]ot an easy one" but that it is their duty to make a decision nonetheless.  There is nothing improper about such a statement.[54]  Precisely the same analysis attaches to the prosecutor's statement that, "It's not an easy decision to make.  Everybody here asks only that you ***do your duty as you see it*** and be able to look yourself in the eye in the morning and say, I did what I was called upon to do."  (*Id.* (emphasis added).)  He was not telling the jurors that they had a duty to recommend death.  He was telling them to do their duty <u>as they saw it</u>.[55]  Such a comment is not improper and cannot support a constitutional claim of prosecutorial misconduct on habeas corpus review.[56]

---

[53]      Far from telling the jury that it was their duty to convict Lee, the prosecutor's actual words were, "Nobody said it's going to be easy.  Not that you're supposed to be happy about it, just supposed to do the duty imposed on you."  (Vol. 4, R-14 at 377.)  Moments later, he said, "Your job is to decide what those facts show."  (*Id.* at 378.)  Thus, the prosecutor was telling the jurors that their job was to find the facts, no matter how difficult or unpleasant that function might be.  That is very different indeed from a directive to the jurors that they were operating under a "duty" to find the defendant guilty.

[54]      In this regard, petitioner's reliance on *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), is misplaced.  In *Young*, the prosecutor said, "If you feel you should acquit him for that it's your pleasure.  I don't think you're doing your job as jurors" if they voted to acquit the defendant.  470 U.S. at 5.  The prosecutor in Lee's case made no such comments of the sort that were roundly condemned in *Young* and its progeny.  Instead of telling the jurors that they had the duty to recommend death, he said only that they had the duty to make a difficult decision and that "everybody here" (which would necessarily include the State and the defense) wanted them to do their duty.

[55]      The prosecutor's statement that the jurors needed to do their duty as they saw it in making their sentencing recommendation was functionally no different than the trial court's ensuing directive that, "It's your duty to decide the facts and apply the law which I give to you to (Continued)

-41-

### 10.   *Cumulative Effects.*

Lastly on the prosecutorial misconduct claim for relief, Lee argues that the aggregate effect of the complained-of instances of prosecutorial misconduct was to render both the guilt phase and the penalty phase of his trial fundamentally unreliable.  The law is clear that the "cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary."  *Frank*, 599 F.3d at 1238 (citation omitted).  For a cumulative error argument, just like any other iteration of a prosecutorial misconduct claim, it is not enough for a habeas petitioner to show "that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986) (citation omitted).  Rather, what is necessary is that the petitioner show those comments to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (citation omitted); *see also Spivey v. Head*, 207 F.3d 1263, 1275 (11th Cir. 2000) ("When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair.").

When the entire record is reviewed, the undersigned is convinced that the prosecutor's few improper comments – viewed in the context of his entire argument, defense counsel's argument, the instructions of the trial judge, the overwhelming evidence of guilt and the jury's

---

those facts."  (Vol. 4, R-25 at 438.)  Taken in context, the prosecutor's use of the word "duty" in his closing argument was no more objectionable or improper than the trial judge's use of the same word in his instructions.  Both were getting at the same concept:  The jurors faced a difficult decision, but nonetheless had a duty to make that decision by deciding facts and applying law.

[56]   Petitioner's contention that the prosecutor attempted to strong-arm or pressure the jurors into recommending death by telling them they were obligated to do so is further undermined by other passages in the transcript.  Most tellingly, the prosecutor stated to the jurors during the penalty phase, "[N]o one in this courtroom, no member of this family will say that you're some sort of weak, cowardly person because you voted for life without parole or that you are some evil bad person because you think death is the proper sentence.  No one.  That's something you've got to deal with yourself."  (Vol. 4, R-22 at 432-33.)  This comment is the very antithesis of the "undue pressure" that petitioner accuses the prosecutor of placing on the jury to force them to return a death recommendation.  The habeas petition ignores these passages, opting instead for a selective reading of excerpts that petitioner thinks might aid his cause while disregarding those that conclusively refute his position.

recommendation of a life sentence – did not render the guilt phase or the sentencing phase fundamentally unfair and did not prejudice Lee.[57]   There was no miscarriage of justice occasioned by the prosecutor's sometimes questionable or even outright improper comments. Accordingly, petitioner is not entitled to habeas relief on his prosecutorial misconduct claim, whether those incidents are considered individually or in the aggregate.

> **C.    Violation of Petitioner's Rights under the Confrontation Clause.**

As his third ground for habeas relief, Lee asserts that his "Sixth Amendment rights were violated at trial by the testimony offered by the State through its expert witness Dr. Kathy Ronan."  (Doc. 1, Ground III, at ¶ 1.)

At trial, the State called as a rebuttal witness Dr. Kathy Ann Ronan, a clinical psychologist employed by the State of Alabama.  A purpose of Dr. Ronan's testimony was to rebut the testimony of defense psychometrist Dr. Donald Blanton, who opined that the results of his testing showed that Lee was mentally retarded.  Dr. Ronan offered an expert opinion that "there was no mental illness or mental retardation that would have impaired [Lee's]

---

[57]    With regard to the penalty phase, one other aspect of the prosecutorial misconduct analysis bears emphasis.  On direct appeal, the Alabama Court of Criminal Appeals opined that the numerous instances of prosecutorial misconduct that Lee ascribed to the penalty phase did not entitle him to relief because the jury had recommended a life sentence, such that any error in the prosecutor's arguments to that jury was harmless.  *See Lee*, 898 So.2d at 830 ("[T]he jury recommended a sentence of imprisonment for life without the possibility of parole.  Therefore, error, if any, in the prosecutor's actions during the penalty phase was harmless.").  In his reply brief, Lee argues that the Alabama court was incorrect.  But he has not shown that the Alabama court's harmless error analysis on this point was contrary to, or an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, which is necessary for him to receive habeas relief under 28 U.S.C. § 2254(d)(1).  Petitioner does not suggest that the Supreme Court has ever concluded that prosecutorial misconduct in a penalty phase is not harmless error if the jury returns a recommendation of life imprisonment.  And the Eleventh Circuit has opined the exact opposite.  *See Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009) (in habeas review of Alabama capital case, "[a] petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death.").  Surely the Alabama state court's ruling could not be an unreasonable application of clearly established federal law when the Eleventh Circuit Court of Appeals has construed the prejudice analysis in a prosecutorial misconduct claim the same way the state court did here, in a penalty phase proceeding wherein the jury recommended life.  While petitioner may well believe that the numerical margin by which jurors recommend life should matter for the prejudice analysis, he identifies no authority, much less clearly established federal law, mandating or even bolstering such a proposition.

understanding of right or wrong during the time of questioning." (Vol. 3, R-11 at 332.) Dr. Ronan further opined that the results of certain tests that Dr. Blanton had performed on Lee were inconsistent with both Dr. Ronan's findings and Lee's academic performance. She elaborated that in a personality test she had administered, Lee "had exaggerated his psychiatric symptoms on that test," and that a different test administered by Dr. Blanton had been invalidated for the same reason. (*Id.* at 333.) In subsequent questioning, Dr. Ronan indicated her opinion that Lee was "[m]aking it up" and "trying to fake that [he's] got a psychiatric condition." (*Id.* at 333-34.) She explained the grounds for this conclusion as follows: (i) the portions of the IQ test she administered to Lee showed him to be "in the more low average range" of intelligence, not retarded; (ii) his academic records "would suggest that he's even higher than that"; and (iii) he had reported hallucinations to Dr. Ronan, to Dr. Blanton, and to an unidentified psychiatrist who had seen him at the jail, but his reports to all three of them had been different and inconsistent (*i.e.*, Lee could not keep his story straight about those hallucinations). (Vol. 3, R-11 at 334; Vol. 4, R-11 at 335.)[58]

"Under the Sixth Amendment, a criminal defendant has the right to confront his accusers, which includes the right to effective cross-examination." *Childers v. Floyd*, 642 F.3d 953, 970 (11th Cir. 2011). The Supreme Court has required that, "[w]here testimonial evidence is at issue, … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). According to petitioner, when the State offered Dr. Ronan's testimony referencing Lee's hallucination reports to the unidentified jail psychiatrist, it violated his Confrontation Clause rights because he never had the opportunity to cross-examine that unknown psychiatrist, and that person did not appear in court.

The legal premise of this habeas ground is highly questionable. It is not at all clear that a prosecution expert is forbidden under the Confrontation Clause from relying on a non-testifying

---

[58]     On this last point, Dr. Ronan testified, "He told me that he had suffered from hallucinations. … He also reported this to a psychiatrist who had seen him in the jail after the alleged offense, but his report to that psychiatrist and his report to me were different. So he was giving different histories to different people. I've read this report by Dr. Blanton, and he gave Dr. Blanton a third version or third different presentation than he gave me or the other doctor." (Vol. 3, R-11 at 334; Vol. 4, R-11 at 335.) Defendant's counsel objected to none of this testimony, either on Confrontation Clause grounds or otherwise.

expert's written observations in forming her opinion.  *See, e.g., United States v. Steed*, 548 F.3d 961, 976 n.13 (11th Cir. 2008) (rejecting *Crawford* argument because "there is no binding precedent from the Supreme Court or this Court regarding what otherwise inadmissible evidence an expert may rely upon in forming an opinion"); *United States v. Ramos-Gonzalez*, 664 F.3d 1, 5 (1st Cir. 2011) ("Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal."); *United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010) (emphatically rejecting notion that "*Crawford* silently invalidated Rule 703 insofar as it permits experts to rely on statements, such as the interviews here, that happen to be testimonial," so long as the expert is not "merely acting as a transmitter for testimonial hearsay").  The state courts' resolution of this issue could not have been contrary to clearly established law, because it is not clearly established in the federal courts that the Confrontation Clause is violated whenever an expert identifies inadmissible evidence as being part of the basis for his or her independent judgment.

Even if the Court were to assume that Dr. Ronan's reliance on discrepancies between Lee's reported hallucinations to her and his reported hallucinations to the jail psychiatrist in forming her opinion that he was exaggerating mental illness effectively introduced testimonial hearsay against Lee, in violation of the Confrontation Clause, Lee would remain ineligible for relief.  The Eleventh Circuit has explained that in habeas corpus proceedings, the relevant harmless error standard of review is "whether the Confrontation Clause error alleged in this case had substantial and injurious effect or influence in determining the jury's verdict."  *Grossman v. McDonough*, 466 F.3d 1325, 1339 (11th Cir. 2006) (citation and internal quotation marks omitted).  Under this test, "[e]rrors are harmless where there is significant corroborating evidence … or where evidence of guilt is overwhelming."  *Guzman v. Secretary, Dep't of Corrections*, 663 F.3d 1336, 1355 (11th Cir. 2011).

Here, any Confrontation Clause error by the trial judge in admitting Dr. Ronan's unobjected-to testimony that Lee reported hallucinations differently to her than to the jail psychiatrist was harmless.  The central thrust of Dr. Ronan's testimony was not that Lee was faking mental illness; rather, it was that he is not mentally retarded.  His "exaggeration" was but one of numerous considerations that she considered in reaching that fundamental opinion of no retardation.  There is no indication and no reason to think that the jail psychiatrist report was the

linchpin on which Dr. Ronan's entire opinion of no mental illness or retardation rested. Moreover, Dr. Ronan mentioned the jail psychiatrist's report once in a single sentence of her testimony, without detailing the contents of that report and how it differed from her own dealings with Lee on the subject of hallucinations.  Lee identifies no portion of the State's closing argument where it ever mentioned (much less emphasized) Dr. Ronan's opinion that Lee was exaggerating or malingering.[59]

Notwithstanding the foregoing, petitioner insists that he suffered "overwhelming" prejudice by virtue of Dr. Ronan's reference to the jail psychiatrist's report.  (Doc. 25, at 58.)  By way of elaboration, petitioner argues that this Confrontation Clause violation "was the central basis for the State's position that Mr. Lee presented contradictory mental health conditions."  (*Id.* at 59.)  Petitioner vastly overstates the import of the challenged testimony.  In the first place, the "contradictory mental health conditions" issue was a minor point to Dr. Ronan's testimony, and her opinion of no mental retardation would be unaffected by its wholesale deletion.  In the second place, her "exaggeration" opinion was founded on much more than a simple comparison of Lee's reports of hallucinations to her with those to the unnamed jail psychiatrist.  Dr. Ronan testified that her opinion that Lee was faking rested on a personality test that she had administered to him (which revealed that he exaggerated his psychiatric symptoms), a Dr. Blanton psychological test that had been invalidated because of exaggeration, her IQ test items (which showed that he was in the low average range, not retarded), the discrepancy between Lee's test results and school records (which showed that he functioned even higher than the low average range),[60] the discrepancy between Lee's hallucinations as reported to Dr. Ronan and as

---

[59]   Instead, Lee points only to a single passage of the State's opening, wherein the prosecutor indicated that Dr. Ronan "found that he was attempting to be a malingerer, to falsify his condition."  (Vol. 3, R-7 at 200.)  Yet in that section of his opening, the prosecutor said nothing about any jail psychiatrist's report or how it differed from Lee's report to Dr. Ronan.

[60]   In this regard, the jury also heard from Van Smith, Principal at Billingsley High School, who testified that Lee had attended school there from 1989 to 1995, that he "was a good student," that he was not in special education classes, that Lee was enrolled in "the advanced track preparing for college," that he maintained "average grades, Bs and Cs" at the school, and that he "passed the high school graduation exam."  (Vol. 3, R-10, at 323-24.)  And Lee's own uncle testified during the penalty phase that "when he was growing up, he was kind of a smart child."  (Vol. 4, R-21 at 425.)  Another witness who had known Lee for years specifically denied the suggestion that Lee was "kind of slow."  (Vol. 3, R-9 at 264.)  Lee's employer testified that (Continued)

reported to the jail psychologist, and the discrepancy between Lee's hallucinations as reported to Dr. Blanton and those reported to the other two. This discussion vividly demonstrates that the jail psychiatrist's report on hallucinations was not a "central basis" for any of Dr. Ronan's opinions, but was only one piece in a much larger collage of evidence that all pointed to the same conclusion.[61] There is no evidence and no reason to believe that Dr. Ronan's "exaggeration" opinion hinged to any significant degree on what Lee had reported to the jail psychologist. There is considerable evidence to the contrary. As such, the Court readily concludes that any Confrontation Clause error that occurred when Dr. Ronan testified about a jail psychiatrist's observations recounting Lee's complaint of hallucinations was harmless (*i.e.*, it did not have substantial and injurious effect or influence in determining the jury's verdict).[62]

> **D.      Illegal Gathering of Psychiatric Evidence.**

The fourth ground for relief articulated in Lee's § 2254 Petition is an allegation that petitioner's Fifth Amendment privilege against self-incrimination was violated when the State introduced evidence concerning a pretrial psychiatric examination, prior to which he had never been advised of his *Miranda* rights.

─────────────────────

Lee worked at his lumber yard as a regular employee, and that he was a capable worker who followed instructions. (Vol. 3, R-10 at 319.) There was thus abundant evidence of malingering, even without considering Dr. Ronan's offhand reference to a statement that Lee made to a non-testifying jail psychiatrist.

[61]     That collage is just the sort of "significant corroborating evidence" that renders Confrontation Clause errors harmless. *See Guzman*, 663 F.3d at 1355.

[62]     This reasoning and result are consistent with the Alabama Court of Criminal Appeals' rejection of Lee's Confrontation Clause claim on direct appeal. *See Lee*, 898 So.2d at 811-12 ("Dr. Ronan made only one brief reference to a statement the appellant made to a psychiatrist who saw him while he was in jail, and she used that as an example of the appellant exaggerating his psychological symptoms. However, she testified that her testing had already shown that he was exaggerating his psychological symptoms."). That the state court did not place its observations of the obvious infirmities in Lee's assignment of error into the formal framework of a Confrontation Clause harmless-error analysis in no way dilutes the correctness of its reasoning and conclusion. The state appellate court's resolution of this issue was neither contrary to, nor an incorrect application of, clearly established federal law; therefore, § 2254 relief is unavailable to Lee on this ground.

#### 1.     The State's Introduction of Evidence from Lee's Competency / Mental Defect Evaluation.

At the outset of his criminal prosecution, Lee filed notice of his intent to pursue a special plea of not guilty by reason of insanity.  (Vol. 1, R-2 at 31.)[63]  On that basis, the State filed a request for court-ordered mental examination of Lee.  (*Id.* at 33.)  The trial court granted the motion and entered an order requiring Lee to "undergo an examination by a qualified mental health professional … certified to conduct clinical evaluations of competency to stand trial and mental state at the time of the offense."  (*Id.* at 31.)  Based on that ruling, Dr. Kathy Ronan examined Lee on behalf of the State to evaluate his competency to stand trial and mental state at the time of the offense.  The defense later abandoned the competency issue and indicated on the record that Lee was not proffering a "mental disease or defect" defense.  (Vol. 3, R-9 at 306.) This abandonment was further confirmed at the charge conference, when the trial judge observed that the defense had not requested an insanity charge.  (Vol. 4, R-11 at 341-42.)

Nonetheless, at trial, the defense called its expert psychometrist, Dr. Donald Blanton, to the stand.[64]  Dr. Blanton testified that he had evaluated Lee on two occasions after the killings of Ellis and Thompson, and had administered a battery of tests.  According to this witness, Lee had scored "in the middle range of mental retardation" on the Wechsler Adult Intelligence Scale, Third Edition, which is a commonly used I.Q. test.  (*Id.* at 310-11.)  He also completed other tests, which showed that Lee performed at a second-grade level in arithmetic and spelling, and at a sixth-grade level in reading.  (*Id.* at 312.)  From further testing, Dr. Blanton concluded that Lee "was not psychotic and that he was having some depression secondary to his situation."  (*Id.* at 314.)  Dr. Blanton's core opinion was that Lee was "within the mild range of mental retardation."  (*Id.* at 315.)

---

[63]     At arraignment, Lee entered a plea of "[n]ot guilty and not guilty by reason of mental disease or defect."  (Vol. 2, R-4 at 7.)

[64]     The State objected to Dr. Blanton's testimony on the ground that "I did not understand there's anything that indicated the defendant is not competent to stand trial or is insane or suffers from a mental disease or defect that might render him incompetent or not being responsible at the time.  And as such, I would object to it as being immaterial to any issues in this case."  (Vol. 3, R-9 at 305.)  The trial judge overruled that objection, but cautioned the defense that the State would "probably have four or five rebuttal witnesses" to Dr. Blanton's testimony on mental retardation.  (*Id.*)  The State went on to do just that.

In rebuttal of Lee's mental status evidence (but not in its case-in-chief), the State called Dr. Ronan, who testified that she had examined Lee in July 2009 in connection with the competency / mental state issues that Lee had initially raised. (Vol. 3, R-11 at 331.) Dr. Ronan testified to her opinion "that there was no mental illness or mental retardation that would have impaired his understanding of right or wrong during the time of questioning." (*Id.* at 332.) Dr. Ronan explained that her opinion was drawn from various sources, including tests that she had performed as well as his statement to her about hallucinations, which differed materially from his reports of hallucinations to other mental health providers, leading Dr. Ronan to conclude that he was exaggerating or malingering. (*Id.* at 332-34; Vol. 4, R-11 at 335.) Petitioner maintains that Dr. Ronan's testimony concerning the results of the competency examination was a violation of Lee's Fifth Amendment rights, inasmuch as Lee was never given *Miranda* warnings in connection with that evaluation and the statements he made to Dr. Ronan therein.

### 2. *Application of* **Estelle v. Smith** *and its Progeny.*

The constitutional principle invoked by Lee has been articulated by the Supreme Court in the following terms: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness." *Estelle v. Smith*, 451 U.S. 454, 468, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

Subsequent authorities have narrowed the reach of *Estelle v. Smith* considerably. For example, in *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court applied the *Smith* reasoning to embrace the proposition that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution." 483 U.S. at 422-23. In *Buchanan*, the defendant had joined in a motion for psychiatric evaluation and, at trial, his "entire defense strategy was to establish the 'mental status' defense of extreme emotional disturbance." *Id.* at 423. Under those circumstances, the Supreme Court held that the introduction of the psychiatrist's report for the

limited purpose of rebutting the defendant's "mental status" defense "does not constitute a Fifth Amendment violation." *Id.* at 424.

Numerous courts have construed the *Smith / Buchanan* line of authorities as allowing the prosecution to put on psychiatric evidence where the defendant presents a defense relating to his mental state and utilizes expert testimony to advance it.   For example, as one federal court of appeals has opined, "the introduction of the government-retained experts' testimony in rebuttal did not constitute error because the defense initially raised the issue of Curtis's mental status and introduced evidence which tended to support the issue."   *United States v. Curtis*, 328 F.3d 141, 144-45 (4th Cir. 2003) (no Fifth Amendment violation where government used psychiatric testimony drawing on defendant's statements during competency examination, and such testimony was presented to rebut defendant's diminished capacity defense); *see also Gibbs v. Frank*, 387 F.3d 268, 274 (3rd Cir. 2004) (summarizing Supreme Court precedents as holding that Fifth Amendment privilege "can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant has not been given *Miranda* warnings," thereby enabling "the prosecution to use the interview to provide rebuttal to the psychiatric defense"); *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) ("The Supreme Court has also recognized that a defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue."); *White v. Johnson*, 153 F.3d 197, 200 n.2 (5th Cir. 1998) ("This court has long recognized that a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting in kind.") (citation omitted); *Schneider v. Lynaugh*, 835 F.2d 570, 576-77 (5th Cir. 1988) (where defendant put his mental state at issue in trial by calling social workers and counselors, their testimony was "analogous to the expert psychological evidence that the defendant introduced in *Buchanan*," and there was no Fifth Amendment violation because "the State's only effective means of countering Schneider's [mental] defense was independent psychological testimony"); *see generally Hughes v. Mathews*, 576 F.2d 1250, 1259 (7th Cir. 1978) (noting that Fifth Amendment privilege against self-incrimination was not implicated by prosecution's use of statements given by defendant during

pre-trial psychiatric evaluation, where defendant argued that he lacked the requisite specific intent for first-degree murder).[65]

Lee placed his mental state firmly at issue by interposing a competency / insanity defense at the outset of this case. There can be no question that Dr. Ronan's evaluation of petitioner as to those competency issues before trial was entirely proper when it was performed. Although Lee later abandoned the competency / insanity defense, his purported mental retardation remained the focal point of his defense at trial. He called Dr. Blanton (an expert witness) to testify about psychological tests as to which Lee had scored in the "middle range of retardation." And he relied heavily on such evidence in his closing argument during both the guilt phase and the penalty phase, wherein the defense asserted that Lee suffered from a "mental problem."[66] Under

---

[65]    The Eleventh Circuit spoke directly to this issue a quarter century ago, reaching the same conclusion as the above decisions do, to-wit: "[P]etitioner in the present case chose to bring psychiatric evidence to the jury's attention and cannot now complain because the State attempted to counter his argument with evidence of its own. Just as a defendant cannot take the stand and lie, secure in the knowledge that his prior confession will be excluded solely because he had not received *Miranda* warnings, ... **we find nothing in the Constitution that prohibits the State from introducing psychological opinions based on statements a defendant has given in the absence of Miranda** *warnings when the defendant himself plans to make his mental abilities an issue*." *Hargrave v. Wainwright*, 804 F.2d 1182, 1192 (11th Cir. 1986) (emphasis added), *vacated on other grounds*, 809 F.2d 1486 (11th Cir. 1987). It does not appear that the Eleventh Circuit has ever retreated from the *Smith / Buchanan* interpretation set forth in the now-vacated *Hargrave* opinion, which at any rate closely parallels the authorities from other courts of appeals, as described *supra*. Moreover, the *Hargrave* reasoning ultimately boils down to common sense: If a defendant puts his mental abilities at issue in his own defense at trial, he ought not be able to hide behind *Miranda* to prevent the prosecution from submitting available evidence to rebut that evidence. Petitioner identifies no case authorities that have ever criticized or rejected such reasoning.

[66]    In the guilt-phase closing argument, defense counsel told the jury that, "You all heard what Dr. Blanton testified to about his skills. Second grade. We went over the tests. He said 80 or 90 percent of the population would score higher than Jeffrey [*sic*]. That's most everybody on the planet walking around. Folks, that's low. That's about as low as you can go. ... You got a combination of drugs and a mentally retarded person is not going to react the same way you and I would react." (Vol. 4, R-13, at 366-67.) To hammer home the point about mental retardation, defense counsel concluded his closing argument by saying, "I want y'all to look at Jeffrey [*sic*] over there. Take a look at him. I think y'all can come to the same conclusion, there's something wrong with Jeffrey [*sic*]. Thank you." (*Id.* at 370.) Defense counsel resumed the theme in the penalty phase closing argument by asserting, "This man has a mental problem. Are we going to kill him?" (Vol. 4, R-23 at 435.) He also stated, "This man has no prior (Continued)

a straightforward application of *Smith* and *Buchanan*, the State was entitled to counter Lee's defense and expert testimony concerning his mental abilities by offering psychological evidence of its own.  The introduction of such evidence was not a violation of Lee's Fifth Amendment rights, because the Constitution does not prohibit the State from introducing psychological opinions based on un-*Mirandized* statements by a defendant who places his mental abilities at issue in trial.

As shown by the foregoing discussion, in rejecting Lee's *Miranda* argument on direct appeal, the Alabama Court of Criminal Appeals did not reach a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court.[67]  Habeas relief is therefore precluded on this ground under 28 U.S.C. § 2254(d).

> ### E.      Erroneous Statements of Law by Trial Judge.

As Ground V in his § 2254 Petition, Lee ascribes error to three aspects of the trial judge's instructions to the jury during the sentencing phase.  The Court considers each of these objections in turn.

> ### 1.      Erroneous Instruction that Intent is Not Required for Intentional Murder During Robbery.

First, petitioner states that "during the court's charge to the jury on Counts 1 and 2 (intentional murder during robbery), the trial court erroneously instructed the jury that intentional murder does not require intent."  (Doc. 1, Ground V, at ¶ 2.)  Lee's assertion on this point is incorrect, or at least highly misleading.  In charging the jury on the offense of "intentional murder during robbery," the trial court consistently, correctly instructed that specific intent to kill

---

criminal history.  The reason he did that is because of mental retardation or drugs or for whatever reason he did it …."  (*Id.* at 436.)

[67]      The Alabama Court of Criminal Appeals observed that Lee "clearly based his defense on a contention that there was something wrong with his mental condition.  Therefore, Dr. Ronan's testimony about the results of her mental examination was admissible to refute his defense that there was something wrong with him [and] to rebut Dr. Blanton's testimony that he was … mentally retarded."  *Lee*, 898 So.2d at 820.  This reasoning tracks the *Smith / Buchanan* line of authorities, and certainly is neither contrary to nor an unreasonable application of them; therefore, petitioner has not satisfied the legal standard for relief under § 2254(d) as to this claim.

was required.  He told the jury that "a person commits an intentional murder if he causes the death of another person, and, in performing the act or acts which caused the death of that person, *he intends to kill that person*."  (Vol. 4, R-15 at 385 (emphasis added).)  As to Count 1 (capital offense of murder of Jimmy Ellis during robbery in the first degree), he instructed that, in order to convict Lee of intentional murder during robbery in the first degree, the State must prove beyond a reasonable doubt that "in committing the act or acts which caused the death of Jimmy Ellis, *the defendant intended to kill the deceased*."  (*Id.* at 386 (emphasis added).)  The trial judge further explained to the jury that "Intent for the purpose of committing the capital offense of murder during robbery in Count 1 means it was the Defendant's purpose to cause the death of Jimmy Ellis.  Intent to kill must be real and specific."  (*Id.* at 387.)  The trial judge gave these very same instructions, using the very same words as to Count 2 (capital offense of murder of Diane Thompson during robbery in the first degree).  (Vol. 4, R-15 at 393, 394.)  To reinforce the point, the trial judge explained to the jury that "[t]he capital offense requires that the defendant intended the death of the victim along with the intention to commit the robbery."  (*Id.* at 389.)  He later repeated that "capital murder requires intent to kill and an intent to rob."  (*Id.* at 392.)[68]

Upon receiving these very clear, unequivocal instructions, no rational jury could have perceived that a finding of intent was unnecessary in order to find Lee guilty in Counts 1 and 2 for the capital offense of murder during robbery.  Of course, the jury ultimately returned verdicts of "guilty of murder during robbery as charged in Count 1 of the indictment" and "guilty of murder during robbery as charged in Count 2 of the indictment."  (Vol. 4, R-16 at 412.)  There was simply no confusion as to their need to make a finding of intent to kill in order to convict Lee of these charges.  Obviously, they did so.  The instructions for the offenses in Counts 1 and 2 of which the jury actually convicted Lee quite properly emphasized the necessity of a finding of intent before a guilty verdict could be returned.  Accordingly, petitioner's assignment of error on this ground is factually unfounded and devoid of merit.[69]  And the Alabama Court of Criminal

---

[68]     With respect to Count 3 (capital murder of two or more persons), the trial judge likewise instructed the jury that an element of the offense was that Lee "intended to kill the deceased or another person" and that "[i]ntent must be real and specific."  (*Id.* at 397.)

[69]     Upon close reading, what Lee is actually objecting to is an erroneous intent instruction as to a lesser included offense in Counts 1 and 2.  The trial transcript shows that in (Continued)

Appeals' determination that the trial court adequately instructed the jury on intent, *see Lee*, 898 So.2d at 836, is not properly overturned here.

### 2. Refusal to Instruct Jury on Certain Lesser-Included Offenses.

Petitioner next assigns error to the trial judge's refusal to charge the jury on the lesser-included offenses of manslaughter, criminally negligent homicide, and robbery. The record confirms that defense counsel asked the trial judge to include charges for manslaughter and criminally negligent homicide. (Vol. 4, R-11 at 342.) Petitioner does not indicate (and the record does not show) that during the trial he ever requested a charge for the lesser included offense of robbery. Accordingly, there appears to be no factual predicate to support petitioner's assertion that "the trial court refused to instruct the jury on the lesser-included offense of robbery." (Doc. 1, Ground V, at ¶ 3.)[70] Moreover, the record clearly shows that the trial judge

---

describing the elements of the lesser included offense of intentional murder (*i.e.*, non-capital murder) for these counts, the trial judge erroneously stated that the State must prove beyond a reasonable doubt that "in committing the act or acts which caused the death of Jimmy Ellis [or Diane Thompson] the defendant lacked intent." (Vol. 4, R-15 at 390, 395.) These instructions are irrelevant to the jury's verdict. After all, the trial judge properly instructed the jury to "give no consideration to the lesser included offenses" if they found that the State had proved every element of the offense of murder during robbery. (*Id.* at 392.) The trial judge's instructions were clear that the jury could take up these lesser included offenses only if they found that the State had failed to prove beyond a reasonable doubt one or more elements of the offense of murder during robbery as charged in Counts 1 and 2. (*Id.* at 392, 396.) But the jury <u>did</u> find that the State had proven all elements of the offense of murder during robbery in Counts 1 and 2. As such, by the clear terms of the trial judge's instructions, they were forbidden to consider the lesser included offenses, and any error in the instructions pertaining to those lesser included offenses is devoid of any constitutional, legal or practical significance. Simply put, Lee cannot take advantage of an apparent typographical error as to the intent element for lesser included offenses that the jury never even reached, and transform such an inconsequential, irrelevant error into a federal constitutional violation warranting the vacatur of his conviction and death sentence. Any error in the instructions on a lesser included offense was harmless and cannot serve as the basis for § 2254 relief. *See generally Coleman v. Jones*, 909 F.2d 447, 449 (11th Cir. 1990) (erroneous jury instruction "is harmless if the instruction does not apply to an element of a crime for which defendant was convicted").

[70]     Furthermore, petitioner argues that the failure to instruct the jury on the lesser included offense of robbery was "contrary to Alabama Code section 13A-5-41." (Doc. 1, Ground V, at ¶ 3.) Of course, habeas review is not available to correct errors in application of state law. *See, e.g., Pulley v. Harris*, 465 U.S. 37, 41-43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Hays v.* (Continued)

-54-

did provide instructions to the jury on a variety of lesser included offenses, including manslaughter.[71]  Specifically, as to Count 1 (murder during robbery in the first degree as to Jimmy Ellis), the trial judge provided detailed instructions to the jury on the lesser included offenses of felony murder, intentional murder, and manslaughter.  (Vol. 4, R-15 at 388-92.)  With respect to Count 2 (murder during robbery in the first degree as to Diane Thompson), the jury was instructed on the lesser included offense of intentional murder.  (*Id.* at 394-96.)[72]

On this record, the trial judge's decisions not to instruct the jury on criminally negligent homicide as to Counts 1 or 2, and not to instruct on manslaughter as to Count 2, appear entirely valid and proper.  The Alabama Court of Criminal Appeals' conclusion that the evidence did not support such charges, *see Lee*, 898 So.2d at 837 & n.10, was not unreasonable and, indeed, appears not to have been erroneous at all.  Even if the failure to provide such instructions was error, however, petitioner's attempt to parlay that error into a constitutional deprivation is misguided.  Petitioner relies for this argument on *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), wherein the Supreme Court declared that "when the evidence unequivocally establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the

---

*State of Alabama*, 85 F.3d 1492, 1501 (11th Cir. 1996) ("the state courts' alleged misinterpretation of Alabama law gives rise to no ground on which the writ might issue").

[71]    In light of that fact, petitioner's argument the "the trial court refused to so instruct the jury" on the lesser included offense of manslaughter is simply wrong, at least as to Count 1.  (Doc. 1, Ground V, at ¶ 3.)

[72]    There were sound reasons for instructing the jury differently on lesser included offenses with respect to Count 1 and Count 2.  As the trial judge indicated during the charge conference, the critical piece of evidence justifying felony murder and manslaughter charges as to Count 1 was Lee's statement that he accidentally fired the shotgun the first time (*i.e.*, the blast that killed Ellis).  But there was no such evidence that the subsequent close-range shotgun blast to the face of Thompson was inadvertent or accidental.  For that reason, the trial judge explained to counsel, "I don't see how you could get felony murder or manslaughter when there's no evidence of accident or recklessness as to her."  (Vol. 4, R-11 at 343.)  In so concluding, the trial judge properly rejected defense counsel's weak, factually unsupported argument that a manslaughter charge was warranted as to Thompson because "after the accidental shooting of Jimmy Ellis, [Lee] got excited and that's when the second shooting occurred."  (*Id.*)

failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction."  447 U.S. at 637.

 In arguing a violation of *Beck*, however, petitioner ignores both Supreme Court and Eleventh Circuit precedent making clear that *Beck* does not apply where, as here, a capital defendant does receive charges on certain lesser included offenses, just not on every single lesser included offense that the evidence might support, or that the defendant might desire.  *See, e.g., Schad v. Arizona*, 501 U.S. 624, 646-47, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. … This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.");[73] *Powell v. Allen*, 602 F.3d 1263, 1271 (11th Cir. 2010) (determining that *Beck* did not entitle capital defendant to jury instruction on felony murder, where charge included capital murder, intentional murder and manslaughter, such that "the jury was not faced with the 'all-or-nothing choice' *Beck* is concerned with").  In light of these principles, this Court cannot find that the Alabama Court of Criminal Appeals' conclusion that the trial judge did not err in

---

[73]  *Schad* was actually in a similar procedural posture to Lee's case.  In *Schad*, the trial judge instructed the jury on both capital murder and second-degree murder, a lesser included noncapital offense.  The defendant argued on appeal that *Beck* entitled him to a jury instruction on the offense of robbery, theorizing that the jury might have thought that he did not murder Mr. Grove, but merely robbed him, and that without a robbery instruction, the jury might have felt compelled to convict him of capital murder because it was not given the option of convicting him of robbery.  The *Schad* Court viewed this argument as irrational: "To accept the contention advanced by petitioner …, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets."  501 U.S. at 647.  This reasoning conclusively defeats Lee's suggestion that he was entitled to a "third option" on Count 2 as to "non-intentional lesser included offenses" because the jury might have felt that he did not have a specific intent to kill Thompson.  (Doc. 25, at 66.)  As the *Schad* Court pointed out, it is nothing short of irrational to believe that a jury unconvinced that Lee was guilty of either capital or noncapital intentional murder, but unable to convict him of criminally negligent homicide or robbery because those choices were not given to it, would choose the capital murder option rather than the noncapital option as its means of keeping him off the streets.

failing to instruct on certain lesser included offenses was contrary to or an unreasonable application of *Beck*.

### 3. Purported Sandstrom *Error in Intent Instruction.*

Also in Ground V, petitioner contends that the trial judge erred in instructing the jury on intent in a manner that allowed the jury to presume it, instead of requiring the State affirmatively to prove it.  The intent instruction to which Lee assigns error reads as follows:  "Intent to kill must be real and specific.  Intent simply means a design or resolve or determination which a person acts.  It's a state of mind and in most instances it cannot be proven by direct proof, but ***the jury may infer intent from the circumstances surrounding the commission of the act***."  (Vol. 4, R-15 at 387 (emphasis added); *id.* at 394.)  According to petitioner, the effect of this instruction was to relieve the State of its burden to prove intent, and to shift the burden to Lee to disprove his specific intent to kill.

Petitioner's argument relies on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), wherein the Supreme Court held that a defendant's intent is an element of a crime that "cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent," and that any instruction creating a burden-shifting presumption or a "conclusive presumption" in this regard is unconstitutional.  442 U.S. at 523-24.  Thus, under *Sandstrom*, a jury instruction on intent violates due process if it creates either a burden-shifting presumption or a conclusive presumption.  *Id.* at 524.

In applying *Sandstrom* to this jury charge on direct appeal, the Alabama Court of Criminal Appeals found no violation, reasoning that "[t]he trial court's instructions on intent … did not create a mandatory presumption that shifted the burden of proof," but instead "created a permissible inference that could be drawn from the evidence."  *Lee*, 898 So.2d at 840.  The Eleventh Circuit has reached similar conclusions regarding similar instructions.  *See, e.g., Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1995) (no *Sandstrom* error where judge's instruction that jury "may infer" that if defendant possessed victim's property, he also killed her, merely creates a rational permissive inference); *United States v. Myers*, 972  F.2d 1566, 1573 (11th Cir. 1992) ("This circuit has approved similar jury instructions that allow the jury to infer intent from the natural and probable consequences of any act."); *United States v. Cotton*, 770 F.2d 940, 946 (11th Cir. 1985) (finding no *Sandstrom* error in instruction that jurors "may infer the defendant's intent from the surrounding circumstances" and "may consider it reasonable to draw the

inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted"). Thus, the Alabama appellate court's application of *Sandstrom* to the intent instruction at issue here was fully consistent with that of the Eleventh Circuit in applying *Sandstrom* to other, similar instructions. The state court's determination that the permissive inference authorized by the challenged instruction here was not neither contrary to, nor an unreasonable application of, the *Sandstrom* line of authorities.[74] Accordingly, the § 2254 Petition is lacking in merit as to this claim for relief.

### F. Ineffective Assistance of Counsel.

Although petitioner cites ineffective assistance of counsel as a single ground for habeas relief, he devotes some 75 pages of his § 2254 Petition to that issue, including a 40-page recitation of purported facts (largely drawn from outside the habeas record, inasmuch as no evidentiary hearing was held in the Rule 32 proceedings), six separate categories of purported ineffective assistance by his trial counsel, and dozens of alleged errors and omissions along the way. The broad categories of ineffective assistance identified by Lee are as follows: (i) trial counsel was ineffective at the penalty phase and at sentencing; (ii) trial counsel conducted inadequate investigation; (iii) trial counsel was ineffective during jury selection; (iv) trial counsel provided ineffective assistance during the guilt phase; (v) trial counsel's ineffectiveness was a product of Alabama's appointment system for indigent capital defendants; and (vi) trial counsel's representation was cumulatively inadequate. These categories (and the numerous sub-issues subsumed within each) will be addressed in turn.

### 1. Legal Standard for Habeas Review of Ineffective Assistance Claims.

Lee's ineffective assistance of counsel claims will be evaluated through the familiar standard promulgated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish an ineffective assistance claim under the Sixth

---

[74] In arguing otherwise, petitioner likens this case to *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The analogy is ill-fitting. In *Francis*, the challenged instruction was that "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted." 471 U.S. at 315. Unlike in *Francis*, the challenged instruction in this case does not involve a burden-shifting presumption as to intent, but rather a correct statement of law that intent may be inferred from surrounding circumstances. The state court did not err, much less unreasonably apply clearly established federal law.

Amendment, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Haliburton v. Secretary for Dep't of Corrections*, 342 F.3d 1233, 1243 (11th Cir. 2003).

To satisfy *Strickland*'s "deficient performance" prong, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *Williams v. Allen*, 598 F.3d 778, 788 (11th Cir. 2010) (citation omitted). "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Haliburton*, 342 F.3d at 1243. Given the "strong presumption in favor of competence," a petitioner bears the heavy burden of showing "that no competent counsel would have taken the action that his counsel did take." *Williams*, 598 F.3d at 790 (citation and internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, --- U.S. ----, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citation and internal quotation marks omitted).

As for *Strickland*'s "prejudice" prong, "the petitioner is required to prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 598 F.3d at 789 (citation and internal quotation marks omitted). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Haliburton*, 342 F.3d at 1243. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S.Ct. at 792.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010); *see also Harrington*, 131 S.Ct. at 788 (cautioning that "the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the very adversary process the right to counsel is meant to serve"). However, it is even more daunting in the habeas context where, as here, the state courts have adjudicated the ineffective assistance claims on the merits in post-conviction proceedings, thereby triggering the § 2254(d) limitations. "When § 2254(d) applies, the question is not

whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S.Ct. at 788. "Thus, [Lee] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*."  *Williams*, 598 F.3d at 789 (citations and internal quotation marks omitted).  "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."  *Harrington*, 131 S.Ct. at 788 (citation and internal quotation marks omitted); *see also Bell v. Cone*, 535 U.S. 685, 698-99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.").

These burdens rest squarely on petitioner's shoulders.  After all, "[t]o give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. … And it is the petitioner's burden to persuade us otherwise."  *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1245 (11th Cir. 2011).

### 2.      *Penalty Phase / Sentencing Hearing.*

With respect to the penalty phase and sentencing hearings, Lee asserts that his trial counsel was ineffective "for failing to present a serious mitigation case to the jury," "for failing to … present mitigating evidence and arguments at the judicial-sentencing hearing," for not advising Lee of his right to testify during the penalty and sentencing phases, for not objecting to improper evidence and argument during the sentencing hearing, for not objecting to prosecutorial misconduct, for not seeking recusal of the trial judge, for not raising meritorious challenges to the sentencing decision, and for undermining the penalty phase via his poor performance during the guilt phase.  (Doc. 1, Ground VI, at ¶¶ 233, 242, 247, 254, 261, 266, 271, 276.)[75]

---

[75]      Petitioner treats this series of eight factually distinct arguments as a single sub-issue spanning 46 paragraphs of his § 2254 Petition for purposes of outlining his ineffective assistance ground for habeas relief.

### a.   No Independent and Adequate State Ground.

In addressing these claims of ineffective assistance at penalty phase and sentencing hearings, the Alabama Court of Criminal Appeals found that Lee had failed to comport with the pleading standards of Rule 32.6(b), Ala.R.Crim.P., as to several alleged instances of ineffective assistance. *See Lee v. State of Alabama*, 44 So.3d 1145, 1151 (Ala. Crim. App. 2009) ("Contrary to Lee's assertions, he was required to plead specific facts to support each of his claims in order to satisfy the pleading requirements of Rule 32.6(b), Ala.R.Crim.P.").[76]  The State argues that the Rule 32 courts' rejection of certain aspects of this ineffective assistance claim for failure to comport with Rule 32.6(b) constitutes a procedural bar precluding them from being raised in Lee's § 2254 Petition.  (Doc. 22, at 76-78.)  Thus, the State invokes the independent and adequate state ground doctrine.[77]

The Eleventh Circuit has recently rejected attempts to apply the independent and adequate state ground doctrine to state-court dismissals for noncompliance with Rule 32.6(b)'s pleading requirements.  *See Frazier v. Bouchard*, 661 F.3d 519, 525 (11th Cir. 2011) ("an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review") (quoting *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011)).  This is particularly true where, as in many of Lee's claims here, the "Alabama Court of Criminal Appeals's ruling plainly shows that it did not rely on a procedural bar in dismissing [petitioner]'s relevant claims," *Frazier*, 661 F.3d at 526 (citation omitted), because it considered the substance of the claim as well.  Therefore, the Court does not find these claims procedurally barred from

---

[76]    The Alabama Supreme Court denied certiorari as to Lee's post-conviction petition; therefore, the Alabama Court of Criminal Appeals' opinion represents the last reasoned decision adjudicating his claims of ineffective assistance of counsel, and is properly examined here.  *See generally Mason v. Allen*, 605 F.3d 1114, 1118 n.2 (11th Cir. 2010) ("When the last state court rendering judgment affirms without explanation, we presume that it rests on the reasons given in the last reasoned decision.").

[77]    *See Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.").

habeas review because of the state court's determination that they were inadequately pleaded under the standards of Rule 32.6.[78]

>    b.    Failure to Present Mitigating Evidence.

The Alabama Court of Criminal Appeals considered the substance of the vast majority of Lee's ineffective assistance challenges relating to the penalty phase and sentencing hearing. With regard to counsel's failure to present mitigating evidence, the state court found that petitioner had not shown specifically what mental health or substance abuse evidence his attorney should have located, explained that counsel had indeed presented evidence concerning Lee's mental health and substance abuse at trial, and concluded that "the evidence that Lee states should have been presented in mitigation was neither strong nor compelling.  We are confident that it would have had no impact on the penalty phase proceedings."  *Lee*, 44 So.3d at 1161.

Assuming that counsel's performance was deficient with regard to mitigation, petitioner still must show prejudice.  Where a § 2254 petitioner alleges that his trial counsel was ineffective during the penalty phase for failure to investigate and present mitigating evidence, federal courts "must determine whether there is a reasonable probability that, if the totality of [petitioner]'s evidence available in mitigation had been heard, the sentencing jury and judge would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Cooper v. Secretary, Dep't of Corrections*, 646 F.3d 1328, 1331 (11th Cir. 2011) (citation and internal quotation marks omitted).  The Alabama Court of Criminal Appeals effectively answered this question in the negative based on its observations that the jury had heard evidence concerning a number of the putative mitigating circumstances (*i.e.*, Lee's purported mental retardation and his protracted history of substance abuse), that the jury had heard "humanizing" evidence (*i.e.*, evidence that he had been a good child, that he had a longstanding drug problem for which he needed help, that he was a father with two children of his own, and that he was loved by his family), and that the additional mitigation that Lee now contends should have been presented "was neither strong nor compelling."

---

[78]    The State reiterates its "independent and adequate state ground" argument as to various other claims in Lee's § 2254 Petition as to which the state courts found a Rule 32.6(b) pleading defect.  This argument of procedural bar fails under the *Frazier / Borden* rationale each time respondent asserts it.

The Alabama state court's application of the *Strickland* prejudice prong in this manner was not objectively unreasonable.  Petitioner would demonize his upbringing as being "marred by brutal violence" (doc. 25, at 95), yet he admits in his § 2254 Petition that he "was living with a family that in many respects was a loving one."  (Doc. 1, Ground VI, at ¶ 23.)  Which is it?  The latter version is what trial counsel chose to present as mitigation evidence, yet petitioner now insists that the other side of the coin should have been presented instead.  Lee does not now identify any significant history of domestic violence involving him, but instead travels in generalities that his parents "would frequently verbally abuse and berate Mr. Lee, and they sometimes would whip him."  (*Id.*, ¶ 32.)  No evidence or argument is presented as to the severity of this discipline, how it differs from that applied in millions of homes around the country by parents who believe in corporal punishment, or how it affected, influenced or shaped Lee.  Petitioner states in passing that he was "extremely upset" that his father was physically abusive to his mother.  (*Id.*, ¶ 31.)  It was not unreasonable for the Alabama Court of Criminal Appeals to find nothing compelling about the mitigating factor of domestic violence as it applied to Lee's circumstances.  *See Price v. Allen*, --- F.3d ----, 2012 WL 1622977, *8 (11th Cir. May 10, 2012) (petitioner failed to satisfy *Strickland* prejudice prong where mitigation evidence of abuse that petitioner claimed counsel should have presented was "too general and conclusory" to support conclusion that such evidence would have changed sentencing outcome).[79]

To advance poverty as a mitigator, petitioner describes at great length the current dilapidated condition of his family's home.  (*Id.*, ¶ 25.)  But that is irrelevant.  He says nothing about how it looked in 1998 (when he committed the offenses) or earlier (when he was growing up).  And Lee admits that his "father worked for the state highway department as a heavy equipment operator" during his childhood (*id.*), which is the kind of stable employment that

---

[79]     Besides, trial counsel focused on a strategy during the penalty phase of having family members (including his parents) testify that they love and value him.  For Lee to offer evidence instead that his father was a drunkard who beat his mother would have undermined the "loving-family" approach to the penalty phase that counsel successfully employed in convincing the jury to recommend a sentence of life imprisonment.  *See generally Gaskin v. Secretary, Dep't of Corrections*, 494 F.3d 997, 1003 (11th Cir. 2007) ("Counsel must be permitted to weed out some arguments to stress others and advocate effectively.") (citation and internal quotation marks omitted); *Whisenhant v. Allen*, 556 F.3d 1198, 1203 (11th Cir. 2009) ("the defendant bears the burden of overcoming a strong presumption that the challenged action is sound trial strategy").

would seem to contradict his "extreme poverty" allegations.  In any event, the trial court made it clear that evidence of poverty would not have affected his sentencing determination in any way, shape or form, as he pointedly wrote, "many people have been reared in socio-economic conditions far worse than those described in the supplement to Lee's amended petition and have not committed a double homicide and an attempted murder during a robbery."  (Vol. 22, R-79, at 34-35.)  Although certainly poverty can be a non-statutory mitigating circumstance, it was not unreasonable of the Alabama Court of Criminal Appeals to credit the trial court's assessment that the poverty evidence in question would not have altered the balance of aggravator and mitigators here for *Strickland* prejudice purposes.[80]

Lee also offers details of his history of substance abuse in the years preceding the offense.  (Doc. 1, Ground VI, at ¶¶ 33-36.)  But these facts are largely cumulative of the evidence of drug and alcohol abuse that the jury did hear at trial.  For example, Dr. Blanton stated that Lee "admitted to me that he had been using marijuana on a daily basis for years.  Cocaine on a weekly basis and he's admitted to drinking alcohol quite often too."  (Vol. 3, R-10 at 313.)  Evidence of Lee's dependency on marijuana, cocaine and alcohol was well established in the trial record.  It was not unreasonable for the Alabama Court of Criminal Appeals to find that Lee was not prejudiced by his counsel's failure to develop such facts further during the penalty and sentencing proceedings.  *See generally Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011) ("Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial."); *Price*, 2012 WL 1622977, at *8 ("we cannot say that a jury would have rendered a different sentence had it heard

---

[80]     Also with respect to family history, petitioner states that there was a history of seizures and migraine headaches in his family amongst Lee and his siblings, and suggests that this history "is consistent with significant neurological problems."  (Doc. 1, Ground VI, at ¶ 26.) It may be "consistent with" many different conditions, some benign and others not.  Petitioner does not allege that he or anyone else in his family has ever been diagnosed with such neurological problems, leaving us with what appears to be counsel's speculation about what medical conditions might be "consistent with" these facts.  Such idle conjecture would not have assisted Lee in the balance of aggravating and mitigating factors at sentencing.  Petitioner does not offer any indication that he remained afflicted by migraine headaches (as opposed to a drug-induced headache and burning sensation that began the night before the shootings when he snorted cocaine during an extended binge of poly-substance abuse) at the time of the offense; rather, he only refers to them occurring while he was "[g]rowing up" and "into Mr. Lee's adolescence."  (*Id.*)

from Price's friends and family … where Price's mother already testified to essentially these same facts at Price's sentencing hearing").[81]

Next, Lee alludes to the possibility that he suffered from mental illness that may have been caused or exacerbated by head trauma received in an automobile accident in 1995.  (Doc. 1, Ground VI, at ¶¶ 38-42.)  For all his innuendo and hypothesis, however, petitioner proffers zero factual allegations that any physician, mental health professional or other expert has ever concluded that Lee actually did sustain a brain injury in the car accident, or that he suffered from any mental illness at the time of the offense.[82]  As the trial court noted, "Lee fails to identify any mental health expert that would have testified that Lee had ever been diagnosed or treated for mental problems ….  Lee fails to identify any psychiatrist that would have testified favorably for him during the guilt or penalty phase of his trial."  (Vol. 22, R-79, at 36.)  Lee's present counsel may well believe that petitioner suffers from mental illness, or that he sustained some undiagnosed brain injury in the car accident; however, they offer nothing to suggest that trial

---

[81]     Besides, it is hardly evident that such evidence would have been helpful to Lee in mitigation even if it were not cumulative. *See, e.g., Tompkins v. Moore*, 193 F.3d 1327, 1338 (11th Cir. 1999) (evidence of alcoholism and drug abuse is often "a two-edged sword that can harm a capital defendant as easily as it can help him at sentencing"); *Rose*, 634 F.3d at 1244 (evidence of alcoholism and chronic substance abuse "not only is cumulative but also is not significantly mitigating").

[82]     At best, petitioner points to evidence of post-incarceration prescriptions for "anti-psychotic and related medication."  (Doc. 1, Ground VI, at ¶ 48.)  Obviously, trial counsel could not have known about such events to the extent that they post-dated the trial.  Moreover, petitioner offers no evidence and no reason to believe that those prescriptions were for a mental health condition that predated the subject offenses or trial, as opposed to a condition brought on by Lee's incarceration and serious legal predicament.  Nor is there any indication that Dr. Pineda (the State-employed mental health professional who prescribed those medications) was aware of Dr. Ronan's opinion that Lee had no mental disease or defect, or of evidence suggesting that Lee was faking his condition.  Simply put, there is no showing whatsoever that Dr. Pineda made robust, reliable findings that Lee was mentally ill when he opened fire in Jimmy's Pawn Shop, much less that his testimony would have been materially helpful or mitigating to Lee at trial had counsel procured it.  Where both the expert that the defense retained (Dr. Blanton) and the State's testifying expert (Dr. Ronan) were convinced that Lee was neither psychotic nor suffering from any mental disease (other than Dr. Blanton's opinion of mental retardation), defense counsel was not constitutionally deficient for electing not to investigate this potential mitigating circumstance further.

counsel could have developed hard evidence of same in mitigation.[83]  The evidence that was presented at trial was directly to the contrary.  Lee's own expert testified that, based on his evaluation, Lee "was not psychotic."  (Vol. 3, R-10 at 314.)  The State's expert opined that "there was no mental illness or mental retardation that would have impaired his understanding of right or wrong during the time of questioning.  (Vol. 3, R-11 at 332.)  She also suggested that Lee was "trying to fake that [he's] got a psychiatric condition."  (*Id.* at 334.)[84]  The jury heard testimony that Lee was a good student and a capable worker.  Based on all of the above, there is no indication and no reason to believe that any persuasive mitigation case could have been developed based on the theory that Lee was suffering from mental illness, whether from birth or from the effects of an automobile accident, at the time he gunned down Ellis and Thompson.  *See Rose*, 634 F.3d at 1244 (no ineffective assistance for counsel's failure to present "weak" mitigating evidence as to brain damage and mental health, where defendant was in normal range of intelligence, had no history of psychological diagnosis or treatment, and experts could not agree on diagnoses other than alcohol/substance abuse).  Certainly, petitioner has not shown prejudice arising from counsel's omissions on this point.  *See Price*, 2012 WL 1622977, at *7 (no *Strickland* prejudice where petitioner "offered no more than a conclusory assertion that a mental-health expert could have testified to a connection between the abuse Price suffered as a child and his subsequent actions").

Petitioner also argues that his counsel was ineffective for not presenting mitigation evidence about "his plans for the future with his girlfriend and children and his efforts at supporting them."  (Doc. 1, Ground VI, at ¶ 235.)  But the jury knew that Lee had two very small children and that he had successfully held down a job at a lumber yard for some time.  The evidence proffered by Lee is that, at the time of the offense, he had a 2-month old son with one woman, and had just learned that another woman was pregnant with his second child.  (*Id.* at ¶ 47.)  Petitioner also admits that he "used much of his modest income on alcohol and drug

---

[83]      Surely if petitioner's counsel's characterization of this event as a "devastating head injury" (doc. 25, at 95) were accurate, there would be medical evidence in support of same. No such evidence is presented or described in Lee's § 2254 filings.

[84]      Although petitioner accords significance to the notion that Lee was experiencing hallucinations, Dr. Ronan explained to the jury that this was evidence of malingering because Lee reported the hallucinations differently to at least three different mental health professionals.

dependencies." (*Id.*)[85]  The Alabama courts cannot be faulted for not viewing this largely cumulative testimony as compelling (or even mildly helpful) evidence in mitigation that Lee's counsel should have presented at trial.

More generally, it is important to remember that "[n]o absolute duty exists to introduce mitigating or character evidence." *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000).  Furthermore, federal law does "not support the proposition that if counsel does not present all possible mitigation at sentencing, the defendant has been denied some constitutional right." *Id.* at 1319 n.25.  Those considerations loom large here, where the mitigating evidence that petitioner says should have been presented was either weak, or cumulative, or nonexistent.

In short, the Court finds that there was an objectively reasonable basis for the Alabama Court of Criminal Appeals' ruling that Lee was not prejudiced within the meaning of *Strickland v. Washington* by virtue of his trial counsel's failure to present the enumerated areas of mitigation to the trial court and jury at the penalty phase and at sentencing.  The state court's determination that "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence," *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), would have had no impact on the penalty phase proceedings readily withstands deferential § 2254(d) review.  Besides, the fact that Lee's counsel successfully convinced the jury to recommend life, rather than death, is compelling evidence that counsel was in fact effective.  *See Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) ("Tarver's lawyer's effectiveness at the sentencing stage is strongly evidenced by the jury's decision to recommend not death, but life without parole.").  Habeas relief is therefore unavailable on this claim.[86]

---

[85]      Similarly unpersuasive is petitioner's attempt to paint Lee as a responsible provider for his infant son because he stopped to purchase diapers before going out for an all-night session of alcohol and drug abuse on the day before the murders.  (*Id.* at ¶ 51.)  This kind of evidence would not reasonably have strengthened Lee's mitigation argument one whit, and trial counsel cannot be faulted for not presenting such a contorted theory that his client deserved lenience because this episode demonstrated that he was a responsible family man.  Nor would petitioner's argument that his drug and alcohol abuse escalated because "he tried to cope with the pressures of being a father" (*id.* at ¶ 47) have borne any mitigation weight in the penalty phase and sentencing hearing portions of the trial.

[86]      One other point bears noting.  In his § 2254 Petition, Lee asserts that counsel should have presented mitigation evidence about "the circumstances leading up to the crime, which included a pounding headache, extensive substance abuse, a sleepless night, and a strong, (Continued)

c.       *Failure to Consult with Lee Concerning Right to Testify.*

With regard to alleged ineffective assistance concerning Lee's right to testify in the penalty phase, the state court rejected this claim based on petitioner's failure to proffer any testimony he would have given had he taken the stand, much less any basis for showing prejudice as a result of not testifying. *Lee*, 44 So.3d at 1170.[87]

Without question, a criminal defendant "has a *fundamental* constitutional right to testify in his or her own behalf at trial.  The right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992); *see also Morris v. Secretary, Dep't of Corrections*, --- F.3d ----, 2012 WL 1370848, *11 (11th Cir. Apr. 20, 2012) (reaffirming right to testify).  Petitioner alleges that trial counsel violated this right by making a "unilateral decision not to have Mr. Lee testify at

---

emotional reaction to what he feared was his girlfriend's betrayal."  (Doc. 1, Ground VI, at ¶ 235.)  The Alabama Court of Criminal Appeals effectively found no deficient performance in this area, because neither the surveillance video nor Lee's statement to police gave any indication of substance abuse in the hours leading up to the shootings.  *Lee*, 44 So.3d at 1159. The Court cannot find that this application of *Strickland*'s "deficient performance" prong is objectively unreasonable.  Perhaps many lawyers would have thought to ask their client if he was drunk or high when he shot two people in the course of robbing a pawn shop early on a Saturday afternoon.  But if there were no outward indications of intoxication, and if Lee never said that he was intoxicated, petitioner does not identify any authority establishing that it is a *per se* violation of *Strickland* for counsel not to explore such questions and theories on their own.  Besides, the jury already knew that Lee habitually abused drugs and alcohol, so this evidence would simply have been an extension of what they had already heard.  *See Rose*, 634 F.3d at 1245-46 (explaining that only "powerful evidence … has been held sufficient to satisfy the prejudice prong in a brutal murder case," and not "new mitigation [that] is simply an extension of what the jury had heard").  And evidence that Lee had slept little the night before and suspected his girlfriend of cheating on him would not likely have any mitigation effect at all, so counsel could not have been ineffective in failing to present such arguments and evidence during the penalty phase.

[87]       The Alabama Court of Criminal Appeals also wrote that the trial transcript shows that defense counsel did consult with Lee about his right to testify "in the penalty phase."  *Id.* The cited portion of the transcript is actually drawn from the guilt/innocence phase, not the penalty phase; therefore, the state court's reading of the record is inaccurate on this point.  This Court has located no on-the-record statements concerning Lee's waiver of his right to testify during the penalty phase or sentencing hearing, or trial counsel's consultation with him as to same.  Accordingly, the Court neither credits nor otherwise adopts this portion of the state court ruling.

sentencing" or during the penalty phase, without consulting with Lee and without Lee ever making an informed decision not to testify. (Doc. 1, Ground VI, at ¶¶ 164, 174, 247, 249, 251.) Accepted as true, these factual allegations show constitutionally deficient performance by Lee's trial counsel.[88] But that is not enough to establish a right to habeas relief. Indeed, the law is clear that "the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under *Strickland v. Washington* ...." *Teague*, 953 F.2d at 1534; *see also Cleckler v. United States*, 2011 WL 200128, *4 (11th Cir. Jan. 24, 2011) ("A claim involving defense counsel's advice about the defendant's right to testify is properly analyzed as a claim of ineffective assistance of counsel under *Strickland* ...."). Thus, Lee cannot prevail unless he satisfies the *Strickland* prejudice prong. *See Geer v. United States*, 2009 WL 4365546, *1 (11th Cir. Dec. 3, 2009) ("If counsel deprives his client of the right to testify, his conduct violates the first prong of the *Strickland* test. ... However, a defendant must also satisfy the second prong of *Strickland*, which requires a showing of prejudice.").[89] The Alabama Court of Criminal Appeals found that he had made no such showing of prejudice. This was not an objectively unreasonable determination. After all, Lee does not affirmatively state that he would have elected to testify at the penalty phase or at sentencing had counsel given him that option. He does not say what testimony he would have provided. He makes no showing that his testimony would have mattered at all for purposes of mitigation. Given these glaring infirmities in petitioner's showing under the prejudice prong of the *Strickland* analysis, the Court finds no error in the Alabama courts' resolution of this issue in Lee's Rule 32 petition. *See Morris*, 2012 WL 1370848, at *12 (rejecting habeas claim based on counsel's failure to inform

---

[88]   "[I]f defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary." *Teague*, 953 F.2d at 1534; *see also Morris*, 2012 WL 1370848, at *11 (defense counsel who does not advise defendant of right to testify has failed to act within range of competence demanded of attorneys in criminal cases).

[89]   The § 2254 Petition suggests that prejudice may be presumed in this instance, without any affirmative showing by Lee. (Doc. 1, Ground VI, at ¶ 251.) However, petitioner does not identify a single case supporting that proposition, nor does he acknowledge binding authority that is directly to the contrary.

defendant of right to testify, where defendant failed to demonstrate reasonable probability that his sentence would have been different had he testified during penalty phase).[90]

          d.        *Failure to Object to Prosecutorial Misconduct.*

As for counsel's failure to object to purported prosecutorial misconduct, the Alabama Court of Criminal Appeals found that this argument did not pass the *Strickland* test because many of the comments in question were not objectionable, and besides, any error arising from the prosecutor's comments was harmless. *Lee*, 44 So.3d at 1171.

This Court has already addressed the numerous instances of alleged prosecutorial misconduct in section III.B., *supra*. As to each, the Court has concluded that there was no prosecutorial impropriety, that the trial court properly gave curative instructions, and/or that any misconduct was otherwise harmless. It was not deficient performance of Lee's trial counsel not to interpose baseless objections to prosecutorial conduct that was proper. Likewise, petitioner cannot satisfy the second prong of *Strickland v. Washington* as to his trial counsel's failure to object to improper prosecutorial acts that were cured by the trial court's instructions or that were otherwise non-prejudicial. Each of the cited instances of purported misconduct falls in one or the other of these analytical categories. Thus, the Alabama courts did not err in rejecting Lee's ineffective assistance claim predicated on failure to object to prosecutorial misconduct.

          e.        *Failure to Move for Recusal of Trial Judge.*

The Alabama Court of Criminal Appeals also denied Lee's ineffective assistance claim concerning counsel's failure to seek recusal of the trial judge. Petitioner's theory is that recusal was warranted because the trial judge knew Jimmy Ellis (one of the victims), had heard extra-record facts during a pretrial suppression hearing, and had been challenged for re-election by Lee's lead trial attorney. The Alabama court explained that any request for recusal would have been meritless because (i) Alabama canons of judicial ethics "do not require a judge to recuse himself or herself when the judge knows a victim;" (ii) "a trial judge is not required to recuse

---

[90]      Petitioner's gratuitous jab at the trial judge for not *sua sponte* "inquir[ing] on the record that Mr. Lee was not testifying at the sentencing voluntarily and based on the advice of counsel" (doc. 1, Ground VI, at ¶ 176) is legally unfounded. *See United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998) (rejecting argument "that whenever a criminal defendant does not testify at trial there is a *per se* requirement that the district court … conduct an on-the-record inquiry into whether a non-testifying defendant knowingly, voluntarily, and intelligently waived the right to testify").

himself or herself because the judge is privy to information not in possession of the jury;" and (iii) "a judge is not disqualified to preside over a case where one of the attorneys unsuccessfully ran against the judge in a previous judicial election." *Lee*, 44 So.3d at 1173. As the Alabama court observed, "[c]ounsel cannot be held ineffective for failing to raise an issue that has no merit." *Id.* (citation omitted). In *Strickland* parlance, the state court found no defective performance by Lee's trial counsel on the recusal issue. As is true for the overwhelming majority of his habeas arguments, petitioner does not identify any legal error in the Alabama courts' resolution of this issue, but instead parrots the same arguments that the Alabama Court of Criminal Appeals systematically and convincingly refuted in its opinion.

By all appearances, it would have been a frivolous waste of time and resources for Lee's trial counsel to seek recusal of the trial judge on these legally threadbare grounds. Given the direct appeal ruling, such a motion would have been summarily denied. Failure to submit a baseless motion cannot be ineffective assistance, as a matter of law. *See, e.g., Cave v. Secretary for Dep't of Corrections*, 638 F.3d 739, 755 (11th Cir. 2011) ("[c]ounsel cannot be labeled ineffective for failing to raise issues which have no merit") (citation omitted).

> f.    *Failure to Object to Evidence and Argument at Sentencing.*

With respect to Lee's assertion that counsel performed ineffectively at sentencing by not objecting to certain inadmissible evidence concerning the victims' status in the community and to certain statements and arguments by the prosecutor at sentencing, the state court found no *Strickland* error because Lee had failed to identify any such inadmissible evidence, and the challenged arguments were not considered by the trial court in any event. *Lee*, 44 So.3d at 1174.

The trial court specifically confirmed in the context of Lee's Rule 32 Petition that "[t]he only aggravating circumstance this Court could have and, in fact, did consider is that Lee intentionally murdered the victims during the course of a robbery or an attempted robbery." (Vol. 22, R-79, at 102.) To the extent, then, that Lee faults his trial counsel for not objecting to the State's interjection of improper or additional aggravating circumstances at sentencing, that argument cannot pass muster under the prejudice prong of *Strickland v. Washington* because the trial court considered no other aggravating circumstances. Moreover, both the trial court and the appellate court in Rule 32 proceedings expressed inability to discern the testimony to which petitioner was referring when he complained that the sentencing hearing included testimony "about the victims' status in the community." Petitioner has repeated that allegation in his

§ 2254 Petition.  (*See* doc. 1, Ground VI, at ¶ 255.)  Once again, however, he has provided no amplification about the testimony to which he is referring, and the Court has been unable to identify same.  Thus, the undersigned cannot find constitutionally deficient performance by Lee's trial counsel in failing to object to sentencing hearing testimony that petitioner has never identified.[91]

> g.    *Failure to Challenge Sentencing Decision / Spillover Effects of Poor Performance during Guilt Phase.*

As his final ineffective assistance arguments directed at the penalty and sentencing phases, Lee asserts that (i) "trial counsel was ineffective for failing to raise meritorious challenges to the court's sentencing decision and for failing to move for a new trial or reconsideration;" and (ii) "trial counsel's ineffective assistance at the guilt phase worked to make counsel's errors at the penalty and sentencing phase even more damaging for Mr. Lee."  (Doc. 1, Ground VI, at ¶¶ 271, 276.)

The State contends that both of these sub-issues are procedurally defaulted because they were not properly exhausted in Lee's Rule 32 proceedings.  (Doc. 22, at 79.)  The Court agrees that these claims suffer from exhaustion problems.  In his Rule 32 Petition, Lee did present as a ground for relief that "Trial Counsel was Ineffective for Failing to Challenge the Court's Sentencing Decision."  (Vol. 14, R-63, at 81.)  But he did not fairly present this issue in its entirety to the Alabama Court of Criminal Appeals on his Rule 32 appeal.  He now admits as much.  (Doc. 25, at 82 n.21.)  As to portions of this ineffective assistance claim that Lee failed to present on appeal in his Rule 32 proceeding, he is procedurally barred by exhaustion principles from pursuing them here.  *See, e.g., Mancill v. Hall*, 545 F.3d 935, 939 (11th Cir. 2008) (explaining that the habeas exhaustion requirement "is not satisfied if the petitioner fails to

---

[91]    The remaining aspect of this claim is that trial counsel should have objected when the State improperly argued "that the race of the jury members should be considered by the Court when imposing sentence."  (Doc. 1, Ground VI, at ¶ 256.)  This statement is counterfactual.  No such argument was made by the prosecutor at sentencing.  The excerpt from the sentencing transcript cited by Lee in support of this proposition is unhelpful.  As the trial court properly stated, "That statement was not an improper racial comparison of the victims and Lee and did not, in any way, influence this Court's sentencing determination."  (Vol. 22, R-79 at 103.)  The failure to object to same thus cannot form the basis of even a colorable *Strickland* claim of ineffective assistance of counsel.

present his claims to the state's highest court," and that "[s]uch a failure to exhaust can result in a procedural default that bars a federal court from hearing that claim").[92]

The only part of the failure-to-challenge-sentence issue that petitioner properly exhausted is that trial counsel should have attacked his sentence because the trial judge had "instructed the jury that it could cease deliberations … if the tally for life-versus-death reached seven-to-five." (Doc. 1, Ground VI, at ¶ 273.)  Petitioner accuses the trial court of neither considering nor caring "about the fact that the jury had been instructed it could stop deliberating after reaching" a 7-to-5 split.  (Doc. 1, Ground VI, at ¶ 183.)  He says that "the judge instructed the jury to stop deliberating once they reached seven votes."  (Doc. 25, at 100.)  He repeats the same allegation later on the same page.  This assertion is counterfactual.  The trial judge <u>never</u> instructed the jury to stop deliberating once seven of them favored a life sentence.  To the contrary, he instructed them that "[a]ny number less than seven cannot recommend life without parole" and that "[t]he fact that a determination of whether … seven or more of you can agree to recommend a sentence of life imprisonment without parole can be reached by a single ballot should not influence you to act hastily or without due regard to the gravity of these proceedings.  You should hear and consider the views of your fellow jurors.  Before you vote, you should carefully weigh, sift, and consider the evidence with all of you realizing that a human life is at stake."  (Vol. 4, R-25 at 457.)  Petitioner's repeated innuendo that the trial court incorrectly instructed the jury to cease deliberating as soon as they reached a vote of 7-to-5 in favor of life imprisonment is thus unsupported by the record.  If the trial court never instructed the jury to stop deliberating as soon as seven of them favored a life sentence, then trial counsel's failure to object to that nonexistent instruction cannot be a basis of § 2254 relief on a theory of ineffective assistance of counsel or otherwise.  Petitioner identifies no viable argument or authority that the trial court's instructions

---

[92]     In the failure-to-challenge-sentencing issue, petitioner asserts in his § 2254 Petition that trial counsel was ineffective for not objecting that "the court had considered improper factors" and that it "had written up its sentencing decision prior to the start of the hearing."  (Doc. 1, Ground VI, at ¶¶ 272, 274.)  Petitioner concedes that he raised those particular issues in his Rule 32 Petition, but did not appeal them.  (Doc. 25, at 82 n.21.)  By his own admission, then, those aspects of the claim are unexhausted and procedurally barred from habeas review.

on jury votes in the penalty phase were improper or incorrect in any way; therefore, it would have been futile for Lee's counsel to object to them on the basis of a fictitious defect.[93]

As for petitioner's claim that trial counsel's ineffectiveness at the guilt phase compounded his errors during the penalty phase, this is a new claim. The Rule 32 courts never addressed it, for the simple reason that Lee never fairly presented it to them. Notwithstanding his present contention that the state courts should have been able to divine the presence of such a claim from scattered innuendo and throwaway, blanket, overbroad references elsewhere in his voluminous briefing, petitioner has not exhausted this claim. *See Picard*, 404 U.S. at 276 (exhaustion doctrine requires "a state prisoner to present the state courts with the same claim he urges upon the federal courts"); *McNair*, 416 F.3d at 1303 ("the exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record"). Even if this claim were considered on the merits, the Court would find it lacking in merit because, as set forth *infra*, petitioner has not shown that he received ineffective assistance of trial counsel during the guilt phase of trial, so there could have been no spillover effects in the penalty phase from ineffective assistance that happened earlier.

### 3. Investigation / Preparation.

Petitioner also contends that trial counsel provided ineffective assistance in conducting investigation and otherwise preparing for trial. In particular, Lee asserts that counsel's performance was deficient, and that he was prejudiced, when counsel failed to conduct a serious mitigation investigation, failed to pursue procurement of funds for investigators and experts, failed to investigate Lee's version of events leading to the crime, failed to interview the State's

---

[93]      The same goes for petitioner's suggestion that counsel was ineffective for not objecting when the trial court "never told the jury that each vote would make a difference to the weight the court would give to the jury's recommendation." (Doc. 1, Ground VI, at ¶ 273.) As the trial court correctly observed in rejecting this argument in the Rule 32 proceedings, "Lee cites to no legal authority from any source, and this Court is aware of none, holding that a trial court is required to instruct the jurors in a capital murder case that their individual penalty phase vote carries a specific weight or that the jurors are required to continue deliberating after they have reached a lawful sentencing recommendation." (Vol. 22, R-79 at 107.) This Court agrees. Besides, the trial judge did adequately instruct the jurors on the individual nature of their decision, after carefully weighing the evidence and considering the views of others, as to death versus life. It simply is not the case that the trial judge directed or invited five undecided jurors to stop deliberating as soon as the other seven decided on life. Trial counsel's failure to raise this meritless objection was not deficient performance, as a matter of law.

witnesses, failed to investigate the State's physical evidence, and engaged in incompetent motions practice. (Doc. 1, Ground VI, at ¶¶ 281-316.)[94]

> a.       *Failure to Conduct Mitigation Investigation.*

In what is in many respects a reprise of his argument (discussed *supra*) that trial counsel failed to present mitigating evidence at the penalty and sentencing phases, petitioner maintains that his lawyers furnished ineffective assistance in failing to pursue an investigation that would have disclosed this mitigating information. Specifically, Lee faults trial counsel for not investigating in a manner that would have revealed information concerning "Mr. Lee's family history or about Mr. Lee's own history of mental-health issues, his gasoline, drug, and alcohol abuse, his head injury and his fears about trying to support two children at a young age, his extreme poverty, and the physical and emotional abuse that had shaped Mr. Lee's life." (Doc. 1, Ground VI, at ¶ 284.)

The infirmities in this contention, particularly from a *Strickland* prejudice standpoint, have already been explored in some detail in section III.F.2.b., *supra*. No constructive purpose would be served by reiterating them in full here. As to certain of these purported mitigating issues (substance abuse, mental retardation, parental status), the jury heard evidence of same. There is no showing that further investigation by trial counsel would have rendered these mitigation arguments any stronger or more compelling than they were, so there is no prejudice occasioned by trial counsel's failure to investigate further.[95]  *See generally Price*, 2012 WL 1622977, at *7-8.  As to other issues (childhood poverty, brain injury, physical and emotional abuse), petitioner has made no showing that such facts even existed and/or could have been discovered upon investigation, but instead appears to be relying on hyperbole and self-serving extrapolation from actual known facts.

---

[94]        As with petitioner's ineffective assistance claims relating to the penalty phase and sentencing hearing, the State maintains that several of Lee's ineffective assistance claims pertaining to investigation and preparation are procedurally barred because they were dismissed under an independent and adequate state procedural rule, namely, the Rule 32.6 requirement that grounds be pleaded with specificity. The Court's determination in Section III.F.2.a., *supra*, that the state courts' rejection of claims as inadequately pleaded under Rule 32.6 does not render them procedurally barred from habeas review applies with equal force here.

[95]        "[A] counsel's failure to satisfactorily investigate potential mitigating factors does *not* give rise to a presumption of prejudice." *Borden*, 646 F.3d at 819.

On the deficient performance side of the equation, a fundamental problem with Lee's castigation of trial counsel for not traversing certain of these mitigation avenues in pretrial investigation is that petitioner does not allege that he told his trial lawyers about any of these facts that were plainly within his purview.  "In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."  *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008); *see also Blankenship v. Hall*, 542 F.3d 1253, 1276 (11th Cir. 2008) ("the petitioner is often in the best position to inform his counsel of salient facts relevant to his defense").  Thus, for example, "an attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him."  *Newland*, 527 F.3d at 1202 (citation omitted).   Petitioner cannot parlay his own failure to divulge helpful information to trial counsel into a claim that counsel rendered ineffective assistance in failing to ferret out these matters independently.[96]

In short, petitioner has not satisfied the deficient performance or prejudice prongs of *Strickland* for this claim.  More importantly, he has not shown that the state courts' treatment of this issue during Rule 32 proceedings was objectively unreasonable, so as to make habeas relief available on such a theory.

---

[96]       The Court is aware, of course, that a complete failure to investigate is constitutionally deficient performance.  *See Gaskin v. Secretary, Dep't of Corrections*, 494 F.3d 997, 1003 (11th Cir. 2007) ("when counsel totally fails to inquire into the defendant's past or present behavior or life history in a capital case, his conduct is deficient") (citations and internal quotation marks omitted).  But petitioner admits that counsel did some investigation into these areas, just not as much as petitioner wishes he had done; therefore, the *Gaskin* line of authorities has no application here.  "[A]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. … That duty does not necessarily require counsel to investigate every evidentiary lead. … [I]n assessing the reasonableness of an attorney's investigation, … a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008) (citations omitted).  Petitioner does not explain how counsel should have been emboldened to investigate further when preliminary investigation showed that Lee's family loved him, that he had been abusing drugs and alcohol for many years, that experts on both sides felt he was neither mentally retarded nor psychotic, and so on, particularly when defendant evidently never volunteered information about his auto accident, abusive home life, or drug/alcohol use and emotionally disturbed state in the hours preceding the killings.

-76-

> b.   *Failure to Obtain Funds for Investigators and Experts.*

Petitioner also criticizes his counsel's preparations for trial by asserting that counsel failed to consult with or retain a neuropsychiatric expert, failed to pursue a request to hire an investigator, failed to pursue a request to hire a mitigation expert, and failed to retain a firearms expert.  (Doc. 1, Ground VI at ¶¶ 289-93.)  But the § 2254 Petition fails to identify any substantial exculpatory or mitigating evidence that a neuropsychiatrist or firearm expert would have been able to provide.  Moreover, insofar as petitioner contends that investigators or mitigation experts should have been retained to develop the kinds of mitigating evidence described in section III.F.2.b., *supra*, this Court has already determined that it was not objectively unreasonable for the Alabama Court of Criminal Appeals to conclude that such mitigation, even if it had been developed via investigators and experts, "was neither strong nor compelling" and "would have had no impact on the penalty phase proceedings."  *Lee*, 44 So.3d at 1161.  Petitioner having failed to make a showing of prejudice under *Strickland*, this aspect of his ineffective assistance claim cannot avail him.

> c.   *Failure to Explore Defendant's Version of Events.*

In what is largely redundant of previous arguments, Lee claims that counsel rendered ineffective assistance in failing "to investigate and seek to support Mr. Lee's version of the events leading to the crime."  (Doc. 1, Ground VI, at ¶ 297.)  According to petitioner, trial counsel "was not even aware of what had transpired the night before the crime until after the trial court proceedings were over."  (*Id.* at ¶ 197.)

As noted previously, this contention cannot support a claim of deficient performance where Lee failed to tell his lawyer anything about his purported "multiple sources of stress and impairment" in the 24 hours preceding the offense.  *See Allen v. Secretary, Florida Dep't of Corrections*, 611 F.3d 740, 752-53 (11th Cir. 2010) (no constitutionally deficient performance where defense counsel failed to present evidence of defendant's whereabouts and associations on day of murder, where defendant was aware of those facts and never told counsel, such that "[i]f he thought those facts were relevant, he should have informed his counsel of them").  "This is not a case where trial counsel ignored obvious red flags or overlooked documents he had a duty to consult."  *Harvey*, 629 F.3d at 1258.  Petitioner apparently never told his lawyer that he was drunk and/or high and/or stressed out when he walked into Jimmy's Pawn Shop and gunned

down Ellis and Thompson.  Nor did he mention it in his statement to police.[97]  Trial counsel does not provide ineffective assistance in failing to obtain evidence concerning effects of the defendant's drug use the night before the crime when counsel was unaware of same.  *Baldwin v. Johnson*, 152 F.3d 1304, 1316-17 (11th Cir. 1998) (rejecting claim of ineffectiveness in preparation for sentencing where defendant's "failure to be forthcoming with information that may have been helpful to him hindered [counsel]'s ability to obtain and present any additional mitigating evidence").  A habeas petitioner cannot withhold potentially helpful information from his counsel during pretrial preparations and trial itself, then claim his attorney violated his Sixth Amendment rights by failing to read his mind or otherwise extract that undisclosed information from him.

Besides, as the Rule 32 courts found, and as stated above, petitioner has not adequately shown that he was prejudiced by the omission of this information from trial, or that the witness interviews that Lee now contends should have happened to explore the events in the hours preceding the shootings would have had any impact on trial.  *See, e.g., Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) (speculation that missing witnesses whom petitioner claims counsel should have called or interviewed would have been helpful is "insufficient to carry the burden of a habeas corpus petitioner") (citation omitted); *Hays v. State of Alabama*, 85 F.3d 1492, 1496 (11th Cir. 1996) ("Hays provides no explanation of how better preparation might have changed the course of the trial.  Thus, the alleged errors cannot support reversal.").  For Lee to argue impairment as a mitigating circumstance in this case would have been problematic, given the lack of corroboration and the presence of inconsistencies.  If he was drunk or high, why did he not appear that way in the surveillance video?  Why did he not tell the police when they took his statement?  Under these circumstances, for trial counsel to put on evidence of the

---

[97]        In his post-arrest statement to law enforcement, Lee said nothing about being under the influence of drugs or alcohol, being emotionally distraught, or otherwise being impaired at the time of the murders.  What Lee told police was that the "first shot I fired accidentally went off.  I then shot both ladies."  (Vol. 2, R-2 at 167.)  To say that Lee did not mean for the gun to fire the first time (and only the first time) is not to say that he was so impaired by his chemical intake or the stress of parenthood and suspicions of infidelity by his girlfriend that he did not know what he was doing when he opened fire during this planned robbery.  Likewise, the surveillance video of the crime reveals no indication that Lee was incapacitated by drugs, alcohol, or distress at his girlfriend or children.

mitigating circumstance of impaired judgment would likely have done more harm than good. *See, e.g., Kokal v. Secretary, Dep't of Corrections*, 623 F.3d 1331, 1349 (11th Cir. 2010) (evidence of intoxication at the time of the offense is "unreliable and of little use as mitigating circumstances evidence when it is predicated solely upon the defendant's own self-serving statements, especially when other evidence is inconsistent with those statements," and at any rate "a showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing") (citations omitted).

      For all of these reasons, this claim is meritless.

d.      *Failure to Interview State's Witnesses.*

      The Alabama Court of Criminal Appeals rejected the argument that Lee's trial counsel was ineffective for failing to interview State witnesses.  In addition to pointing out that Lee had failed to identify a single witness that he contended counsel should have interviewed, the court reasoned that "the failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial *per se*," and cited numerous federal decisions for that proposition.  *Lee*, 44 So.3d at 1158 (citations omitted).  In effect, then, the state court found no *Strickland* prejudice.

      The state court's conclusions on this issue are not objectively unreasonable and cannot support habeas relief.  As to deficient performance, petitioner has never identified which witnesses he contends his lawyers should have interviewed before trial.  Instead, petitioner makes the vague, unhelpful statement that "trial counsel made only limited efforts to interview any of the likely witnesses for the State."  (Doc. 1, Ground VI, at ¶ 301.)  What does "limited" mean?  Petitioner offers no concrete, specific facts to support this conclusory sleight-of-hand accusation, which falls well short of establishing constitutionally deficient performance.  Moreover, the state court's determination that no *per se* prejudice resulted from Lee's attorneys' failure to interview the State's witnesses before trial is correct, as a matter of law.  *See Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("the failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial *per se*") (collecting cases); *McCleskey v. Kemp*, 753 F.2d 877, 900 (11th Cir. 1985) (no prejudice from counsel's failure to interview witnesses, where attorney could reasonably prepare to cross-examine state's expert by reading his report and where no showing was made that interviewing victims would have revealed something their statements did not).  Indeed, a claim of ineffective assistance of counsel

-79-

predicated on trial counsel's failure to interview adverse witnesses cannot succeed, where the defendant "has not identified any specific information that would have been revealed by depositions or interrogatories and would have added to the impeachment of the State's witnesses." *Aldrich*, 777 F.2d at 637; *see also Johnson*, 256 F.3d at 1187.  This is precisely the case here; therefore, Lee has not made the requisite showing of prejudice arising from his counsel's purported failure to interview unspecified witnesses.

*e.    Failure to Investigate Physical Evidence.*

The crux of this claim is petitioner's contention that trial counsel provided ineffective assistance by failing "to investigate and determine whether the gun's trigger was overly sensitive," failing "to compare the characteristics of the gun at issue with other guns," and failing to analyze the surveillance video for evidence of accidental discharge of the firearm, panicked reaction by defendant, or impairment by defendant.  (Doc. 1, Ground VI, at ¶¶ 305-07.)  In this same claim, Lee revisits ground that has already been plowed elsewhere in his § 2254 Petition by faulting his attorneys for not investigating "the amount of drugs and alcohol in Mr. Lee's system at the time of the crime" or seeking out evidence from witnesses at the hotel or bars that Lee had patronized the night before the offense.  (*Id.* at ¶¶ 308-09.)

On Rule 32 review, the Alabama Court of Criminal Appeals thoroughly and methodically rejected any notion that petitioner was prejudiced by these purported shortcomings of trial counsel.  With regard to the firearm, the state court pointed out that a State firearms expert "testified that the trigger pull on the shotgun used in the murders required six pounds of pressure, which, she testified, was the average pressure necessary to fire a similar weapon." *Lee*, 44 So.3d at 1158.  Petitioner makes no showing and offers no suggestions that this expert's testimony was inaccurate or that his counsel could reasonably have obtained an expert to testify differently.  If the State's expert testified accurately – and petitioner does not allege otherwise – then chasing down a defense expert in hopes of procuring an opinion that the trigger was unusually sensitive or defective (thereby supporting Lee's "first shot was an accident" defense) would have been a futile, pointless endeavor.  Trial counsel's failure to perform a futile, make-work task does not implicate a defendant's Sixth Amendment rights.

As to the surveillance video, the state appellate court recognized that the trial judge "specifically found that nothing in the videotape supported the claim that the shootings were accidental." *Id.*  The appellate court further observed that "the jury viewed the videotape of the

murders and could reach its own conclusions." *Id.* at 1159.  There has been no showing that "investigation" of the video by trial counsel would have made even the slightest difference at trial because (i) nothing in the video suggested accidental shooting or intoxicated state and (ii) the jury watched it anyway; thus, there is no prejudice for purposes of the *Strickland* analysis.[98]

As for the drugs and alcohol in Lee's system, the Alabama Court of Criminal Appeals correctly pointed out that nothing in the video or in petitioner's statement to the police reflected that he was intoxicated when he committed the murders.  Nor is there any indication that Lee ever informed his trial counsel at any time before the trial that he was drunk or high when he committed the offense.  The law does not require attorneys to read their clients' minds in developing avenues for investigation.  *See Newland*, 527 F.3d at 1202 ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant.").  Moreover, Lee was on the lam for roughly 16 hours after the murders before being apprehended in Georgia.  Given the passage of time, no post-arrest drug test would have revealed Lee's degree of intoxication at the time of the offense.  Nor is there indication in the record that a drug/alcohol screen was even performed upon Lee's arrest.  In short, petitioner has not shown that trial counsel had any reason to suspect that Lee was under the influence of drugs and alcohol when he shot Ellis and Thompson dead.  And there appears to have been no available evidence of Lee's blood-alcohol level or marijuana/cocaine levels in his system at the time of his crimes.  Under these circumstances, it was not ineffective assistance for trial counsel not to investigate "the amount of drugs and alcohol in Mr. Lee's system at the time of the crime." (Doc. 1, Ground VI, at ¶ 308.)

---

[98]     Indeed, it is highly doubtful that trial counsel's performance was even deficient in this regard.  In the trial judge's words, the surveillance video shows vividly that Lee "opened fire upon entering the door.  He emptied his weapon, firing as quickly as he could, shot after shot." (Vol. 4, R-28 at 491.)  According to the trial judge, "[t]he surveillance video tape showed Lee opening fire and gunning down three people as soon as he entered Ellis' store." (Vol. 22, R-79 at 30.)  Nothing in that description of the images depicted in the video (which petitioner does not challenge) can possibly be reconciled with, much less bolster, a defense of accident or panic. The trial judge likewise explained that he "saw nothing in the video tape that raised the slightest inference that Lee was under the influence of drugs and/or alcohol." (Vol. 22, R-79 at 30.)  Far from alleging ineffective assistance, then, petitioner appears to be vilifying his trial counsel for failing to conjure up evidence that simply did not exist and for failing to pretend that exculpatory evidence could be found in a videotape that revealed nothing of the sort.  Trial counsel's election not to indulge in wishful thinking is not constitutionally deficient performance.

This reasoning is likewise dispositive of petitioner's assertion that trial counsel was ineffective for failing to interview witnesses from establishments Lee had visited the previous night to bolster defenses of intoxication and impairment at the time of the offense. As stated, petitioner has made no showing that trial counsel had any knowledge or any reason to believe that such issues were in play. The physical evidence did not reveal as much. And there is no allegation that petitioner so informed his counsel. Trial counsel did not violate the standards articulated in *Strickland v. Washington* by failing to investigate a theory of defense/mitigation that it had no reason to know even existed.[99]

> f.    *Incompetent Motions Practice.*

Petitioner also asserts that his trial counsel deprived him of his Sixth Amendment right to counsel by engaging in "incompetent and constitutionally deficient motions practice," inasmuch as they filed pretrial motions that they did not subsequently pursue. According to petitioner, "[t]hese motions were superficial substitutes for actually doing the work or obtaining the resources they showed were necessary." (Doc. 1, Ground VI, at ¶ 313.)

In response, the State correctly raises an exhaustion objection. In his Rule 32 brief to the Alabama Court of Criminal Appeals, Lee made no pretense of advancing a claim of ineffective assistance predicated on "deficient motions practice" by his trial counsel. Specifically, Lee devoted nearly 50 pages of that appellate brief to a legal argument of ineffective assistance, delineating 11 different categories of purported errors and omissions by his trial counsel. (Vol.

---

[99]    Additionally, this last issue is properly dismissed for the independent reason of want of exhaustion. In his Rule 32 Petition, Lee framed the claim as being that "[t]rial counsel failed to obtain ***records or information from either the hotel where Petitioner stayed the night before or the bars he had visited.***" (Vol. 14, R-63 at 52 (emphasis added).) The Rule 32 Petition said nothing about interviewing witnesses at the hotel or bars, nor did it identify available witnesses from those locations or proffer what they would have said if counsel had interviewed them. This difference in how the claim was framed prompted the Rule 32 state courts to focus on whether hotel receipts could have advanced petitioner's claim, rather than whether people who saw him at those locations could have verified that he was drinking heavily, ingesting narcotics, and not sleeping. (Vol. 22, R-79 at 30-31; *Lee*, 444 So.3d at 1159.) Petitioner revised his claim in the § 2254 Petition to eliminate the reference to "records" and instead focus on "witnesses." That claim, in this formulation, was not fairly presented to the state courts. Even if it were, petitioner does not identify any witnesses whom trial counsel could have located who would have testified to Lee's intoxicated, sleep-deprived state, so there is no indication that such investigation would have mattered, in any event.

19, R-69 at 65-112.)  Nowhere in that sprawling argument section did petitioner make clear that he was advancing a claim that trial counsel had been ineffective in their handling of pretrial motions practice.  Petitioner does not contend that he did present such a claim in the argument section of that brief.  Instead, he merely identifies a few stray references to the issue in the fact section of his brief as evidence that he properly exhausted this claim.  (Doc. 25, at 86 n.24.)  These offhand references are simply not enough to satisfy the fair presentment requirement, or to place the Alabama appellate court on notice that he was actually pursuing such a claim in his Rule 32 appeal.  By all appearances, Lee's presentation of facts in his Rule 32 appellate brief alleging deficient motions practice was simply as background evidence to support other ineffective assistance claims that he vigorously pursued and articulated in the argument portion of the brief.  In short, this issue is not exhausted and cannot be litigated in federal habeas proceedings.

    Even if this claim were properly exhausted, petitioner has not shown that any minimally competent counsel would have followed up on various motions that were filed but that the trial court did not formally rule on, much less that he was prejudiced by same.  As to the first point, "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  *Harrington*, 131 S.Ct. at 789.  It was not unreasonable for trial counsel to file a slew of pretrial motions in hopes of getting relief, to infer from the trial court's silence that such motions were viewed with disfavor, and to move on to other avenues for trial preparation.  As to the second point, many of the motions in question either involved minor matters, matters requesting relief to which he was not entitled, or investigative / expert matters that petitioner has never established would have borne fruit even if they had been pursued diligently.[100]  Accordingly, the *Strickland* test for ineffective

---

[100]     For example, petitioner argues that trial counsel should have pursued a motion to disqualify from jury service any venire member who was acquainted with victims or victims' family members.  Such an argument was contrary to Alabama law; therefore, the motion was certain to fail.  *See, e.g., Taylor v. State*, 808 So.2d 1148, 1185 (Ala.Crim.App. 2000) ("a veniremember's mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause").  Petitioner also insists that trial counsel should have pursued a motion to require the State to produce or permit inspection of certain documents, files, physical evidence, and objects.  But Lee never identifies any documents or things that the State wrongfully withheld, much less identifies any manner in which he was prejudiced by counsel's failure to pursue such a motion.  With respect to petitioner's argument that counsel should have (Continued)

assistance of counsel is not satisfied even if this claim were properly considered on the merits in federal habeas review.

### 4. Jury Selection.

Next, petitioner argues that he received ineffective assistance of counsel during jury selection in three specific ways, to-wit: that trial counsel improperly failed to remove "biased jurors" from the panel, failed to ask appropriate questions to reveal bias, and failed to object to voir dire being focused on death qualification.

### a. Failure to Strike Biased Jurors.

According to petitioner, jurors H.W., R.M. and J.B. all gave answers during voir dire that demonstrated bias against Lee, yet defense counsel did not utilize challenges for cause or peremptory strikes to remove them from the jury. Petitioner frames this omission as constitutionally ineffective representation by his trial counsel. In considering this claim, the Alabama Court of Criminal Appeals quoted at length from the trial court's opinion reviewing the record as to each of these jurors and finding no indication of bias. The appellate court concurred with this determination, reasoning that "Lee did not allege that any of the jurors were actually biased against him and … the record of the voir dire examination shows that the three jurors

--------

followed up on motions for an investigator and mitigation expert, that issue has been addressed in detail *supra*, and the Court reiterates its finding that Lee has not shown prejudice. Next, petitioner argues that trial counsel should have done more to exclude evidence of gruesome crime scene photographs, but there is nothing counsel could have done. The Alabama Court of Criminal Appeals specifically deemed such materials to be admissible in this case. *See Lee*, 898 So.2d at 869 ("We have reviewed the photographs, and we find that they were relevant to depict the crime scene and the injuries each of the victims suffered. Therefore, the trial court did not err in admitting them into evidence."). The motion would have failed, at any rate. Likewise, while petitioner castigates trial counsel for failing to pursue a motion for a jury questionnaire, the Alabama Court of Criminal Appeals ruled that he was not entitled to one. *See id.* at 854 (finding that the method of examination and empaneling of jury in this case provided reasonable assurance that any prejudice would be discovered, such that "the trial court did not err in denying the appellant's motion for a jury questionnaire"). The point is simple: Lee's constitutional rights were not implicated by trial counsel's failure to pursue pretrial motions that either were not meritorious or would not have helped him in any material way at trial. Neither prong of *Strickland* is satisfied here. Trial counsel is not ineffective for failing to follow up on motions that were either meritless or unlikely to make a difference.

indicated that they had no bias against Lee nor were they biased in favor of the State." *Lee*, 44 So.3d at 1164.

In many respects, petitioner's recitation of facts concerning these three jurors is misleading or unsupported. As to juror H.W., petitioner states that he "disliked the lead trial counsel." (Doc. 1, Ground VI, at ¶ 321.) But the record shows only that, when asked if anyone knew of defense counsel, H.W. raised his hand and said, "Been the Judge of the traffic court." (Vol. 2, R-5 at 41.) In two follow-up questions inquiring specifically whether H.W. and other jurors who knew of defense counsel would be unable to render a fair and honest verdict, H.W. remained silent. (*Id.* at 43-44.) Petitioner also says that H.W. "favored the death penalty" (doc. 1, Ground VI, at ¶ 321). In fact, H.W. was one of numerous jurors who raised his hand when asked if he felt the death penalty was "the proper penalty given the proper circumstances by law"; however, H.W. remained silent when asked if his feelings were so strong that he would be unable to consider life without parole. (Vol. 2, R-5 at 159-60.) And finally, while H.W. indicated that he had been "robbed at gun point" (*id.* at 54), he never stated that such experience would bias him against one in Lee's position. From this record, it was not obvious that H.W. was a biased juror whom any competent defense counsel would have struck at all costs.

As to juror R.M., petitioner says he was biased against the defense because R.M. "favored the stiffest penalties for those convicted of crimes," one of his relatives had been murdered, he had been the victim of property crimes, and he knew one of the victims. (Doc. 1, Ground VI, at ¶ 321.) In fact, what R.M. said during voir dire was that "[l]ife without parole would be to me worse than the death penalty, because I've worked in prison and county jail and everything." (Vol. 2, R-5 at 141.) Petitioner blasts trial counsel for perceiving this answer as favorable to the defense, but counsel's reasoning presumably was that the response suggested R.M. might favor a life sentence rather than a death sentence in the egregious factual circumstances presented by this case. (Doc. 1, Ground VI, at ¶ 116.) While petitioner may disagree with trial counsel's interpretation of this response, it was neither unreasonable nor incompetent for trial counsel (who was, after all, fundamentally trying to save Lee's life and was looking for jurors that might be favorably disposed to imposing a life sentence rather than a death sentence for Lee's actions of gunning down two people in cold blood without warning in the course of an attempted pawn shop robbery) so to conclude. And R.M.'s answers showed that the other factors cited by petitioner would not affect his ability to consider the evidence

impartially.  (Vol. 2, R-5 at 77.)  There is thus no reason to think that R.M. was biased against Lee.

Finally, with respect to juror J.B., petitioner's only argument for why should have been struck is that J.B. was employed as a police officer.  (Doc. 1, Ground VI, at ¶ 321.)[101]  Of course, police officers are not conclusively presumed to be biased against criminal defendants.  More to the point, no authority holds that defense counsel is *per se* ineffective for allowing a law enforcement agent to sit on a jury.

This entire ground for habeas relief amounts to nothing more than Lee second-guessing his trial counsel's strategic decisions during jury selection.  Striking a jury is an inherently subjective, imperfect process, where counsel are necessarily making decisions more by gut instinct and feel than by absolute certainty.  None of these jurors made statements that categorically evinced bias against Lee or his lawyers.  Nothing in the facts recounted herein would have given rise to a remotely viable for-cause challenge against jurors H.W., R.M., and J.B.  Petitioner does not appear to be arguing otherwise.  As for peremptory challenges, the Eleventh Circuit has strongly cautioned that courts applying *Strickland* must "defer to trial counsel's performance and eschew the distorting effects of hindsight" in interpreting a prospective juror's statements and trial counsel's decision whether or not to leave that person on the jury.  *Harvey v. Warden, Union Correctional Institution* 629 F.3d 1228, 1247 (11th Cir. 2011) (citation omitted); *see also Babb v. Crosby*, 2006 WL 2805642, *2 (11th Cir. Oct. 2, 2006) ("the Supreme Court has not concluded that a lawyer who leaves an arguably biased juror on a jury is *per se* ineffective").  Moreover, "trial counsel may validly select jurors he or she believes are open to life imprisonment or are receptive to a particular mitigation defense."  *Harvey,* 629 F.3d at 1244.  By all appearances, this is precisely what Lee's trial counsel did.  Also, it bears emphasis that "[a]ssessing jurors during *voir dire* also requires an evaluation of demeanor and credibility.  Review of counsel's performance is highly deferential in any case, but the case for

---

[101]    In a bit of overt Monday morning quarterbacking, Lee also argues that J.B. should have been removed from the jury because he "forcefully encouraged his fellow jurors to accept the State's position in the penalty phase."  (Doc. 1, Ground VI, at ¶ 321.)  Obviously, trial counsel had no knowledge that J.B. would champion a recommendation of death during penalty phase deliberations in this case.  It is improper for petitioner to use the unfair lens of 20/20 hindsight to evaluate his trial counsel's strategic decisions during jury selection.

deference is even greater when counsel is evaluating credibility." *Bell v. United States*, 2009 WL 3488457, *3 (11th Cir. Oct. 30, 2009); *Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007) ("On habeas review, federal courts general accord particular deference to the judgment of trial counsel during *voir dire*.") (citation omitted); *DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008) ("an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness") (citation omitted).[102]  On this showing, and given the high level of deference accorded to counsel's strategic decisions in assessing prospective jurors in jury selection, petitioner has not demonstrated that trial counsel performed in a constitutionally deficient manner in failing to exercise peremptory strikes to remove H.W., R.M. and J.B. from the jury.[103]  Habeas relief is inappropriate on this claim.

> b.    *Failure to Ask Questions to Reveal Bias.*

Petitioner also asserts that trial counsel "was ineffective for failing to ask questions to reveal potential jury bias," inasmuch as he failed to pursue a motion that venire members be given a questionnaire and "did not make appropriate inquiry of venire members about their lives or experiences or knowledge."  (Doc. 1, Ground VI, at ¶¶ 323-26.)

The State correctly argues that this claim is procedurally barred because it was not exhausted in state court.  To be sure, Lee's Rule 32 Petition identified as a subground for relief that trial counsel had failed to ask adequate questions to reveal bias.  (Vol. 14, R-63 at 58.)

---

[102]    One aspect of strategy as to peremptory strikes, of course, is a relative weighing of which jurors would be most or least harmful to the defense.  Saying that H.W., R.M. and J.B. appeared unfavorable to Lee tells us nothing without a comparison to the jurors whom the defense struck instead.  Petitioner offers no such analysis.  Even assuming these jurors' answers supported an inference of hostility to the defense, there is no reason to think that counsel's peremptory challenges were not used on other, more obviously unfavorable jurors.  This "lesser of two evils" approach would not be deficient performance at all.

[103]    There is likewise no evidence of prejudice, absent a showing of bias that has not been made.  *See, e.g., Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased.").  The Alabama Court of Criminal Appeals' determination that Lee had not proven prejudice on his "biased juror" theory was not objectively unreasonable, and therefore will not be disturbed on deferential habeas review.

However, he did not pursue this claim on appeal of the denial of his Rule 32 Petition, such that it was never presented to the Alabama Court of Criminal Appeals.  Because the exhaustion requirement was not satisfied, petitioner cannot seek habeas relief on the theory that trial counsel was ineffective during jury selection for failing to ask questions to reveal bias.[104]  Besides, the record shows that ample information about jurors' lives, experiences and knowledge was in fact elicited during voir dire, so as to facilitate reasonably informed use of strikes.  Petitioner's contention that more information should have been obtained reveals neither deficient performance nor prejudice.

c.    *Failure to Oppose "Death Qualification" Focus.*

As his final objection to counsel's performance during the jury selection phase of trial, Lee argues that trial counsel "was ineffective for allowing voir dire to focus almost exclusively on whether jurors were 'death qualified' and for not objecting to the manner in which this death qualification was accomplished."  (Doc. 1, Ground VI, at ¶ 327.)

In deeming this theory of ineffective assistance meritless, the Alabama Court of Criminal Appeals concluded that the alleged performance deficiencies were unfounded.  Specifically, the

---

[104]    In so determining, the Court considers and rejects Lee's assertion in a footnote in his reply that he actually did submit this claim to the Alabama Court of Criminal Appeals.  (Doc. 25, at 87 n.25.)  To support his exhaustion argument, Lee directs this Court's attention to a section of his Rule 32 brief labeled "Ineffective Assistance in Jury Selection."  (Vol. 19, R-69 at 23-27.)  However, that section does not purport to state any claims of ineffective assistance; rather, it is squarely located in the "Statement of Facts" portion of the brief.  Looking at the "Argument" section of Lee's appellate Rule 32 brief, the ineffective assistance claims pertaining to jury selection that he raises are (i) failure to object to focus on death qualification; (ii) failure to object to inflammatory statements during voir dire; and (iii) failure to use peremptory challenges to strike biased jurors.  (Vol. 19, R-69 at 76-83.)  The Alabama Court of Criminal Appeals could not reasonably have discerned from the "Argument" section of his brief that Lee was pursuing a claim of ineffective assistance based on counsel's failure to ask questions designed to reveal bias.  Nor is it reasonable for petitioner to insist that the state court should have inferred from background facts presented elsewhere in his brief that he was actually pursuing such a claim, even though not a whisper of it appeared in the argument section captioned "Jury Selection."  Petitioner has failed to comport with fundamental principles of fair presentment.  *See, e.g., McNair v. Campbell*, 416 F.3d 1291, 1302-03 (11th Cir. 2005) (it is not sufficient "that all facts necessary to support the claim were before the state courts," and a habeas applicant must "do more than scatter some makeshift needles in the haystack of the state court record").  For exhaustion and fair presentment principles to have any meaning, Lee cannot properly request habeas relief on a claim that, from his Rule 32 brief, the Alabama Court of Criminal Appeals never knew he was pursuing.  Yet that is what he seeks to do here.

appellate court cited with approval the trial court's determination that Lee had come forward with nothing other than his own self-serving opinion that death-qualification was carried out in an improper manner, and further noted that the Supreme Court has authorized death-qualification of venire members in capital cases.  *See Lee*, 44 So.3d at 1161-62.

　　　The Alabama Court of Criminal Appeals' resolution of this claim was not objectively unreasonable.  It is well established, as a matter of both federal and Alabama law, that prosecutors may "death-qualify" a jury in a capital case.  *See, e.g., United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011) ("there is no constitutional right to have guilt determined by a jury that has not been death-qualified"); *Parker v. Allen*, 565 F.3d 1258, 1270 (11th Cir. 2009) ("it is constitutionally permissible for the prosecutor to retain jurors who are 'death qualified' and to strike jurors who state that they could not impose the death penalty under any circumstance"); *Travis v. State*, 776 So.2d 819, 871 (Ala.Crim.App. 1997) ("the Constitution does not bar the States from 'death-qualifying' juries in capital cases, and … death-qualifying a jury does not deprive a defendant of a fair and impartial jury, and Alabama courts have consistently held likewise").  Given these authorities, Lee's trial counsel could not have performed deficiently in failing to raise a patently meritless argument that death-qualification of his jury was improper.  Nor has petitioner shown error in the Alabama courts' determination that death-qualification was conducted properly in this case, much less that any competent attorney would have objected to the manner in which it was carried out.[105]  On deferential habeas review,

---

[105]　　　At the heart of this objection appears to be Lee's contention that trial counsel should have objected when the State challenged jurors D.J. and I.M. for cause.  (Doc. 1, Ground VI, at ¶ 330.)  Juror D.J. made somewhat confusing statements that appear to evince strong opposition to the death penalty, from which defendant's counsel only partially rehabilitated her. (Vol. 2, R-5 at 107-09.)  Juror I.M. emphatically stated, "I don't feel like I have that authority to end someone's life.  I'm against it.  That's all."  (Vol. 2, R-5 at 135.)  The Court cannot say that any competent counsel would have objected to the striking of D.J. and I.M. for cause based on their opposition to the death penalty.  Any such objection would have been destined to fail, in any event.  *See Lee*, 898 So.2d at 812 ("Based on veniremember I.M.'s statements regarding her opposition to the death penalty, the trial court properly removed her from the venire for cause."); *id.* at 844 (explaining that D.J. expressed opposition to death penalty and that  "we do not find any error, plain or otherwise, in the trial court's granting of the State's challenges for cause" of D.J. and others).  A lawyer is not ineffective for failing to advance meritless or weak arguments.  Besides, to petitioner's larger point that trial counsel failed to object to unfounded challenges for cause based on jurors' opposition to the death penalty, the record contradicts that claim.  In fact, in several instances defense counsel did object to the State's "death-qualification" challenges to (Continued)

the Court will not disturb the state courts' finding of no constitutionally deficient performance by Lee's trial counsel on this issue.

### 5. Guilt Phase.

Petitioner also attributes no fewer than eight instances of ineffective assistance to trial counsel's performance during the guilt phase of trial. Those specific acts and omissions include failure to present additional evidence during the defense case-in-chief, failure to object to introduction of inadmissible evidence, failure to offer testimony to neutralize the State's rebuttal witnesses, incompetent handling of school records, ineffective cross-examination of witnesses, concession during closing argument that Lee was guilty of murder, failure to object to alleged prosecutorial misconduct, and failure to object to purported improper jury instructions. Each of these sub-issues will be addressed in turn.[106]

### a. Failure to Present More Evidence during Case-in-Chief.

In his § 2254 Petition, Lee brings a claim that "trial counsel was ineffective for not presenting additional evidence during Mr. Lee's case-in-chief." (Doc. 1, Ground VI, at ¶ 336.) Specifically, petitioner faults his lawyers for not introducing evidence that Lee's first shot was accidental, that Lee had been intoxicated and under stress in the hours before the killings, that Lee's high school was of poor quality, and that drug and alcohol abuse would have exacerbated Lee's mental deficits.

The State has a viable argument that this claim was not exhausted in Rule 32 proceedings. Examination of Lee's brief to the Alabama Court of Criminal Appeals does reveal a category of claims labeled "Ineffective Handling of Evidence at Guilt Phase," but his sole

---

jurors where he felt their answers showed that they could impose the death penalty. (*See* vol. 3, R-5 at 182-85.) Petitioner cannot satisfy his burden under the *Strickland* deficient performance prong as to the theory that trial counsel sat idly by during improper challenges for cause.

[106] In so doing, the Court bears in mind the trial court's astute observation that "Jackson and Hagood faced a daunting task during the guilt phase of Lee's trial in the light of the overwhelming evidence against him, including: 1) survivor Helen King's eye-witness testimony; 2) the fact that the murders and attempted murder were recorded by a surveillance video camera; and 3) Lee's inculpatory statement to Lt. Roy Freine." (Vol. 22, R-79 at 66-67.) Given the quantum of powerful, consistent evidence pointing to Lee's guilt, defense counsel faced long odds indeed in urging the jury not to convict him of capital murder.

reference in that argument to this particular claim is a conclusory statement that "[t]rial counsel were ineffective for … failing to present additional evidence during the guilt phase." (Vol. 19, R-69 at 83.) Nowhere in that section did Lee elaborate, or specify for the Alabama appellate court's benefit what evidence he contended his trial counsel should have presented but did not. Apparently, petitioner expected the state appeals court to guess what evidence he thought his lawyers should have introduced at the guilt stage. Much more is required to satisfy bedrock exhaustion requirements. As such, this claim was not fairly presented to the Alabama Court of Criminal Appeals in the Rule 32 proceeding, and is not exhausted.

Even if the claim had been exhausted, it does not satisfy the deficient performance prong of the *Strickland* test because, in essence, it amounts to mere second-guessing of trial counsel's reasonable strategies. With regard to the "accidental" gunshot, trial counsel relied on Lee's statement to law enforcement that "the gun went off the first time by accident." (Vol. 2, R-2 at 167.) The Court cannot find that no competent counsel would have failed to submit corroborating evidence on this point.[107] Besides, given the overwhelming evidence of guilt, and the apparent dearth of potential evidence that could have lent credence to an "accident" defense,

---

[107] This is particularly true given the paucity of available supporting evidence. Lee says that trial counsel should have offered expert or other testimony that the gun accidentally fired the first time, but does not identify any witness who could or would have so testified. And he ignores the testimony of the State expert who test-fired the murder weapon, found that six pounds of pressure was required to pull the trigger, and testified that such is "about average" for a firearm. (Vol. 3, R-9 at 251.) Petitioner cannot establish constitutionally deficient performance by arguing that his lawyers should have obtained evidence that did not exist. And certainly trial counsel cannot fairly be criticized for failing to put Lee's co-conspirators to the robbery (who also happened to be his brother and cousin) on the witness stand to testify that he told them the gun "just went off." Such a statement may or may not have been admissible under a hearsay exception. Even if it were, these witnesses would have had little credibility, given their role in the crime and kinship to Lee. The larger point, of course, is that these witnesses may have had harmful things to say about the premeditated, planned nature of the crime once they were on the stand. In sum, the "accidental discharge" defense appeared flimsy, at best. Surveillance video and eyewitness testimony showed that Lee simply walked in and started shooting. Nothing suggested accident; rather, the evidence showed him methodically gunning down his victims one by one, firing his weapon over and over again. In that factual context, it cannot be said that no competent counsel would have failed to put on additional risky evidence (assuming it even existed) to endeavor to bolster a shaky defense of accident. By all appearances, the best evidence the defense could have mustered on the accident theory was the evidence the jury actually heard, to-wit: Lee's post-arrest statement that the gun fired accidentally the first time.

there was no *Strickland* prejudice either.  With regard to Lee's stressed-out and intoxicated status, the Court has already addressed these issues fully in the context of petitioner's failure-to-investigate claim, and has found that it was not ineffective assistance for trial counsel not to obtain this information.  This aspect of Lee's claim is redundant of the failure-to-investigate claim, and fails for precisely the same reasons.

As for petitioner's criticism of trial counsel's unsuccessful attempts to elicit evidence about the quality of Lee's high school or the interaction of Lee's substance abuse and mental retardation, the Court on reviewing the transcripts cannot find that trial counsel's performance in those respects fell below the minimal threshold level of competence mandated by *Strickland*.[108] There is also no prejudice on this point because showing that Billingsley High School is of poor quality would not have explained away Lee's average scores and grades (unless either (i) mentally ill or retarded students are the norm at such a high school, or (ii) Billingsley grades do not correlate to actual relative academic performance, neither of which is suggested in the § 2254 Petition).  Likewise, further attempts by defense counsel to show that mentally retarded persons may be more susceptible to drugs and alcohol would probably have been unavailing given Dr. Ronan's unequivocal testimony that Lee was suffering from no mental disease or retardation of any kind and that drugs would not affect mentally retarded individuals to any greater extent than they would average persons.  (Vol. 4, R-11 at 340.)  Petitioner makes no showing that Dr. Blanton or any other witness would have disputed Dr. Ronan's conclusions on the latter issue.

> b.      *Failure to Object to Inadmissible Evidence.*

Next, petitioner alleges ineffective assistance by his trial counsel in "failing to object to the introduction of inadmissible evidence."  (Doc. 1, Ground VI, at ¶ 344.)  This claim focuses on the testimony of Dr. Ronan, arguing that trial counsel should have objected to her testimony

---

[108]      Virtually every criminal trial is marked by defense counsel trying and failing to elicit particular evidence from particular witnesses, either because the witness does not testify as expected or because prosecutorial objections are sustained.  If such shortcomings were constitutionally deficient performance, then scarcely any criminal defense attorneys anywhere could be deemed competent.  A § 2254 Petition is not the time to second-guess trial counsel's methods for attempting to introduce evidence, merely because the trial court in its broad discretion disallowed the evidence.  Nor will the Court find trial counsel's performance to dip below minimum constitutional guarantees simply because they did not persist in endeavoring to present certain lines of testimony in derogation of trial judge rulings sustaining objections to keep them out.

about an unidentified psychiatrist's report (as alleged in Ground III, *supra*) and that she should not have been permitted to parlay her competency evaluation into testimony against Lee during the guilt phase (as alleged in Ground IV, *supra*).[109]  This Court has already resolved Grounds III and IV adversely to petitioner and has found no constitutional deprivation in either case.  *See* §§ III.C. & III.D., *supra*.  Trial counsel does not perform in a constitutionally substandard manner by failing to interpose meritless objections.  Nor is there any prejudice.  In this regard, the Alabama Court of Criminal Appeals correctly observed that "there was no indication that Dr. Ronan considered illegal evidence in reaching her conclusion about Lee's mental health.  Thus, even if there had been an objection, there would have been no reversible error."  *Lee*, 44 So.3d at 1166.[110]  As the trial court opined, "[e]ven if Lee's trial counsels had objected to Ronan's

---

[109]     Petitioner also maintains that Dr. Ronan was not qualified to give the expert opinions she rendered in this case.  (Doc. 1, Ground VI, at ¶ 350.)  However, petitioner does not develop this claim in any meaningful way by either (i) explaining which testimony he believes Dr. Ronan was not qualified to give, or (ii) showing how her qualifications were inadequate in any such respect.  Certainly, it was not constitutionally infirm of Lee's trial counsel not to object to the competency of a clinical psychologist such as Dr. Ronan to testify as her clinical observations of petitioner and subsequent opinions concerning mental illness, retardation of other defect.  At best, petitioner suggests that Dr. Ronan was not qualified to evaluate tests performed by Dr. Blanton, but he neither explains how her qualifications were deficient or why any minimally competent trial attorney would have perceived them to be so.  This kind of *ad hoc* conclusory attack cannot entitle a petitioner to habeas corpus relief.

[110]     Petitioner also takes trial counsel to task for not objecting to Dr. Ronan's testimony about whether Lee suffered from a mental disease or defect.  According to petitioner, this issue was not part of the case, so defense counsel should not have remained silent while Dr. Ronan testified about it.  But when the defense expert, Dr. Blanton, testified about the various tests he had administered to Lee, he stated his opinion based on those test results that Lee "was not psychotic and that he was having some depression secondary to his situation."  (Vol. 3, R-10 at 314.)  Surely it was not ineffective assistance for trial counsel to ask Dr. Blanton about his tests and test results.  And once Dr. Blanton offered testimony about Lee's limited mental capacity and purported retardation, it was not improper for the State to put on its own mental health expert testifying that Lee was not operating under a mental disease or defect.  The issues are sufficiently linked that such testimony was not *per se* improper and objectionable.  And given defense counsel's theme during the closing argument that "there's something wrong with Jeffrey [*sic*]" (vol. 4, R-14 at 370) and that Lee's crime makes no sense "[u]nless, of course, something is not quite right upstairs" (*id.* at 367), it was hardly improper for the State to refute that theory using the testimony of Dr. Ronan pertaining to mental disease or defect.  As the state court pointed out, "it is clear that defense counsel's strategy from the beginning was to challenge Lee's mental health."  *Lee*, 44 So.3d at 1167.  Any defense efforts to prevent the State from (Continued)

opinion testimony, this Court is convinced there is no reasonable probability the outcome of Lee's direct appeal would have been different."  (Vol. 22, R-79 at 63.)

For these reasons, the Court finds that the Rule 32 courts' rulings that petitioner did not receive ineffective assistance of counsel with regard to non-objection to certain evidence at trial were not objectively unreasonable.  Accordingly, these rulings will not be disturbed on federal habeas review.

### c.    Failure to Present Sur-Rebuttal Witnesses.

Petitioner also attributes ineffective assistance to trial counsel in "failing to call any witnesses to respond to the State's rebuttal witnesses."  (Doc. 1, Ground VI, at ¶ 357.) According to petitioner, his lawyers should have recalled Dr. Blanton to the stand to testify about inconsistencies identified by Dr. Ronan and to reconcile Lee's average academic performance with Dr. Blanton's conclusion that he was mentally retarded.  In this same vein, petitioner suggests that a sur-rebuttal witness should have been called to discuss "the poor quality of Billingsley High School."  (*Id.* at ¶¶ 358 – 61.)

A threshold problem is that, as identified by the State, Lee did not properly exhaust this claim in the state courts.  In his Rule 32 appellate brief, petitioner stated only that "[t]rial counsel were ineffective for … failing to respond to the State's rebuttal case."  (Vol. 19, R-69 at 83.) The Alabama Court of Criminal Appeals could not reasonably discern from this section of Lee's appellate brief how he contended that trial counsel had been ineffective in this regard, what evidence Lee contended his lawyers should have presented, and so on.[111]  This kind of

_____

introducing evidence to rebut that theory of defense were certain to have been ineffectual; therefore, defense counsel's failure to engage in such futile endeavors cannot satisfy *Strickland*.

[111]    At best, Lee wrote in his brief that "counsel failed to recall Dr. Blanton to at least challenge Dr. Ronan's testimony, never introducing the critical conclusion from Dr. Blanton's report that Lee gave 'good effort' throughout the testing."  (*Id.* at 86.)  So the "good effort" aspect of this claim may be exhausted, but the other dimensions of it are not.  As to the "good effort" claim, there was nothing "critical" about that testimony.  Dr. Ronan's testimony was not that Lee failed to give good effort, but that her testing showed him in the "low average range" of I.Q. and that he purposefully "exaggerated his psychiatric symptoms" by telling three different mental health providers three different sets of facts about his purported hallucinations.  (Vol. 3, R-11 at 333-35.)  Thus, eliciting testimony from Dr. Blanton on sur-rebuttal that Lee had given good effort would not have effectively rebutted her harmful opinions that he was not retarded and that he appeared to be exaggerating symptoms as to a psychiatric condition.  If anything, (Continued)

conclusory, laundry-listing of errors falls short of a habeas petitioner's obligation to present fairly and exhaust fully his claims in the state courts before presenting them to a federal habeas court.  By all appearances, the Alabama Court of Criminal Appeals did not write to this claim because Lee never developed it for them in a manner that would show that he actually intended to pursue it.

Even if this issue had been properly exhausted in state court, the result would be unchanged.  It is not at all clear that Dr. Blanton could have effectively rebutted Dr. Ronan's testimony as to the numerous telltale signs of malingering that she discovered.   Saying that Lee gave "good effort" would not have been enough.  Nor does it appear that trial counsel's efforts to elicit testimony from Dr. Blanton on sur-rebuttal as to the reputation of Billingsley High School would have been permitted, as all of the State's prior objections to this line of questioning had been sustained.  (Vol. 3, R-10 at 313, 317.)  Even if trial counsel had succeeded in impugning the high school, the damage to the defense wrought by the school principal's testimony that Lee was "a good student" (*id.* at 323) remained severe, especially when combined with family witnesses testifying that Lee had been a "smart" child, an employer testifying that Lee was able to follow instructions and function normally in the workplace, and Dr. Ronan's testimony that he was not mentally retarded.[112]  There has been no showing of *Strickland* prejudice resulting from trial counsel's failure to call additional witnesses to challenge the State's rebuttal case in this manner.

---

recalling Dr. Blanton to the stand would have simply underscored and drawn additional attention to this line of testimony, all of which was detrimental to Lee's interests.  Neither prong of *Strickland* is satisfied as to that claim.

[112]    To say that Billingsley High School is "poor, rural and accustomed to social promotion" (doc. 1, Ground VI at ¶ 358) is not to say that Billingsley test results and faculty and administration assessments of a student's performance are devoid of significance.  Besides, insulting as "poor" and "rural" a local high school which jurors, jurors' children and jurors' family and friends may have attended and from which they may take pride in having graduated would have been an enormously risky endeavor that might have succeeded only in angering the jurors against defense counsel for insinuating that everyone who performed well at Billingsley must be mentally impaired because the school is rural and poor.  Thus, it would have been a sound trial strategy for counsel to leave this combustible, collateral issue alone, rather than playing it up further during the rebuttal portion of the case, particularly where it did not stand to provide much benefit to Lee even under the rosiest of evidentiary forecasts.

> d.      *Errors in Handling School Records.*

Petitioner is sharply critical of trial counsel's performance with respect to certain school records.  In cross-examining Van Smith, principal of Billingsley High School, defense counsel showed the witness certain school records purportedly relating to Lee, and asked a question about them.  Smith answered, "That's not his record, that test date was in 1998.  This says Jeffrey Lee here and it's got 4/6/98 of a 9th grader.  That's someone else's record that's messed up there."  (Vol. 3, R-10 at 325.)  Defense counsel recovered quickly, withdrawing the exhibit and explaining, "I think they sent us the wrong one."  (*Id.*)  Petitioner now attempts to use that exchange as the factual predicate for a Sixth Amendment violation of his right to effective assistance of counsel.

Obviously, trial counsel made a mistake with the records.  It happens from time to time in jury trials that a lawyer shows a witness the wrong document, or a document that was incorrectly produced because it pertains to someone else.  This kind of error on a collateral matter does not implicate constitutional concerns.[113]  After all, the Constitution does not mandate that criminal defendants receive perfect, infallible counsel.  *See Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) ("we emphasize that petitioner was not entitled to error-free representation, only representation that fell within the range of competence demanded of attorneys in criminal cases and conformed to professional standards of reasonable investigation of facts and understanding of the law"); *Henry v. Wainwright*, 721 F.2d 990, 996 (11th Cir. 1983) ("The Constitution does not mandate error-free counsel."); *Washington v. Watkins*, 655 F.2d 1346, 1367 (5th Cir. 1981) ("Our repeated assertions that a criminal defendant is not entitled to perfect or error-free counsel are not mere rhetoric.").  As such, the Rule 32 appellate court's conclusion that there was no

---

[113]      Petitioner suggests that this error was unforgivable because counsel should not have waited until the eve of trial to request the documents.  Such a statement reflects wholesale disregard for the practical realities of modern litigation practice.  It is entirely commonplace in civil and criminal trials for counsel to request documents (particularly on collateral matters) at the eleventh hour.  Perhaps counsel should request these materials sooner, but the fact of the matter is they often do not.  Such a delay does not place counsel's performance below minimum thresholds of attorney competence, and is not out of step with the performance of the vast majority of trial lawyers.

*Strickland* deficient performance as to this claim was not objectively unreasonable.  *See Lee*, 44 So.3d at 1167.  Petitioner is entitled to no habeas relief on this claim.[114]

> e.    *Purportedly Ineffective Cross-Examination.*

As his next ground for alleging ineffective assistance, petitioner maintains that "trial counsel was ineffective in how they conducted cross-examinations."  (Doc. 1, Ground VI, at ¶ 368.)  The only two examples recited in the § 2254 Petition are that trial counsel elicited the lay opinion of witness Maurice Cunningham that Lee was not "slow," and that trial counsel botched the cross-examination of Dr. Ronan by failing to elicit testimony from her that would have been favorable to the defense.  (*Id.* at ¶¶ 371-72.)

This claim, in whole or in part, is procedurally barred for lack of exhaustion.  In his Rule 32 appellate brief, petitioner identified no category of ineffective assistance claims pertaining to poor cross-examination.  The section of his brief labeled "Ineffective Handling of Evidence in Guilt Phase" made only a passing reference to ineffective cross-examination, without articulating the factual predicate for that claim.  (Vol. 19, R-69 at 83-86.)  Elsewhere in that brief, Lee outlined what he said was the factual basis for his ineffective cross-examination claim.  (*Id.* at 50.)  Yet Lee did not mention the Cunningham cross in that section, nor did he specify how he contended that his lawyer's cross-examination of Dr. Ronan was ineffective.  In a couple of spots

---

[114]    Besides, there was no prejudice from any error in this regard.  Ultimately, Lee's school records were presented to Smith, and the jury heard accurate and correct information concerning those records, to-wit: that Lee had average grades until his 11th and 12th grade years, that his grades then declined, that he passed the high school graduation exam, that Lee scored poorly on a standardized test, and that he received scores of 69 in English, 68 in Current Events, and 86 in American History in his Grade 11 year and so on.  (Vol. 3, R-10 at 323-29.)  The critical point that defense counsel wanted to establish was Lee's poor standardized test scores, a fact which counsel emphasized heavily during closing arguments.  (Vol. 4, R-13 at 359-60.)  Defense counsel got exactly what they wanted from witness Smith.  The mistaken records were simply a momentary blip, a non-event.  Petitioner does not identify any pertinent information from Lee's academic record that the jury did not receive; therefore, trial counsel's gaffe was entirely inconsequential, and cannot support a finding of prejudice under *Strickland*.  Petitioner's conjecture that this mistake "was fatal to trial counsel's credibility with the jury" (doc. 1, Ground VI, at ¶ 366) is divorced from fact and inconsistent with any reasonable assessment of how juries operate.  If every lawyer who made a good-faith mistake with an exhibit during a trial instantly, irrevocably shattered his or her credibility with the jury, vanishingly few attorneys could survive a trial unscathed.  Besides, if counsel's credibility was demolished by this one mistake, as petitioner insists, how could this same lawyer have persuaded the jury to recommend a sentence of life without parole, rather than death?

in his brief, petitioner suggested that trial counsel should not have elicited testimony from Cunningham that Lee was not "slow." (*Id.* at 31, 86.)

From a fair reading of Lee's Rule 32 appellate brief, the Alabama Court of Criminal Appeals could not have discerned that he was claiming that trial counsel rendered ineffective assistance by asking Dr. Ronan about the interaction between drug use and mental retardation, and by not asking her certain questions that purportedly would have been favorable to the defense.[115]  As such, this claim meets the textbook definition of failure to exhaust.  This Court, sitting in federal habeas review, will not examine a claim that trial counsel rendered ineffective assistance in their cross-examination of Dr. Ronan, when petitioner never exhausted that claim in state court.

The claim that trial counsel was ineffective in cross-examining Maurice Cunningham is arguably preserved for habeas review, despite its oblique, offhand mention in the Rule 32 appellate brief.  But there was no deficient performance here.  On direct examination, Cunningham testified on a few minor points, such as that he had known Lee for years and that he had actually fired the gun the night before the killings because he wanted to "see how it shot." (Vol. 3, R-9 at 261.)  Defense counsel was aware of a written statement in which Cunningham had described Lee as "crazy."  So on cross-examination, defense counsel asked Lee about that statement.  He denied having made it.  (*Id.* at 263.)  That may have been a tough break for the defense, but it happens every single day in criminal trials that, under the harsh glare and intense scrutiny of trial, witnesses back off from statements they had previously given.  Defense counsel properly tried to impeach Cunningham with his statement, but the witness stood his ground.  (*Id.* at 264-65.)  Trying to salvage something from this unsuccessful cross, defense counsel asked, "Jeffrey [*sic*] kind of slow to you?" to which the witness responded, "No, not to me." (*Id.* at 264.)  Again, this was a tough break.  But it is not even close to constitutionally deficient performance.  If every defense lawyer who asked a question on cross-examination that backfired was automatically below a constitutional minimum standard of performance, nary a single criminal defense lawyer that this Court has ever observed could withstand a *Strickland* challenge.

---

[115]    More to the point, in response to the State's exhaustion argument, Lee has identified no portion of the Rule 32 appellate brief in which he fairly placed the state court on notice of these issues.  (*See* doc. 25, at 87 n.25 (mentioning only pages 3, 31 and 50 of the Rule 32 appellate brief as to this claim).)

That is not how ineffective assistance claims work.  The kind of stringent, rigorous, 20/20 hindsight that petitioner employs here cannot be, and is not, the prism through which counsel's performance is assessed for *Strickland* deficient performance purposes.  Nor is there any prejudice, given that a number of other witnesses (lay and expert alike) testified to Lee functioning normally in everyday life.

This ground for habeas relief is meritless.

     *f.*   *"Murder" Concession  to Jury in Closing Argument.*

During closing arguments in the guilt phase of trial, defense counsel told the jury, "Jeffery Lee here, he murdered two people.  There's no question about that."  (Vol. 4, R-13 at 356.)  He later reiterated the point, "Remember again we all know what the truth is, Jeffery Lee murdered Mr. Ellis and Mrs. Thompson."  (*Id.* at 362.)  Petitioner now asserts that trial counsel made these admissions without his consent, and that such concessions without consultation with or approval by Lee constitute ineffective assistance.

It was not objectively unreasonable for the Court of Criminal Appeals to adopt the trial court's determination in Rule 32 proceedings that there was no Sixth Amendment violation.  *See Lee*, 44 So.3d at 1168-69.  As an initial matter, federal law is clear that defense counsel is not ineffective for attempting to build credibility and rapport with a jury in the guilt phase of a capital trial, particularly where evidence of guilt is overwhelming and counsel is focused on trying to save the defendant's life.  *See, e.g., Florida v. Nixon*, 543 U.S. 175, 192, 125 S.Ct. 563 (2004) ("[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade' [by failing to concede overwhelming guilt].") (citation omitted); *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1243 (11th Cir. 2011) ("conceding guilt and focusing on the penalty phase is a valid trial strategy for *Strickland* analysis" because "[w]ith overwhelming evidence of guilt, it's often trial counsel's only chance to spare the capital defendant's life").  This is just such a case. Lee faced multiple compelling types of evidence of guilt, including eyewitness testimony from the lone survivor of his shooting spree, a chilling surveillance video that recorded the killings as they happened, and Lee's post-arrest confession to the crimes after he fled to Georgia.

Conceding guilt of murder (but not capital murder) was a valid strategy in this case.[116]  To be sure, counsel should have consulted with Lee before making that concession.  *See Nixon*, 543 U.S. at 187 ("An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy.").  But prejudice is <u>not</u> presumed when capital defense counsel concedes guilt without the client's consent.  *See id.* at 190-93 (declining to apply *Cronic* presumed-prejudice analysis to circumstance where capital defense counsel concedes guilt without client's consent).

The Eleventh Circuit examined this precise issue recently in *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228 (11th Cir. 2011).  In his opening statement in Harold Lee Harvey's first-degree murder trial, defense counsel stated, "Harold Lee Harvey is guilty of murder.  If anything is established over the next week, it will be that Harold Lee Harvey is guilty of murder."  *Id.* at 1247.  Harvey insisted that he never consented to that concession, and that counsel never even consulted with him about it.  *Id.* at 1250-51.  The Eleventh Circuit held, on habeas review, that the state court's application of the normal *Strickland* prejudice standard rather than the *Cronic* presumed prejudice standard was neither contrary to, nor an unreasonable application of, clearly established federal law.  *Id.* at 1252.

The Alabama Court of Criminal Appeals made the same determination here, and found no prejudice.  *See Lee*, 44 So.3d at 1168-70.[117]  Under *Nixon* and *Harvey*, the Court cannot find that the state courts' determination in this regard was objectively unreasonable, or that it was contrary to clearly established federal law.  There being no showing of prejudice here, particularly in light of the overwhelming evidence that Lee was in fact guilty of murder, the Court finds no *Strickland* prejudice in trial counsel's concession to the jury during the guilt phase

---

[116]     The record makes clear that counsel adopted this approach in the interests of "candor" and to avoid "useless charade," just as in *Nixon*.  Defense counsel explained during closing argument that he could have argued that Lee was not guilty of murder, "but what's the point?  We know what happened.  I'm not going to insult y'all's intelligence by trying to pull something like that."  (Vol. 4, R-13, at 368.)  Trial counsel's motives (appeal to candor, attempt to build credibility with the jury) were both proper and transparent from this passage.

[117]     In particular, the Rule 32 appellate court reasoned that "this case is governed by *Florida v. Nixon*; thus, there was no presumption of prejudice when counsel conceded Lee's guilt.  In light of the overwhelming evidence presented against Lee, counsel's strategy was not unreasonable."  *Lee*, 44 So.3d at 1170.

without prior consultation with Lee.  Defendant has not shown that, but for his counsel's murder concession, there is a reasonable probability that the outcome of his trial would have been different.  Indeed, Lee apparently does not suggest that he would not have consented to such a strategy, which counsel employed for the proper and valid reasons that evidence of guilt was high and that the strategic focus of the defense was to procure a recommendation of life without parole at the penalty phase, rather than a not-guilty finding at the guilt phase.  For counsel to do otherwise would have been just the sort of "useless charade" that the *Nixon* Court condemned.  *See Nixon*, 543 U.S. at 191("Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared," while "defense counsel must strive at the guilt phase to avoid a counterproductive course.").

### g.      *Failure to Object to Prosecutorial Misconduct.*

Next, petitioner once again attempts to piggyback his failed prosecutorial misconduct arguments onto an ineffective assistance claim focused on the same conduct.  (*See* doc. 1, Ground VI, at ¶ 381 ("trial counsel was ineffective for failing to object to numerous instances of prosecutorial misconduct").)  This argument, pertaining to ineffective assistance in the guilty phase, fails for precisely the same reasons that petitioner's ineffective assistance claim relating to failure to object to prosecutorial misconduct in the sentencing phase failed, as discussed in section III.F.2.d., *supra*.  No constructive purpose would be served by reiterating the analysis here.  Suffice it to say that the identified instances of prosecutorial misconduct either were not improper statements or were not prejudicial to Lee.  Thus, as to each instance of identified prosecutorial misconduct, defense counsel either did not perform deficiently in failing to object to it (because there was nothing improper about the statement) or did not prejudice defendant by failing to do so (because curative instructions were given or the statement was otherwise harmless).  Petitioner's third attempt to spin a § 2254 claim out of prosecutorial misconduct is rejected for the same reasons that the first two were.  The Rule 32 appellate court's like conclusion was not objectively unreasonable, and will not be disturbed on habeas review.  *See Lee*, 44 So.3d at 1170-71.

### h.      *Failure to Object to Improper Jury Instructions.*

As his eighth and final ground for alleging ineffective assistance during the guilt phase of the trial, petitioner asserts that trial counsel was ineffective in failing to object to improper jury

instructions.  Petitioner explains this claim as follows:  "As set forth in Ground 5, above, Mr. Lee's rights to a fair trial and reliable sentence were violated by various errors made in the instructions to the jury.  Trial counsel never once objected.  They should have."  (Doc. 1, Ground VI, at ¶ 387.)  But this Court has already found in section III.E., *supra*, that the assignments of error in Ground 5 are meritless.  Because the subject jury instructions were not erroneous and/or were incorrect in immaterial respects, it could not have been constitutionally deficient performance for trial counsel not to object to them.[118]

### 6.    *Alabama Counsel System for Indigent Capital Defendants.*

Petitioner devotes a separate subheading in his ineffective assistance claim (and several pages of his § 2254 Petition) to a digression in which he roundly condemns Alabama's system for appointment and compensation of counsel for indigent capital defendants.  (Doc. 1, Ground VI, at ¶¶ 389-403.)  In particular, petitioner maligns purported "structural flaws" in Alabama's procedures for appointment and compensation of counsel in capital cases, such as not ensuring that counsel are competent and experienced, imposing caps on out-of-court work during each phase of the trial, and failing to pay counsel until the conclusion of the trial.

It is unclear to the Court what petitioner's purpose is in criticizing Alabama's appointment and compensation systems in this way, or how any of this relates to his circumstances.  Although Lee recites a litany of perceived constitutional infirmities in the manner in which Alabama selects and pays defense counsel in capital cases involving indigent defendants, he does not address how or whether this is an independent violation of his rights.  In other words, petitioner does not explain how, if the representation he received at trial comported with his Sixth Amendment right to counsel, any of these purported structural infirmities would give rise to an actionable habeas claim for him.  This Court is constrained not to fill in those blanks or develop petitioner's legal theories for him.  *See, e.g. Chavez v. Secretary Florida Dep't of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him.").

---

[118]    And to the extent that Lee would attempt to broaden this claim to include sentencing-phase instructions, such a claim would be procedurally barred.  *See Lee*, 44 So.3d at 1171 (ineffective assistance arguments that counsel should have objected to instructions on aggravating circumstances and advisory role in sentencing "are raised for the first time on appeal and are not properly before this Court").

By all appearances, Lee's attack on the Alabama "system" collapses into the ineffective assistance of counsel claims he previously raised, which both the Alabama courts and the undersigned have found to be without merit.

Even if Lee had articulated arguments showing how flaws in the Alabama appointment/compensation of counsel procedures could be an independently actionable violation of his constitutional rights, such a challenge would be procedurally barred for want of exhaustion. Petitioner never presented to the Alabama Court of Criminal Appeals in the Rule 32 proceedings a claim that Alabama's capital defense appointment and compensation systems run afoul of his rights under the U.S. Constitution in a manner requiring vacatur of his conviction and/or death sentence.[119]

Finally, insofar as petitioner is suggesting that the Alabama system of appointment and compensation of capital defense counsel caused the ineffectiveness of his trial counsel, such an argument amounts to nothing without a showing that Lee in fact received ineffective assistance of counsel that prejudiced him, pursuant to the *Strickland* standard. As discussed at great length *supra*, petitioner has made no such showing. Accordingly, his editorial comments[120] about his

---

[119]     Although petitioner insists in a footnote in his reply brief that this claim is properly exhausted (doc. 25, at 87 n.25), close inspection shows otherwise. In his appellate brief for his Rule 32 Petition, Lee included one paragraph of allegations concerning Alabama's methodology for appointment and compensation of indigent capital defense counsel under the heading "Background Factors." (Vol. 19, R-69 at 12-13.) Later in the same brief, Lee wrote in a footnote under the heading of "Failure to Investigate" that "[t]he trial court held that Lee has not supported his claim challenging the defense counsel compensation system of Alabama." (*Id.* at 73 n.33.) But nothing therein would reasonably place the Alabama Court of Criminal Appeals on notice that Lee was pursuing that claim on appeal; therefore, the claim was not fairly presented and is not fully exhausted. *See, e.g., Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009) ("The habeas statute requires petitioners to exhaust all available state law remedies" and "alert state courts to any federal claims").

[120]     This is not too harsh a characterization of petitioner's argument on this point. If he were trying to assert an independent constitutional claim concerning that system, he should have developed the legal theory on which such a claim is based and explained how it entitles him to § 2254 relief. If not, however, then the argument as presented is nothing more than a gratuitous swipe at the Alabama criminal justice system, unconnected to his own circumstances. As long as Lee received effective assistance of counsel at trial, then any perceived shortcomings in Alabama's appointment and compensation system would appear to be irrelevant to these proceedings. And if Lee did not receive ineffective assistance of counsel at trial, then his right to (Continued)

dissatisfaction with the manner in which his trial counsel was appointed and compensated cannot provide the foundation for any habeas relief for Lee because his Sixth Amendment right to counsel was not violated in the first place.

### 7.    Cumulative Error.

Finally, petitioner contends that the accumulation of trial counsel's errors amounts to ineffective assistance of counsel that was highly prejudicial to Lee.  The Court has considered these claims in the aggregate, and finds no *Strickland* prejudice, even when all of the assignments of error set forth in Ground Six are examined together.  The Alabama Court of Criminal Appeals, in evaluating this claim, concluded that cumulative errors in his counsel's performance did not amount to a miscarriage of justice.  *Lee*, 44 So.3d at 1175.  This conclusion was not objectively unreasonable.

### G.    Denial of Funding for Investigator and Mitigation Expert.

The seventh ground for relief recited in Lee's § 2254 Petition is that his due process rights were violated when the trial court failed to grant him funding for an investigator and a mitigation expert.

In March 2000, defense counsel filed a motion for funds to hire an investigator.  (Vol. 1, R-2 at 79-81.)  To support this request, counsel alleged that Lee was indigent and that he "require[d] the assistance of a trained criminal investigator to assist in the preparation for cross-examination of the State's witnesses."  (*Id.* at 79-80.)  However, the Motion for Funds to Hire an Investigator was quite vague as to exactly what Lee wanted the contemplated expert to do or why that investigator's assistance was reasonably necessary for him to prepare for trial and present his defense.  Also in March 2000, defense counsel filed a document styled "Motion for Extraordinary Funds."  (Vol. 1, R-2 at 89-91.)  In that motion, the defense requested funds "to hire additional assistance that is available to hire an expert on Mitigation and Investigation to evaluate the reports and information received in this cause."  (*Id.* at 90.)  The motion was similarly ambiguous as to why Lee maintained he needed to retain an expert, inasmuch as he did not specify what reports and information needed to be reviewed, why the assistance of an expert

habeas relief would exist independently of whether Alabama's "system" suffered from structural flaws or not.

was necessary to review those items in preparing Lee's defense, or why his existing counsel were not equipped to perform the requisite investigation and review themselves. Neither motion was granted or expressly addressed by the trial court. Essentially, this was a "pocket veto" by the trial judge.

On direct appeal, Lee assigned error to the *de facto* denial of his requests for funds to hire an investigator and mitigation expert. The Alabama Court of Criminal Appeals rejected this argument, pursuant to the following analysis: "[T]he appellant did not make a threshold showing that either of the requested experts would probably assist his defense and that the denial of funds would result in a fundamentally unfair trial. Rather, he simply speculated that the experts would assist his defense." *Lee*, 898 So.2d at 853.

In his § 2254 Petition, Lee maintains that the state court's treatment of this issue contravenes *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake*, the Supreme Court held that "when a defendant demonstrates … that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Significantly, neither the Supreme Court nor the Eleventh Circuit has extended *Ake* to non-psychiatric experts of the kind Lee sought here. *See, e.g., United States v. Brown*, 441 F.3d 1330, 1365 (11th Cir. 2006) ("[w]e have not extended *Ake* to non-psychiatric experts"); *Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004) (pointing out that *Ake* Court "limited its holding to psychiatric assistance" and that "the Supreme Court has not yet extended *Ake* to non-psychiatric experts").

Petitioner admits as much, but urges the Court to find *Ake* error anyway with respect to his requests for funding for an investigator and mitigation expert. (*See* doc. 25, at 113 n.33.) What he does not do is square this contention with the statutory requirement that habeas relief cannot be granted on a claim adjudicated on the merits in state court unless such adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The Supreme Court has never held that an *Ake* analysis applies to defense requests for funding for non-psychiatric experts such as investigators and mitigation experts. The Eleventh Circuit has never extended *Ake* to cover the types of experts at stake here. Thus, Lee's *Ake* claim is predicated not on clearly established law as announced by the Supreme Court, but on petitioner's desire that the

law be extended to a new area where neither the Supreme Court nor even the Eleventh Circuit have gone before.  Such an argument cannot be reconciled with the plain language of § 2254(d); therefore, habeas relief is properly denied as to this claim.

Even assuming petitioner's *Ake* claim for denial of funding for non-psychiatric experts did invoke clearly established rights under Supreme Court precedent, the result would unchanged.  To prevail on an *Ake* claim, a petitioner must show that "(1) he made a timely request for the expert assistance, (2) it was unreasonable for the trial court to deny the request, and (3) the denial rendered the trial fundamentally unfair."  *Brown*, 441 F.3d at 1365; *see also Conklin*, 366 F.3d at 1206.  The Alabama Court of Criminal Appeals found that the second requirement was not satisfied, inasmuch as Lee had failed to show that the experts he was requesting would probably assist his defense or that denial of same would result in a fundamentally unfair trial.  *See Lee*, 898 So.2d at 853.  The Court agrees.  Lee's written motions for funding for an investigator and mitigation expert were non-specific.  They did not explain in any detail why the defense reasonably needed such assistance, why defense counsel could not perform the necessary investigation and review the relevant reports themselves, and so on.  The law is clear that "[i]n determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on a particular motion."  *Conklin*, 366 F.3d at 1208.  The facts presented in defendant's motions for funds were not sufficient to establish that if funding were not granted, Lee would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense.[121]  As such, there was no *Ake* error, and Lee's § 2254 Petition is properly **denied** as to that ground for relief.

---

[121]     Nor has Lee made a sufficient showing that the denial of funding to hire an investigator and mitigation expert rendered his trial fundamentally unfair.  This prong of the *Ake* standard requires a defendant to show that the denial of expert funding had "substantial and injurious effect or influence in determining the jury's verdict."  *Conklin*, 366 F.3d at 1209 (citation omitted).  To be sure, the § 2254 Petition asserts in general terms that investigation would have helped the defense in marshaling evidence about Lee's poverty, his upbringing, his substance abuse, his emotional problems, and so on.  (Doc. 1, Ground VII, ¶ 5.)  The closest petitioner comes to articulating a specific argument under *Ake*'s third prong is to say that his "profoundly troubled upbringing, for example, helps to explain why he was driven to substance abuse, which likely contributed to his impaired judgment prior to and during the offenses."  (*Id.*, ¶ 7.)  But the jury heard testimony that Lee's drug abuse began as early as the ninth grade, and (Continued)

### H.     Denial of Motion for Change of Venue.

The eighth ground for habeas relief identified by Lee is a claim that he was denied his rights to due process and to trial by an impartial jury when the trial court denied his motion for change of venue based on pretrial publicity.

In September 1999, well before trial, defense counsel filed a motion for change of venue. (Vol. 1, R-2 at 60-62.)  As grounds for this motion, the defense cited newspaper coverage of the crime in *The Selma Times Journal* and the *Montgomery Advertiser*, as well as radio and television coverage in the area.  The defense further alleged that such media coverage had included information not admissible into evidence, which would prejudice prospective jurors against Lee.  In short, defense counsel's position was that "the public mind has been so poisoned and prejudiced by exaggerated rumors in the newspapers and local press that he … will be unable to get a fair trial by an impartial jury in [Dallas] County."  (*Id.* at 61.)  On that basis, the defense requested that Lee's trial proceedings be transferred "to another county beyond a radius of 150 miles from Dallas County, Alabama."  (*Id.* at 60.)  At jury selection, defense counsel renewed the motion, arguing that "just about everybody here has heard of the case" based on media coverage in the local area.  (Vol. 2, R-5 at 70.)  The trial judge denied the motion, reasoning that while 43 of 82 prospective jurors had heard about the case, only 2 had indicated that they would be affected by previous exposure to information about the case.  (*Id.*)

On direct appeal, the Alabama Court of Criminal Appeals examined the venue issue on the merits, and properly addressed both actual and presumed prejudice standards.  *See, e.g.,*

---

that he became a markedly different person thereafter.  (Vol. 4, R-21 at 420.)  They heard that Lee had admitted "using marijuana on a daily basis for years," as well as "Cocaine on a weekly basis and … drinking alcohol quite often too."  (Vol. 3, R-10 at 313.)  Petitioner does not explain how an investigator or mitigation expert was necessary to uncover evidence that Lee had a troubled childhood, that he had abused drugs and alcohol for years, or that his judgment was impaired when he gunned down Jimmy Ellis and Elaine Thompson, much less that any such expert would have been able to link these discrete items together.  There is no showing that additional mitigation evidence, had it been available at trial with the help of these experts, would have been sufficiently compelling and non-cumulative to influence the jury's verdict.  As such, petitioner has not demonstrated that the denial of funding for an investigator and mitigation expert had substantial or injurious effect or influence, so as to render Lee's trial fundamentally unfair.  *See generally Price*, 2012 WL 1622977, at *7 (denying habeas claim based on failure to retain an expert, where petitioner did not explain with specificity what expert would have said).

*Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (in analyzing whether a defendant's trial was deprived of fundamental fairness by pretrial publicity or an inflamed community atmosphere, courts consider both an "actual prejudice" standard and a "presumed prejudice" standard).  Actual prejudice requires that a defendant show both (i) "that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty" and (ii) that such jurors "could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court."  *Coleman*, 708 F.2d at 544 (citations and internal marks omitted); *see also Mills v. Singletary*, 63 F.3d 999, 1009 (11th Cir. 1995) (similar).  Meanwhile, prejudice may be presumed from pretrial publicity when both (i) "pretrial publicity is sufficiently prejudicial and inflammatory," and (ii) "the prejudicial pretrial publicity saturated the community."  *Coleman*, 708 F.2d at 541; *see also Mills*, 63 F.3d at 1010 (similar).  "[T]he principle of presumed prejudice is rarely applicable and reserved for extreme situations."  *Mills*, 63 F.3d at 1010 (citations and internal quotation marks omitted). More generally, "the burden placed upon the defendant to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one."  *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (citation and internal marks omitted).[122]

The Alabama appellate court correctly recited these constitutional standards, then applied them to Lee's circumstances.  As to presumed prejudice, the state appeals court noted that Lee had presented no transcripts or copies of the purportedly inflammatory news items, that "[h]is bare allegations about prejudicial publicity were not sufficient" to meet his burden, and that he had not shown that this was one of those "extreme situations" where a presumption of prejudice might apply.  *Lee*, 898 So.2d at 867.  As to actual prejudice, the Alabama court likewise found that the defense had not met its burden.  Even though approximately half of the venire members had heard about the case, the court reasoned, "all who remained on the venire indicated that they could set aside that information and make a decision based solely on the evidence presented in

---

[122]     In considering such motions, the Supreme Court has favored deference to the judgment of the trial judge, who is able to evaluate the depth and extent to which pretrial publicity in a particular case might affect jurors.  *See Skilling v. United States*, --- U.S. ----, 130 S.Ct. 2896, 2918 (2010) ("Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.").

the case." *Id.* at 868.  Because Lee had not shown that jurors were either presumptively or actually prejudiced, the Alabama Court of Criminal Appeals concluded that the trial court did not err in denying the defense's request for change of venue.

Nothing about the state court's sound, accurate and well-reasoned treatment of the venue issue was contrary to, or involved an unreasonable application of, clearly established federal law, so as to afford Lee a right to habeas relief under § 2254(d).  Remarkably, the § 2254 Petition does not identify whether petitioner takes issue with the state court's conclusions under the actual prejudice or the presumed prejudice standards.[123]  Instead, he rattles off a list of three factors that he contends entitle him to relief, to-wit: (i) the pretrial press coverage in Dallas County (where the trial was held) described the acts with which Lee was charged, sometimes using documentary and hearsay evidence; (ii) one of Lee's victims was well-liked in the small community where the offense occurred; and (iii) half the venire admitted exposure to pretrial publicity.  (Doc. 25, at 116-17.)

These vague and imprecise assertions do not satisfy petitioner's burden under either prong of the "presumed prejudice" standard, inasmuch as they do not show that the nature of the publicity was inflammatory at all (as opposed to merely factual)[124] or that the community was saturated by same, much less that this case fits within the narrow band of "extreme situations" where prejudice may be presumed.  *See generally Gaskin v. Secretary, Dep't of Corrections*, 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion for change of venue, even though articles published in local paper "may have been somewhat prejudicial or inflammatory" and "92% of potential jurors and 11 of the 12 jurors at trial had read newspaper

---

[123]     In his reply, Lee argues that "a habeas petitioner does not need to conclusively demonstrate prejudice in the face of extensive negative pretrial publicity."  (Doc. 25, at 116.) Actually, he must do just that if he is proceeding under an "actual prejudice" theory. Nonetheless, this assertion (combined with other allegations in that paragraph relating to presumed prejudice) suggests that petitioner is proceeding under the "presumed prejudice" standard.

[124]     Petitioner has never made any proffer of the information contained in the media reports that he deems objectionable.  As such, neither the record nor the habeas petition and brief contain any showing that might support a finding of prejudicial or inflammatory coverage at all. The Court will not base such a finding on the conclusory labels that petitioner has affixed to media reports whose contents are unknown and have not been presented in any meaningful way.

accounts of the crime"); *Campa*, 459 F.3d at 1144 (explaining that prejudice cannot be presumed absent a trial atmosphere "utterly corrupted by press coverage"); *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998) ("The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue."); *see also Murphy v. Florida*, 421 U.S. 794, 800 n.4, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (distinguishing "largely factual publicity from that which is invidious and inflammatory," and noting that "[t]o ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community").

Petitioner having failed to demonstrate how the state court's treatment of the change of venue issue is redressable in habeas proceedings pursuant to § 2254(d), this ground for relief is without merit. Fair-minded jurists could agree with the state court's adjudication of this issue; therefore, habeas relief is unavailable.

> ### I.   **Atkins *Violation.***

As pleaded in his § 2254 Petition, Lee designated as Ground 9 that "The Eighth and Fourteenth Amendments to the Constitution of the United States were Violated when Mr. Lee, Suffering from Mental Retardation, was Sentenced to Death." (Doc. 1, at 116.) This claim for relief is predicated on *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), wherein the Supreme Court found that "the execution of mentally retarded criminals … is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." 536 U.S. at 321 (citation and internal quotation marks omitted).

The scope of *Atkins* is narrow. Indeed, the Eleventh Circuit recognized that "[i]nstead of establishing a national standard and procedures for determining whether a particular individual is mentally retarded, the Supreme Court in *Atkins* left to the states the task of developing appropriate ways to enforce the constitutional restriction upon the execution of mentally retarded convicts." *Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010). "In Alabama, to establish mental retardation a defendant must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. … [I]t is implicit in that definition that the IQ and deficits in adaptive behavior exist not only prior to the age of eighteen but also both at the time of the crime and currently." *Id.* (citations and internal quotation marks omitted).

Although Lee presented an *Atkins* claim in his § 2254 Petition, he has since had a change of heart. In his Reply, petitioner notified the Court that "[a]fter further investigation, Mr. Lee has concluded that he would not be entitled to relief on this claim premised on *Atkins* …, as the United States Supreme Court and Alabama courts have interpreted that decision narrowly to foreclose its application to individuals who are mentally impaired or mentally ill. As a result, Mr. Lee withdraws his *Atkins* claim." (Doc. 25, at 117-18.) Because it does not appear from record evidence that Lee is capable of meeting the stringent legal requirements of (i) significantly subaverage intellectual functioning, and (ii) significant or substantial deficits in adaptive behavior, at the periods of his life before the age of 18, on the date of the capital offense, and currently, the Court agrees that petitioner's *Atkins* claim is non-meritorious and cannot prevail.[125] Accordingly, that claim is deemed **withdrawn** and, alternatively, is **dismissed** at petitioner's request. Of course, the voluntary abandonment of Lee's *Atkins* claim in no way precludes him from pursuing ineffective assistance claims, as discussed *supra*, relating to counsel's alleged failure during the penalty phase to offer mitigating evidence of Lee's purportedly impaired or diminished social, practical, and cognitive skills.

> **J.       Judicial Override of Jury's Life Recommendation.**

Ground 10 of Lee's § 2254 Petition is an assertion that "[o]n its face and as applied in this case, the Alabama system for overriding jury conclusions that life is the proper sentence under the evidence presented to the jury violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 1, Ground X, at ¶ 1.) In stark (and somewhat puzzling) contrast to most of the other grounds for habeas relief that Lee has asserted, this issue is only dimly and obliquely articulated in the § 2254 Petition. As such, the specific nature of Lee's

---

[125]   The Alabama Court of Criminal Appeals' findings on direct appeal are telling as to the infirmities in Lee's *Atkins* argument: "The majority of the evidence presented in this case does not indicate that the appellant has significantly subaverage intellectual functioning. In fact, it appears that any such deficits may be due to his voluntary use of drugs and/or alcohol and/or malingering. Also, the record does not indicate that the appellant has significant or substantial deficits in adaptive behavior. Finally, the record does not indicate that any such problems manifested themselves before the appellant reached the age of 18. The Appellant does not satisfy even the broadest definition of mental retardation." *Lee*, 898 So.2d at 859-60. What's more, petitioner concedes that his "impairment has eased over the years" (doc. 25, at 118), suggesting that he cannot show that the IQ and deficits in adaptive behavior exist currently, as required for him to be classified as mentally retarded for purposes of his *Atkins* claim.

objections to Alabama law and the trial judge's override of the jury's recommendation of life imprisonment is difficult to divine.[126]

### 1.  *The Long Shadow of* **Harris v. Alabama.**

As an initial matter, petitioner's statement of naked opinion (divorced from authority or constitutional analysis) that "[j]uries are more accurate and independent than judges, particularly elected judges and particularly in determining whether a life sentence is more appropriate than a death sentence" (doc. 1, Ground X, at ¶ 3) is self-serving, unproven and unhelpful.[127]  There is nothing inherently constitutionally suspect about a capital sentencing scheme in which juries submit recommendations to the sentencing judge, who then makes the final sentencing decision. After all, the Supreme Court has explained that "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence.  It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."  *Harris v. Alabama*, 513 U.S. 504, 515, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (affirming that Alabama capital sentencing statute does not unconstitutionally permit arbitrary imposition of the death penalty).[128]  Remarkably, petitioner does not acknowledge the existence

---

[126]     Petitioner states in articulating this ground for relief that "the jury rejection of the death penalty could not constitutionally be circumvented" (doc. 1, Ground X, at ¶ 13), but his discussion in the § 2254 Petition leaves the Court guessing as to the specific constitutional principles and Supreme Court rulings on which that conclusion is predicated.

[127]     Petitioner presents these propositions as fact, but they are far from it.  Indeed, this type of assertion lauding the superiority of juries for the task of finding facts in capital sentencing proceedings has been regarded with profound skepticism by the Supreme Court.  *See, e.g., Schriro v. Summerlin*, 542 U.S. 348, 356, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (pointing out that "for every argument why juries are more accurate factfinders, there is another why they are less accurate," that "[m]embers of this Court have opined that judicial sentencing may yield more consistent results because of judges' greater experience," that "reasonable minds continue to disagree over whether juries are better factfinders *at all*," and that "we cannot confidently say that judicial factfinding *seriously* diminishes accuracy").

[128]     In so concluding, the *Harris* Court held that "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict," and observed that "[i]f the Alabama statute indeed has not had the effect that we or its drafters had anticipated, such unintended results would be of little constitutional consequence.  An ineffectual law is for the state legislature to amend, not for us to annul."  573 U.S. at 512, 514.

of *Harris* (except to cite Justice Stevens' dissent in a footnote), much less advocate that it is no longer good law or that it may somehow be distinguished in this case.[129]

## 2.   *No Violation of* Ring v. Arizona.

Because of petitioner's failure to litigate *Harris* issues with anything beyond the most superficial of rhetoric, the constitutional foundation of this habeas claim appears to lie in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).  In particular, petitioner relies on the holding of *Ring* that "[c]apital defendants, no less than noncapital defendants … are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  536 U.S. at 589.  The specific legal effect of *Ring* was that it overruled prior Supreme Court jurisprudence that "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."  *Id.* at 609.[130]

---

[129]     This oversight is particularly glaring given that *Harris* expressly examined the constitutionality of Alabama's capital sentencing scheme (which petitioner now challenges).  Furthermore, the Alabama Court of Criminal Appeals specifically relied on *Harris* in rejecting Lee's arguments on direct appeal that "the judicial override violates equal protection principles, due process principles, and § 11 of the Alabama Constitution," *Lee*, 898 So.2d at 857.  These arguments are part and parcel of the constitutional rhetoric he appears to be advancing in his § 2254 Petition.  By failing to address *Harris*, petitioner ensures that he has not shown that the Alabama court's adjudication of those aspects of his constitutional claims was contrary to, or an application of, clearly established federal law.  *Harris* appears to remain good law.  *See, e.g., McNair v. Campbell*, 307 F. Supp.2d 1277, 1339 (M.D. Ala. 2004) ("Neither Alabama law nor Supreme Court precedent has changed since *Harris* upheld the constitutionality of Alabama's sentencing scheme."), *reversed in part on other grounds*, 416 F.3d 1291 (11th Cir. 2005).  For the same reasons, the Court therefore rejects petitioner's expression of dissatisfaction (untethered to any legal argument of constitutional infirmity) that Alabama "unlike the choice that has been made by other States, assigns elected judges the decisive role at the sentencing phase."  (Doc. 1, Ground X, at ¶ 5.)

[130]     By its terms, *Ring* was expressly circumscribed to present a very narrow holding.  By the *Ring* Court's own reckoning, the "question presented is whether [an] aggravating factor [necessary to imposition of the penalty in the Arizona statutory scheme] may be found by the judge … or whether the Sixth Amendment's jury trial guarantee … requires that the aggravating factor determination be entrusted to the jury."  536 U.S. at 597.  In an accompanying footnote, the *Ring* Court made clear that it was not being asked to decide whether the Sixth Amendment required the jury to make findings as to mitigating circumstances, required the jury to make the ultimate determination as to whether to impose the death penalty, or forbade the state court from reweighing aggravating and mitigating circumstances.  *Id.* at 597 n.4.

The potential significance of *Ring* lies in the Alabama capital sentencing scheme's requirement that at least one aggravating circumstance must be found beyond a reasonable doubt before a defendant may be sentenced to death.  *See* Ala. Code §§ 13A-5-45(e) ("the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances"), 13A-5-45(f) ("Unless at least one [statutory] aggravating circumstance … exists, the sentence shall be life imprisonment without parole.").  Reading *Ring* in the context of the Alabama capital sentencing mechanism, it is clearly established federal law that no death sentence may constitutionally be imposed on a defendant in Alabama unless the jury unanimously finds beyond a reasonable doubt the presence of at least one statutory aggravating circumstance.

The Supreme Court decided *Ring* on June 24, 2002, long after Lee's April 2000 trial had concluded but while his direct appeal was still pending before the Alabama Court of Criminal Appeals.  On that basis, the Alabama court directed the parties to prepare, and the parties ultimately filed, extensive supplemental briefs concerning the effect, if any, of *Ring* on Lee's death sentence.  (*See* Vol. 10, R-51 to R-54.)[131]

Upon review of those supplemental briefs, the Alabama Court of Criminal Appeals found that Lee was not entitled to relief under *Ring*, pursuant to this analysis:

> "In this case, the trial court found that one aggravating circumstance existed – the appellant committed the capital offenses while he was engaged in the commission of a robbery or an attempted robbery.  *See* § 13A-5-49(4), Ala. Code 1975.  Because the jury convicted him of the capital offense of robbery-murder, that statutory aggravating circumstance was proven beyond a reasonable doubt.  Therefore, in this case, the jury, and not the judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.'  *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.  Furthermore, '*Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.'  *Ex parte Waldrop*, 859 So.2d 1181, 1190 (Ala. 2002).  Therefore, there was not a *Ring* violation in this case."

*Lee*, 898 So.2d at 858.

---

[131]     There is no question that *Ring* is retroactively applicable to this case, since it was decided before Lee's conviction became final on direct appeal.  *See Summerlin*, 542 U.S. at 351, 358 (holding that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review," but that this new rule "applies to all criminal cases still pending on direct review").

Because Lee's *Ring* claim concerning the constitutionality of the judicial override in this case was adjudicated on the merits by the state courts, he cannot obtain habeas relief on this issue unless he satisfies the daunting threshold established by § 2254(d).  Specifically, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington*, 131 S.Ct. at 786-87.  The Court perceives nothing in the Alabama Court of Criminal Appeals' well-reasoned discussion of *Ring* that was contrary to, or an unreasonable application of, that Supreme Court decision.  Fair-minded jurists might disagree with the Alabama courts' *Ring* analysis in this case, but they would not necessarily do so.  Habeas relief is thus unavailable on this claim.

### 3.   *Petitioner's Criticisms of State Court's* Ring *Analysis.*

In so concluding, the undersigned has considered and rejected Lee's criticisms of the state-court ruling, including his contentions that (i) the verdict did not specify that the jurors had unanimously found the presence of an aggravating factor beyond a reasonable doubt, (ii) *Ring* requires a jury to weigh and decide aggravating and mitigating circumstances, and (iii) the trial judge "compound[ed] the error" by taking and considering evidence not presented to the jury and by wrongfully adding a non-statutory aggravating factor.  The shortcomings in each of petitioner's contentions will be addressed in turn.

First, petitioner's argument that there is no way to know whether the jury found a statutory aggravating circumstance is directly rebutted by the Alabama Court of Criminal Appeals' opinion.  A statutory aggravating circumstance is that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit … robbery."  Ala. Code § 13A-5-49(4).  In the guilt phase, the jury convicted Lee of the capital offense of "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant."  Ala. Code § 13A-5-40(a)(2).  In rejecting Lee's *Ring* claim, the state appellate court reasoned that the jury's guilt-phase finding of conviction under § 13A-5-40(a)(2) necessarily implied a finding that the aggravating circumstance delineated in § 13A-5-49(4) was present.  Alabama appeals courts have consistently hewed to this construction of the interrelationship between the capital offenses set forth in § 13A-5-40 and

the aggravating circumstances listed in § 13A-5-49.[132]  It is also directly bolstered by state statutes.  *See* Ala. Code § 13A-5-45(e) ("any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing"); Ala. Code § 13A-5-50 ("the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40").

Although he apparently disagrees with the state court's legal assessment that a jury's unanimous guilty verdict on the capital offense of murder-robbery equates to a finding of the aggravating circumstance in § 13A-5-49(4) beyond a reasonable doubt, petitioner cannot obtain federal habeas relief by arguing that state courts misconstrued state statutes.  *See, e.g., McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("[A] state court's interpretation of its own laws or rules provides no basis for federal habeas relief, since no question of a constitutional nature is involved."); *Walton v. Attorney General of State of Ala.*, 986 F.2d 472, 475 (11th Cir. 1993) (federal habeas court "is bound by the determination of the Alabama courts that no state law violation has occurred").[133]  Besides, the Alabama Court of Criminal Appeals'

---

[132]        *See, e.g., Stanley v. State*, --- So.3d ----, 2011 WL 1604794 , *65 (Ala. Crim. App. Apr. 29, 2011) ("Because the jury convicted Stanley of murder during the course of a first-degree robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975, the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, § 13A-5-49(4), Ala. Code 1975, was 'prov[en] beyond a reasonable doubt.'") (citations omitted); *Brown v. State*, --- So.3d ----, 2010 WL 3612138, *45 (Ala. Crim. App. June 25, 2010) ("Because the jury convicted Brown of the capital offense of robbery-murder and killing two or more people pursuant to one scheme or course of conduct, those statutory aggravating circumstances were proven beyond a reasonable doubt.").

[133]        In essence, this is exactly what Lee is arguing.  After all, petitioner relies heavily on the fact that the trial judge instructed the jury in the sentencing phase that Lee's conviction in this case "in and of itself is not an aggravating circumstance."  (Doc. 25, at 119-20.)  But this was a state-court instruction on state law, not federal constitutional law.  Thus, petitioner's argument boils down to a contention that Alabama state law does not allow a jury to use the existence of a robbery-murder conviction, by itself, to prove the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery.  The Alabama appellate courts have repeatedly, unequivocally held to the contrary.  That (Continued)

determination on this issue cannot be contrary to clearly established federal law as set forth in *Ring* – and therefore cannot serve as a basis for habeas relief – because the *Ring* Court expressly declined to reach the very issue of whether a statutory aggravating circumstance finding may be implicit in a guilty verdict.  *See Ring*, 536 U.S. at 609 n.7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict.").[134]

Second, petitioner argues that *Ring* was violated when the trial judge independently weighed the aggravating and mitigating circumstances in imposing a sentence of death.  *Ring* expressly refrains from wading into the weighing of aggravating and mitigating circumstances. *See Ring*, 536 U.S. at 597 n.4 (pointing out that the defendant "does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances"). Likewise, the *Ring* opinion is clear that it does not hold that "the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty."  *Id.*  Instead, the *Ring* holding is quite narrow, to-wit:  That the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating factor that is a prerequisite to imposition of the death penalty must be found by a jury.  *Ring* goes no further, and petitioner points to no Supreme Court authority that has extended its holding to embrace the weighing of aggravating and mitigating circumstances.  In the context of its extremely deferential § 2254(d) review, the Court cannot find that Alabama courts' refusal unilaterally to extend *Ring* in this manner amounts to an unreasonable application of clearly established federal law.

---

petitioner disagrees with the Alabama courts' interpretation of Alabama laws concerning the capital sentencing system is not a cognizable basis for § 2254 relief.

[134]    Indeed, in a concurrence joined by Justice Thomas, Justice Scalia wrote that the import of *Ring* was that "[t]hose States that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by ***placing the aggravating-factor determination (where it belongs anyway) in the guilt phase***."  *Ring*, 536 U.S. at 612-13 (emphasis added) (Scalia, J., concurring). It is not an unreasonable interpretation of *Ring* for the Alabama state courts to construe it in this case exactly as Justice Scalia did, namely, as allowing for aggravating-factor determinations by a jury during the guilt phase.

Nonetheless, Lee seizes on the stated principle in *Ring* that "[c]apital defendants … are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589.  In petitioner's view, the weighing of aggravating and mitigating circumstances is no different the finding of a statutory aggravating circumstance for purposes of capital sentencing in Alabama.  This view is incorrect.  Everyone agrees that a finding of a statutory aggravating circumstance is necessary to render an Alabama defendant eligible for the death penalty.  Without it, the inquiry ends and no death sentence can be imposed.  *See* Ala. Code § 13A-5-45(f) ("Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.").  Thus, Lee became eligible for the death penalty when the jury convicted him of a capital offense that has an embedded corresponding statutory aggravating circumstance.  Once that aggravating circumstance was found, the maximum punishment available for Lee was death.  All that remained was the ultimate sentencing determination of whether or not to impose it, based on the weighing of aggravating and mitigating circumstances.

In contrast to a factual finding as to the presence of a statutory aggravator needed to make a defendant death-eligible, Alabama courts have consistently held post-*Ring* (including in Lee's case) that the balance of aggravating circumstances and mitigating circumstances is the sentencing determination itself, not a fact necessary to expose a capital defendant to a sentence of death.  In this view, the weighing process is not a fact finding at all.  While Lee disagrees with this proposition, he does not identify a single federal judicial decision at any level that has interpreted *Ring* as prohibiting judicial weighing of aggravating and mitigating factors.  There is authority to the contrary.[135]  At best, then, it appears that there may be an unsettled question after

---

[135]   One federal district recently observed that "courts have refused to extend the Supreme Court's decisions in *Apprendi* and *Ring* to require a jury recommending capital punishment to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt."  *Higgs v. United States*, 711 F. Supp.2d 479, 539 (D. Md. 2010).  "Whether the aggravating factors presented by the prosecution outweigh the mitigating factors presented by the defense is a *normative* question rather than a *factual* one."  *Id.* at 540.  Similarly, the First Circuit Court of Appeals unequivocally rejected the notion (trumpeted by Lee here) "that the weighing of aggravating and mitigating factors is a *fact*.  This assumption is incorrect.  As other courts have recognized, the requisite weighing constitutes a process, not a fact to be found."  *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007).  These cases and their ilk compel the conclusion that federal law is not clearly established in a manner that undermines the Alabama (Continued)

*Ring* as to whether and to what extent its holding might reach the weighing of aggravating and mitigating circumstances. That Alabama courts have resolved such an open question by interpreting *Ring* in a manner unfavorable to petitioner is not a valid basis for granting federal habeas relief to him on this claim. *See, e.g., Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. … [T]he deference due is heavy and purposely presents a daunting standard for a habeas petitioner to clear.").[136]

Third, Lee takes the trial judge to task for conducting a separate sentencing hearing, at which he received and considered additional evidence. The § 2254 Petition lambasts the trial judge for hearing from witnesses not presented to the jury, for considering a presentence report not presented to the jury, for knowing facts concerning inadmissible evidence not heard by the jury, and so on.[137] But petitioner does not articulate any manner in which the trial judge's

---

Court of Criminal Appeals' decision on the *Ring* issue here, as needed for Lee to obtain relief pursuant to § 2254(d).

[136]     Indeed, the Alabama line of authorities declaring that *Ring* does not require a jury to weigh aggravating and mitigating circumstances is rooted in Eleventh Circuit precedent holding that "aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer's discretion in a structured way after guilt has been fixed. … While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard …, the relative *weight* is not." *Ex parte Waldrop*, 859 So.2d 1181, 1189-90 (Ala. 2002) (quoting *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983)). *Ford* has never been overruled or even criticized within the Eleventh Circuit. As such, the Court cannot accept petitioner's argument that a line of Alabama cases predicated on *Ford* is contrary to, or an unreasonable application of, clearly established federal law.

[137]     On this point, the § 2254 Petition is a jumbled grab-bag of accusations and assertions, devoid of any legal or analytical framework, or even a bare allegation as to how petitioner believes them to be constitutionally impermissible. For example, petitioner goes out of his way to impugn the trial judge's ethics, writing that "the judge did not recuse himself even though he knew the victims, had heard inadmissible evidence, and had stood for election against the attorney representing Lee." (Doc. 1, Ground 10, ¶ 9.) Petitioner has raised no constitutional challenge of judicial bias based on the trial judge's failure to recuse himself as a separate ground in his § 2254 Petition, supported by facts and authorities as appropriate. In any event, during the Rule 32 proceedings, the Alabama Court of Criminal Appeals correctly allayed any such ethical concerns over the trial judge's involvement. *See Lee v. State of Alabama*, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009) ("The Canons do not require a judge to recuse himself or herself when (Continued)

-119-

proceeding in this fashion was violative of Alabama sentencing law, much less federal constitutional law as might give rise to a viable habeas claim.  By all appearances, the trial judge conducted sentencing in the very manner required by Alabama Code §§ 13A-5-45 through -47.  No constitutional infirmity having been identified or being perceptible with respect to any of his actions in this regard, the Court will not grant § 2254 relief on this basis.[138]

### K.   Method of Execution is Cruel and Unusual Punishment.

As his final substantive assignment of error, petitioner maintains that Alabama's method of execution violates the Eighth Amendment's ban on cruel and unusual punishment because it "exposes capital defendants to substantial risk of severe pain, is inconsistent with evolving standards of decency, and is therefore unconstitutional."  (Doc. 1, Ground XI, at ¶ 1.)

---

the judge knows a victim.  If this were true judges in small rural communities would seldom, if ever, be qualified to preside over a criminal case. … Also, a trial judge is not required to recuse himself or herself because the judge is privy to information not in possession of the jury. … Moreover, a judge is not disqualified to preside over a case where one of the attorneys unsuccessfully ran against the judge in a previous judicial election.").  Petitioner's baseless, hollow accusations of bias on the part of the sentencing judge are misplaced, and do not strengthen his § 2254 Petition.

[138]    In complaining about how the trial judge handled the sentencing hearing, Lee accuses him of "effectively add[ing] a non-statutory aggravating factor: proportionality with other defendants given the death penalty for robbery-murder."  (Doc. 25, at 124.)  This characterization is inaccurate.  To be sure, in his Amended Sentencing Order, the trial judge wrote the following: "The Court has considered the facts of this case and the actions of the Defendant and compared them to similar cases.  The sentence is proportionate to sentences given in other murder during robbery capital murder convictions in this County, this Circuit and this State."  (Vol. 22, R-75 at 2.)  Far from adding a "non-statutory aggravating factor," as petitioner alleges, the trial judge was actually attempting to satisfy Alabama's express statutory requirement that reviewing courts examine death sentences for proportionality.  *See* Ala. Code § 13A-5-53(b)(3) (in determining whether death was proper sentence, Alabama appellate courts determine "[w]hether the sentence of death is excessive or disportionate to the penalty imposed in similar cases, considering both the crime and the defendant").  In any event, the Alabama Court of Criminal Appeals emphatically agreed with the trial judge's proportionality assessment, writing on direct appeal that "[t]he appellant committed murder during the course of a robbery and killed two people pursuant to one scheme or course of conduct.  Similar crimes are being punished by death throughout this state. … Therefore, we find that the sentence was neither disproportionate nor excessive."  *Lee*, 898 So.2d at 874.

In response, the State correctly points out that this claim for relief is not cognizable in a habeas petition, but instead must be pursued in the context of a § 1983 civil rights cause of action.  The Eleventh Circuit has expressly stated that "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures."  *Tompkins v. Secretary, Dep't of Corrections*, 557 F.3d 1257, 1261 (11ᵗʰ Cir. 2009).[139]  Petitioner counters that this statement in *Tompkins* was *dicta* in a distinguishable case, and therefore should not be followed.  In so arguing, however, petitioner glosses over the considerable body of law that has developed in Eleventh Circuit in recent years concerning the interplay between § 2254 petitions and § 1983 complaints.  The law of this Circuit leaves no doubt that a § 2254 petition for habeas corpus and a § 1983 complaint "are mutually exclusive: if a claim can be raised in a federal habeas petition, the same claim cannot be raised in a separate § 1983 civil rights action."  *Hutcherson v. Riley*, 468 F.3d 750, 754 (11ᵗʰ Cir. 2006) (citation omitted); *see also Miller v. Nix*, 2009 WL 2959684, *1 (11ᵗʰ Cir. Sept. 17, 2009) ("Because habeas and civil rights actions are mutually exclusive, … the district court did not err by determining that Miller's claims cannot be brought in a petition for a writ of habeas corpus.").  The Eleventh Circuit routinely recognizes method-of-execution claims as being proper in the § 1983 context.  *See, e.g., DeYoung v. Owens*, 646 F.3d 1319, 1325-27 (11ᵗʰ Cir. 2011) (considering on the merits death row inmate's Eighth Amendment challenge under § 1983 to the method of execution).  If § 2254 and § 1983 are "mutually exclusive" remedies, and if method-of-execution challenges are properly raised in § 1983 actions, then logic dictates that they cannot be presented in the form of a § 2254 Petition, as Lee has done here.

More generally, petitioner's crabbed argument overlooks the overarching principle that "[f]ederal habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration

---

[139]    *See also Rachal v. Quarterman*, 2008 WL 410696, *4 (5ᵗʰ Cir. Feb. 14, 2008) ("Claims challenging the method of execution cannot be raised in a habeas proceeding because they do not concern the fact or duration of a sentence. … This challenge sounds in civil rights, not habeas."); *Lucas v. Upton*, 2011 WL 4526754, *5 (M.D. Ga. Sept. 28, 2011) ("A habeas action is not the appropriate vehicle for attacking Georgia's lethal injection procedures; rather, that challenge must be brought in a 42 U.S.C. § 1983 action."); *Rhodes v. Secretary, Dep't of Corrections*, 2010 WL 3819358, *57 (M.D. Fla. Sept. 30, 2010) (Eighth Amendment challenge to method of execution "properly can be brought only under 42 U.S.C. § 1983 and the Prison Litigation Reform Act, not in this habeas proceeding") (citation omitted); *Hertz v. McNeil*, 2009 WL 3161813, *35 (N.D. Fla. Sept. 25, 2009) (similar).

of physical imprisonment and to obtain immediate or speedier release." *Valle v. Secretary, Florida Dep't of Corrections*, 654 F.3d 1266, 1267 (11th Cir. 2011). By contrast, "[w]hen an inmate challenges the circumstances of his confinement but not the validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under § 1983." *Hutcherson*, 468 F.3d at 754. In challenging Alabama's method of execution (and arguing that such a method bears an unreasonable risk of causing him severe pain), Lee is not attacking the fact or duration of his physical imprisonment by the State of Alabama, and is not requesting immediate or speedier release. Rather, he is challenging the means by which the State means to execute him, which is plainly a circumstance of his confinement. As such, under both *Tompkins* and the *Hutcherson* line of authorities, Lee may bring his Eighth Amendment challenge to Alabama's method of execution only in a § 1983 complaint. Because a habeas corpus petition is an improper vehicle for pursuing such a claim, this ground for relief is **denied**.

> ### L. *Cumulative Errors.*

Petitioner's twelfth and final ground for habeas relief is that "[t]he cumulative effect of the errors affecting Mr. Lee's conviction and sentence requires reversal." (Doc. 1, at 131.)

"Even where individual judicial errors or prosecutorial misconduct may not be sufficient to warrant reversal alone, we may consider the cumulative effects of errors to determine if the defendant has been denied a fair trial." *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009) (citation omitted); *see also United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995) ("[T]he cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible."). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error – courts look to see whether the defendant's substantial rights were affected." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (citation omitted).

After careful review of this matter in its entirety, including each assignment of error identified by petitioner, the Court finds that the cumulative effect of any such errors was not prejudicial, and that Lee received a fair trial as was his due under the United States Constitution.

The Alabama Court of Criminal Appeals concluded as much on Rule 32 post-conviction review. *See Lee*, 45 So.3d at 1175. This Court agrees.

## IV.     Evidentiary Hearing.

Petitioner has requested an evidentiary hearing on his claims. The Supreme Court recently explained that "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Cullen v. Pinholster*, --- U.S. ----, 131 S.Ct. 1388, 1401 (2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Chavez v. Secretary Florida Dep't of Corrections*, 647 F.3d 1057, 1060 (11th Cir. 2011) (citation omitted). "That means that if a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." *Id.*; *see also Valle v. Secretary for Dep't of Corrections*, 459 F.3d 1206, 1216 (11th Cir. 2006) ("in order to obtain an evidentiary hearing, Valle must demonstrate that his factual allegations, if proven, would indicate that the state courts acted contrary to, or unreasonably applied, clearly established federal law").

Here, the Court has accepted petitioner's well-pleaded factual allegations in his § 2254 Petition as accurate. Even assuming those facts to be true, however, the undersigned has concluded that Lee is not entitled to federal habeas relief. Inasmuch as it is clear that an evidentiary hearing would not affect the resolution of Lee's claims, and in light of the strong AEDPA policy discouraging the submission of new evidence to federal courts in habeas proceedings, the undersigned exercises its discretion to deny petitioner's request for evidentiary hearing.

## V.     Conclusion.

For all of the foregoing reasons, Lee's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by Person in State Custody under Death Sentence (doc. 1) is **denied** in its entirety. A separate judgment will enter.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts,[140] the Court **grants** a Certificate of Appealability to Lee on the following issues, but no others: (i) whether the State utilized peremptory challenges in this case in a manner that violated *Batson v. Kentucky*; (ii) whether petitioner received ineffective assistance of counsel with respect to the investigation of mitigation evidence; and (iii) whether the trial judge's sentence violated *Ring v. Arizona*. As to all other claims, grounds, and issues presented, any request for COA is **denied** because Lee has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

DONE and ORDERED this 30th day of May, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[140]    That Rule provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *Id.*